# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

|  |  |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>**v.**<br><br>**EDWARD CONSTANTINESCU,**<br>**PERRY "PJ" MATLOCK,**<br>**JOHN RYBARCZYK,**<br>**GARY DEEL,**<br>**STEFAN HRVATIN,**<br>**TOM COOPERMAN,**<br>**MITCHELL HENNESSEY,**<br>**DANIEL KNIGHT.** | **No. 4:22-CR-00612-S** |

## DEFENDANT EDWARD CONSTANTINESCU'S JOINT[1] MOTION TO DISMISS

---

[1] The arguments in this Motion are approved and adopted by the following Defendants, who join as to Count 1 and to the extent these arguments apply to their respective securities fraud counts: Stefan Hrvatin (Counts 14, 15); Tom Cooperman (Counts 10, 12, 16, 17, 19), Perry "PJ" Matlock (Counts 3, 4, 5, 7, 10, 11), and Gary Deel (Counts 3, 5, 10, 11, 12, 16, 17).

TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................ 1

STATEMENT OF FACTS ............................................................................................... 4

ARGUMENT .................................................................................................................. 8

    I.    LEGAL STANDARDS. ...................................................................................... 8

        A.  <u>Failure to State an Offense</u> ........................................................................ 8

        B.  <u>Due Process and Vagueness Doctrine</u> ....................................................... 9

        C.  <u>As-Applied Vagueness Challenges</u> ........................................................... 10

   II.   THE INDICTMENT FAILS TO STATE A § 1348 SECURITIES FRAUD OFFENSE AGAINST CONSTANTINESCU BECAUSE CONSTANTINESCU'S TWEETS DO NOT CONTAIN ANY "FALSE" STATEMENTS AS A MATTER OF LAW .............. 11

  III.  THIS PROSECUTION OF CONSTANTINESCU, PREMISED ON THE GOVERNMENT'S NOVEL APPLICATION OF § 1348 AND § 1349, VIOLATES THE CONSTITUTIONAL COMMAND THAT A PERSON MUST HAVE FAIR WARNING THAT THEIR CONDUCT FALLS WITHIN THE SCOPE OF THOSE STATUTES .. 13

        A.  <u>The Securities laws and regulations cover the conduct alleged in the Indictment</u> .............. 14

        B.  <u>The five § 1348 counts against Constantinescu, as alleged in the Indictment, violate the fair warning requirement because (i) the government's novel construction of the statute has never been applied by courts and (ii) Constantinescu's alleged conduct falls outside the scope of established securities laws which already regulate the sale of securities</u> .................................................................... 18

           1.  *The government's theory with respect to the requisite "falsity" under § 1348 is unprecedented and has never been applied by courts in a manner that would have provided fair warning of the government's proposed application of the statute here* ............................................................................................ 18

           2.  *The existing securities laws that establish limitations on the sale of a security after an individual provides advice on that security do not apply to Constantinescu* .... 20

           3.  *Remaining securities laws do not provide notice that Constantinescu was restricted from selling shares after speculating about their price or tweeting his intent to hold them* .................................................................................. 21

C.   The Indictment violates due process because the Defendants did not have fair warning that their lawful conduct could give rise to criminal liability under 18 U.S.C. § 1349 for conspiracy to commit securities fraud ................................................................... 23

CONCLUSION ........................................................................................................................... 28

TABLE OF AUTHORITIES

*Chiarella v. United States*,
  100 S. Ct. 1108 (1980).............................................................................................24

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) .................................................................................................14

*Connally v. General Constr. Co.*,
  269 U.S. 385 (1926) ...............................................................................................10

*Corenco Corp. v. Schiavone & Sons, Inc.*,
  488 F.2d 207 (2d Cir. 1973) ...................................................................................18

*Donaldson v. Severn Sav. Bank, F.S.B.*,
  No. CV JKB-15-901, 2015 WL 7294362 (D. Md. Nov. 18, 2015).........................21

*Grayned v. City of Rockford*,
  408 U.S. 104 (1972) ...............................................................................................11

*Heinze v. Tesco Corp.*,
  971 F.3d 475 (5th Cir. 2020) ..................................................................................13

*In re Living Benefits Asset Mgmt., L.L.C.*,
  916 F.3d 528 (5th Cir. 2019) ..................................................................................20

*In re Winship*,
  397 U.S. 358 (1970) .................................................................................................9

*Kolender v. Lawson*,
  461 U.S. 352 (1983) ...............................................................................................10

*Marinello v. United States*,
  138 S. Ct. 1101 (2018).............................................................................................14

*Maynard v. Cartwright*,
  486 U.S. 356 (1988) ...............................................................................................11

*McBoyle v. United States*,
  283 U.S. 25 (1931) .................................................................................................14

*Microbot Med., Inc. v. Mona*,
  No. 19CIV3782GBDRWL, 2021 WL 1192110 (S.D.N.Y. Mar. 30, 2021)............22

*Morales v. Quintel Ent., Inc.*,
  249 F.3d 115 (2d Cir. 2001) ...................................................................................18

*Motient Corp. v. Dondero*,
  2006 WL 8437595, (N.D. Tex. Aug. 7, 2006) *aff'd in part, remanded in part*, 529 F.3d 532
  (5th Cir. 2008) ......................................................................................................................... 18

*Plaisance v. Schiller*,
  2019 WL 1205628 (S.D. Tex. Mar. 14, 2019) ........................................................................ 24

*Rubenstein v. Collins*,
  20 F.3d 160 (5th Cir. 1994) .................................................................................................... 13

*Rubenstein v. International Value Advisers, LLC*,
  959 F.3d 541 (2d. Cir. 2020) .................................................................................................. 21

*SEC v. E. Delta Res. Corp.*,
  2011 WL 13305345 (E.D.N.Y. Mar. 22, 2011) ...................................................................... 15

*SEC v. Gallagher*,
  21 CV 8739 ¶ 41 (S.D.N.Y.) .................................................................................................. 19

*SEC v. Life Partners Hldgs., Inc.*,
  41 F. Supp. 3d 550 (W.D. Tex. 2013) .................................................................................... 13

*Transcon Lines v. A.G. Becker Inc.*,
  470 F. Supp. 356 (S.D.N.Y. 1979) ......................................................................................... 18

*United States v. Bass*,
  92 S. Ct. 515 (1971) ................................................................................................................ 23

*United States v. Campbell*,
  64 F.3d 967 (5th Cir. 1995) .............................................................................................. 12, 23

*United States v. Castro*,
  704 F.3d 125 (3d Cir. 2013) ................................................................................................ 9, 12

*United States v. Crow*,
  164 F.3d 229 (5th Cir.1999) ..................................................................................................... 9

*United States v. Dikshit*,
  2022 WL 13835072 (S.D.N.Y. Oct. 20, 2022) ...................................................................... 19

*United States v. Flores*,
  404 F.3d 320 (5th Cir. 2005) .................................................................................................... 9

*United States v. Fontenot*,
  665 F.3d 640 (5th Cir. 2011) ................................................................................9, 13

*United States v. Gallagher*,
  No. 1:22-cr-122 (S.D.N.Y. July 6, 2022) ..................................................................19

*United States v. Harra*,
  985 F.3d 196 (3d Cir. 2021) ............................................................2, 9, 11, 13, 27

*United States v. Hendricks*,
  116 F.3d 1476, 1997 WL 304169 (5th Cir. 1997) .............................................4, 23

*United States v. Hussain*,
  972 F.3d 1138 (9th Cir. 2020) ..................................................................................19

*United States v. Lanier*,
  477 U.S. 242 (1986) .........................................................................................9, 10, 14

*United States v. Matthews*,
  31 Fed. App'x. 838, 2002 WL 261421 (5th Cir. 2002) ...........................................12

*United States v. Medeles*,
  916 F.2d 195 (5th Cir. 1990) ....................................................................................11

*United States v. Nadi*,
  996 F.2d 548 (2d Cir.1993) .......................................................................................11

*United States v. Radley*,
  659 F. Supp. 2d 803, 816 (S.D. Tex. 2009) *aff'd* 632 F.3d 177 (5th Cir. 2011) .......................16

*United States v. Ryan*,
  580 F. Supp. 3d 359 (E.D. La. 2022).........................................................................12

*United States v. Safavian*,
  528 F.3d 957 (D.C. Cir. 2008)...................................................................................27

*United States v. Schneiderman*,
  968 F.2d 1564 (2d Cir.1992) .....................................................................................11

*United States v. Simpson*,
  741 F.3d 539 (5th Cir. 2014) ....................................................................................23

*United States v. White Eagle*,
  721 F.3d 1108 (9th Cir. 2013) ............................................................................14, 24

*Williams v. United States*,
    458 U.S. 279 (1982) ................................................................ 11

*Wooden v. United States*,
    142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring) ..................... 10, 23

Statutes and Rules:

15 U.S.C. § 77 et seq .................................................................. 15

15 U.S.C. § 78 et seq .................................................................. 15

15 U.S.C. § 78i ............................................................... 15, 19, 25

15 U.S.C. § 78i(a)(2) ............................................................... 16, 17

15 U.S.C. § 78i(a)(6) ............................................................... 16, 17

15 U.S.C. § 78i(d) ................................................................. 16, 17

15 U.S.C. § 78m(d)(1) ................................................................ 17

15 U.S.C. § 78m(d)(3) ............................................................. 17, 25

15 U.S.C. § 78m(g) .................................................................. 17

15 U.S.C. § 78p(b) ............................................................... 16, 21

15 U.S.C. § 80b-2(11) ............................................................ 17, 20

15 U.S.C. § 80b-6 ................................................................... 17

15 U.S.C. § 80b-6(3) ............................................................. 17, 20

15 U.S.C. § 80 et seq ................................................................ 15

17 C.F.R. § 240.10b5-1 ........................................................... 16, 22

17 C.F.R. § 240.13d-1 ............................................................ 17, 25

18 U.S.C. 1348 .......................................................... 1, 3, 4, 8, 11, 13

18 U.S.C. § 1349 ............................................................... 4, 7, 23

18 U.S.C. 1957 ..................................................................... 4

18 U.S.C. § 1001(a)(1) .................................................................................14, 27

26 U.S.C. § 7212(a) ..........................................................................................14

Federal Rule of Criminal Procedure 12(b)(3)......................................................1

Federal Rule of Criminal Procedure 12(b)(3)(B)(v)............................................9

Defendant Edward Constantinescu ("Constantinescu") respectfully submits this memorandum of law in support of his motion to dismiss counts 1, 2, 14, 15, 18, and 20 pursuant to Federal Rule of Criminal Procedure 12(b)(3).

## PRELIMINARY STATEMENT

The Indictment of Constantinescu must be dismissed in its entirety. The government brings seven counts against him: a single count of conspiracy to commit securities fraud, five counts of securities fraud, and a single count of money laundering.[2] The government's theory is that Constantinescu committed securities fraud by engaging in a "scheme to 'pump and dump'"[3] the stock of five public companies and conspired to commit another 402 "pump and dumps" with "other individuals, known and unknown," including the seven other Defendants named in the Indictment. According to the government, Constantinescu and others engaged in these "pump and dumps" through a three-step scheme: "(1) purchasing shares of a security in their accounts," (2) posting "false" information about these securities on Twitter and the Atlas Trading Discord chatroom, and (3) "secretly" selling or "concealing their intent to sell" those securities. The government's theory fails as a matter of law and, thus, *cannot and should not* proceed to a jury.

It fails for two independent but related reasons. First, the five securities fraud counts against Constantinescu fail to state an offense, because the government has not adequately alleged an essential element of § 1348 securities fraud: namely, that any of the 21 tweets by Constantinescu quoted in the Indictment were "false." The 21 tweets attributed to Constantinescu in the Indictment

---

[2] Constantinescu previously moved to dismiss the money laundering count (Count 21) [ECF 170], which is *sub judice*.
[3] "Pump and dump" schemes are typically characterized by the dissemination of fake "inside" information about a company. Specifically, promoters of the stock "will claim to have inside information about an imminent development that will lead to a dramatic upswing in the share's price." *Investor Protection Guide: Micro-cap Stock Fraud ("Pump and Dump"),* Legal Information Institute, Cornell U Law School, https://www.law.cornell.edu/wex/investor_protection_guide_microcap_stock_fraud_%28%22pump_and_dump%22 %29; Dhir, Rajeev, *Pump-and-Dump: Definition, How the Scheme is Illegal, and Types*, Investopedia.com, Jan. 13, 2022, https://www.investopedia.com/terms/p/pumpanddump.asp.

all fall into two categories: (1) speculations about the future price of a public company's non-restricted stock or (2) speculations about Constantinescu's intent to hold (or not sell) a security. The government's theory is that these statements were "false" based *solely* on Constantinescu's *subjective beliefs*, that is, he never believed the stock would reach the speculated price or he never intended to hold (or not sell) the security. The government intends to ask the jury to infer falsity of the 21 tweets based *solely* on Constantinescu's subsequent sales of the securities, which it suggests creates the inference that Constantinescu never believed that the share price would reach that value and never intended to hold the shares.

But the law does not recognize criminal charges on such a theory and due process does not permit it. Rather, "the falsity element stand[s] independent of a defendant's subjective intent," requiring the government to "prove beyond a reasonable doubt that the statement was objectively false." *United States v. Harra*, 985 F. 3d 196, 211–12 (3d Cir. 2021). In other words, the government must allege falsity based on some *objective indicia of falsity*. None of the 21 tweets cited in the Indictment can be deemed "objectively false," since they were merely price predictions and statements of future intent without any objective indicia alleged suggesting their falsity.

Even if the government could stand on "subjective" belief alone, it has failed to allege any facts suggesting Constantinescu did not believe what he said at the time he said it. The government may not rely on Constantinescu's sales after his tweets as proof he did not believe what he said for a few simple reasons: nothing in the securities laws prohibited him from changing his mind, nothing in the securities laws restricted him from selling after making these forward-looking statements, and nothing in the securities laws required him to disclose these sales.

Permitting a jury to infer "falsity" in this manner would create novel and unworkable restrictions on the transfer of securities that are contrary to existing securities laws. After tweeting

a price prediction, is an individual (who is indisputably not an investment adviser) barred from disposing of that security if and until the security reaches that price?  How long must an individual wait to dispose of shares after tweeting an intent to hold them?  Hours?  Days?  Months?  Years?  Must an individual disclose his intent to sell prior to selling shares (or sometime after)?  Does he have to tweet it?  Or can he merely file on the SEC's EDGAR web platform 10 days after the sale?  Does he have to file even though he never exceeded 5% ownership of the company's existing shares?

These questions reveal the precise flaw in the Indictment against Constantinescu: the Constitution's fair warning requirement and its intolerance of vagueness in the application of criminal statutes mandates dismissal of the § 1348 (securities fraud) and § 1349 (conspiracy to commit securities fraud) counts.  The laws, regulations, and guidance that regulate the securities industry already provide a comprehensive scheme setting forth the rights, duties, and obligations governing the types of conduct alleged in the Indictment.  Yet none of these laws, regulations, or guidance prohibit any of the conduct alleged here nor recognize the government's "cutting edge" conspiracy theory.[4]  The fact is, even if one accepts the allegations in the Indictment as true, Constantinescu's actions were not unlawful.  What the Indictment alleges is not a crime: a non-insider, non-investment adviser who holds less than 5% of the outstanding shares of a company tweeting price predictions for shares of public companies and selling them before the share reaches that price.

---

[4] At the press conference announcing Constantinescu's Indictment, U.S. Attorney for the Southern District of Texas Alamdar S. Hamdani publicly pronounced: "As some use advances in technology and social media to prey upon the public, our office will be on the *cutting edge* of prosecuting this area of fraud."  *Eight Men Indicted for $114 Million Securities Fraud Scheme Orchestrated Through Social Media*, U.S. DEPARTMENT OF JUSTICE, Office of Public Affairs (Dec. 12, 2022), https://www.justice.gov/opa/pr/eight-men-indicted-114-million-securities-fraud-scheme-orchestrated-through-social-media (emphasis added).

The conspiracy charge fails for the same reason.  The Fifth Circuit has made clear a conspiracy charge cannot stand where a defendant "acted within the perimeters of his legal rights." *United States v. Hendricks*, 116 F.3d 1476, 1997 WL 304169, at *4 (5th Cir. 1997).  The Defendants had no notice that their lawful actions could give rise to criminal liability: (i) making *bona fide* market purchases of non-restricted securities at prevailing market prices; (ii) recommending and encouraging others to buy those securities; (iii) speculating about the price those securities might reach; (iv) sharing truthful information about the companies on social media;[5] and (v) making *bona fide* sales of those non-restricted securities at prevailing market rates without disclosing the sales. These are all *lawful* routine activities in the securities industry engaged in daily by millions of market participants in paid and unpaid chatrooms and on social media.  There is nothing nefarious about it.  And nothing in the securities laws prevented these individuals from building a community around their shared passion for day-trading, teaching and sharing with others their ideas on social media, and showing off their successes.

## STATEMENT OF FACTS

The Indictment charges Constantinescu with the following offenses:

a.   One count of conspiracy to commit securities fraud (18 U.S.C. § 1349), along with seven other defendants;

b.   Five counts of securities fraud (18 U.S.C §§ 1348 & 2), in connection with 5 identified securities;

c.   One count of engaging in monetary transactions in property derived from specified unlawful activity (18 U.S.C. § 1957).

---

[5] While the Indictment alleges the Defendants posted "due diligence" about some securities it does not allege this "due diligence" was "false" nor does it provide any examples of "false" "due diligence."

Each of the five counts of securities fraud for which Constantinescu is charged are predicated on the government's allegation that he made "false" statements in posts on Twitter.  The government alleges the following scheme based on purportedly false tweets: First, Constantinescu purchased shares through *bona fide* market transactions at prevailing market rates.  Next, he posted "false" "price target[s]" and "falsely" expressed an intent to hold shares rather than sell them.  Lastly, he sold the shares sometime after the tweets in *bona fide* market transactions without disclosing his sales.  The Indictment identifies the following 21 tweets by Constantinescu, all of which the government alleges are "false":

*Re: CEI (Camber Energy, Inc.)*

1. "CEI is going to 10 . . ." (¶ 98),
2. "$CEI is a $10 stock all day long" (¶ 98),
3. "OIL going to $100 $CEI going to $10" (¶ 98),
4. "$CEI 10+" (along with a link to a tweet of a Reuters.com news article describing how the price of oil would rise to "100+ in Winter months") (¶ 99),

*Re: DATS (DatChat, Inc.)*

5. "$DATS I want $30+ with all the upcoming catalysts" (¶ 106),
6. "$DATS We're early and shorts are trying hard. We'll squeeze that seeking alpha hoe. He's short. See you at over $30 b*tches." (along with a photo of upcoming milestone of DATS through Q4 2021") (¶ 106),
7. "$DATS $30+ maybe $50 or $100" (¶ 106),
8. "$DATS has nothing to do with CEI. The scam paid room was grouping them together. We're going to $10 $20 $30 maybe $50. Sick app and only 12 million float with lots of catalysts on the way" (¶ 106),
9. "$DATS See you on Mars[,]" (¶ 107),
10. "$DATS I'm holding shares LT [long term]. I could careless of [sic] a short report comes out. I'll gobble up the dip and f them." (¶ 107),
11. "$DATS Let's do a short report at the bottom. Lol idiots squeeze these hoes. $DATS $30++." (¶ 107),

*Re: BBI (Brickell Biotech, Inc.)*

12. "added big on the dip" (¶ 112),

13. "$BBI 1-2 week hold for me. Looking for .50–$1" (¶ 113),

14. "$BBI .33 is my add zone" (¶ 113),

15. "$BBI I'm pumping while it's still cheap. Don't tag me when you chased over .50 [cents per share.]" (¶ 113),

16. "$BBI dips for my crips. We're going over .50 and higher. We got catalysts baby . . . ." (¶ 113),

17. "$BBI to $1" (¶ 113),

18. "still fully in $BBI" (¶ 113),

19. "$BBI It's going past .50 I feel it in my heart" (¶ 114),

20. "$BBI Bullish!!!!!!" (¶ 114),

21. "$BBI You're going to feel so stupid when this hits .50+" (¶ 115).

*Re: ONTX (Onconova Therapeutics, Inc.)*

22. The Indictment does not include any general allegations with respect to ONTX, nor descriptions of any tweets, retweets, or statements by Constantinescu regarding ONTX.

*Re: MYSZ (My Size, Inc.)*

23. The Indictment does not include any general allegations with respect to MYSZ, nor descriptions of any tweets, retweets, or statements by Constantinescu regarding MYSZ.

Each of the above-mentioned alleged tweets is introduced in the Indictment with emphasis that the statement is "false." With respect to these allegations, Constantinescu requested, pursuant to a letter addressed to the government on February 16, 2023, particulars regarding his allegedly "false" statements. When the government refused, Constantinescu filed a Motion for Bill of Particulars and Grand Jury Transcripts on March 24, 2023, seeking an explanation as to *how* the alleged statements by Constantinescu quoted in the Indictment are "false." [ECF 219]. In its Response, the government emphasized its "general description" of the sort of "false, positive information about the security" Constantinescu had posted:

> **the defendants' position in the security, how long the defendants intended to hold the security, the defendants' view that the security would increase in price, and the price the security could reach …**

[ECF 234 at 2] (emphasis original).  According to the government, "the bolded sections in the passage above provide general explanation of the types of false statements at issue in this case and general *description of why and how many statements were false or misleading*."  [ECF 234 at 2] (emphasis added).  And the government suggested that the quoted tweets attributed to Constantinescu in the Indictment constitute "copious instances of particular examples of false and misleading statements falling under those general descriptions." [ECF 234 at 2].  The government made clear that "*the Defendants' trading activity* … demonstrates that they in fact did not believe what they said publicly or were not trading as they represented publicly."  [ECF 234 at 5–6] (emphasis added).

At the hearing on Constantinescu's motion for a bill of particulars, the government emphasized that its theory, that Constantinescu "did not believe" what he allegedly tweeted, was based on his *subsequent* trading activity.  For example, the government argued:

> And so what does Mr. Constantinescu start doing seven minutes after posting: "See you on Mars," he starts dumping his shares. He sells  80,000,  98,000,  95,000,  30,000,  90,000,  18,000,  30,000, 25,000. **He sells over 466,000 shares of DATS after telling the world: "See you on Mars."** The stock is going to the moon.

(Apr. 12, 2023 Tr. at 21: 8-13) (emphasis added).  It went on to explain that the "See you on Mars" statement is "false" because he "conceal[ed]" his subsequent sale of $DATS shares from "all of his followers." (Tr. at 21: 20-24).[6]

In addition to these counts, the Indictment also charges Constantinescu with a single count of conspiracy to commit securities fraud under 18 U.S.C. § 1349.  To support this count, the government proposes that "the defendants used their social media influence to pump and dump

---

[6] In presenting this argument, the government ignores its own allegations in paragraph ¶ 107(i) of the Indictment that the following day Constantinescu purchased *695,942, approximately $6.3 million, in DATS shares*.

securities for their own financial gain." (Indictment ¶ 12). "To do so," according to the government, "one or more of the defendants first purchased a security, often notifying other defendants of the purchase so that they, too, could 'load' and buy the security." (*Id*. at ¶ 13). It continues, "After purchasing or 'loading' the security, one or more of the defendants sought to 'pump' the price of that security by posting false or misleading information about the security on Twitter and Atlas Trading Discord so that other investors were induced to purchase the security and artificially increase its price." (*Id*.). The government alleges the Defendants sought "to conceal from … their Twitter followers and members of Atlas Trading Discord" their "true trading positions and intentions" and then "secretly sold their own shares" and "concealed their intent to sell." (*Id*. at ¶ 1, 14).

The Indictment does not point to any specific agreement among the Defendants and the "other individuals, known and unknown" but contains allegations that the some of the Defendants discussed in chatrooms, private direct messages, and through tagging and posting on Twitter their positions in certain stocks. Critically, the Indictment does not allege the Defendants all bought, posted about, and sold the same stocks or that they did so at the same time. For example, Constantinescu only tweeted about 5 of the 19 stock tickers referenced in the Indictment during the alleged time of the conspiracy purportedly to pump and dump those stocks. That is, Constantinescu did not make a single tweet about those 14 stocks during the supposed time period of the conspiracy to pump and dump each particular stock, nor does the government allege substantive violations against Constantinescu under § 1348 as to those 14 stock tickers.

## ARGUMENT

## I.   LEGAL STANDARDS

### A.   Failure to State an Offense

An indictment is subject to dismissal for the Government's failure to state an offense. *See* Fed. R. Crim. P. 12(b)(3)(B)(v). "The propriety of granting a motion to dismiss an indictment … by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact … If a question of law is involved, then consideration of the motion is generally proper." *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir. 2005) (internal quotation marks and citations omitted)). "In reviewing a challenge to an indictment alleging that it fails to state an offense, the court is required to take the allegations of the indictment as true and to determine whether an offense has been stated." *Id*. (quoting *United States v. Crow*, 164 F.3d 229, 234 (5th Cir. 1999)).

> B.   <u>Due Process and Vagueness Doctrine</u>

The Fifth Amendment provides that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury … nor be deprived of life, liberty, or property without due process of law … " U.S. CONST. amend. V. "It is a bedrock principle that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *United States v. Harra*, 985 F. 3d 196, 211 (3d Cir. 2021) (quoting *In re Winship*, 397 U.S. 358, 364 (1970)) (alterations omitted). "In the false statement context, because falsity and knowledge are distinct elements, this means the Government must prove a statement was false beyond a reasonable doubt, regardless of the defendant's subjective intent … " *Id*. (citing *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013)).

Due process also requires that "no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States v. Lanier*, 520 U.S.

259, 265 (1997) (internal quotations omitted).  "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (emphasis added) (citations omitted). The Supreme Court has described "three related manifestations of the *fair warning requirement*."  *Lanier*, 520 U.S. at 266 (emphasis added).  "First, the vagueness doctrine bars enforcement of 'a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.'" *Id*. (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)).  "Second, as a sort of 'junior version of the vagueness doctrine' … the canon of strict construction of criminal statutes, or rule of lenity, ensures fair warning by so resolving ambiguity in a criminal statute as to apply it only to conduct clearly covered."  *Id*. (internal citation omitted). In that respect, the rule of lenity serves as "a means for upholding the Constitution's commitments to due process and the separation of powers … " as it "works to enforce the fair notice requirement by ensuring that an individual's liberty always prevails over ambiguous laws."  *Wooden v. United States*, 142 S. Ct. 1063, 1082 (2022) (Gorsuch, J., concurring). Finally, "although clarity at the requisite level may be supplied by judicial gloss on an otherwise uncertain statute … due process bars courts from applying a *novel construction* of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope." *Lanier*, 520 U.S. at 266 (internal citations omitted) (emphasis added).  "In each of these guises, the touchstone is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*.

   C.    <u>As-Applied Vagueness Challenges</u>

"Vagueness challenges to statutes not threatening First Amendment interests are examined in light of the facts of the case at hand; the statute is judged on an as-applied basis." *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988). When faced with an "as-applied" vagueness challenge, a "court must first determine whether the statute 'give[s] the person of ordinary intelligence a reasonable opportunity to know what is prohibited and then consider whether the law 'provide[s] explicit standards for those who apply [it].'" *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir.1993) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), and *United States v. Schneiderman*, 968 F.2d 1564, 1568 (2d Cir.1992)).

## II. THE INDICTMENT FAILS TO STATE A § 1348 SECURITIES FRAUD OFFENSE AGAINST CONSTANTINESCU BECAUSE CONSTANTINESCU'S TWEETS DO NOT CONTAIN ANY "FALSE" STATEMENTS AS A MATTER OF LAW.

The Indictment makes clear—by referring to purportedly "false" statements by the Defendants no less than 100 times in its 44 pages—that its securities fraud charges against Constantinescu rely on § 1348(2)'s requisite "false or fraudulent pretenses, representations, or promises[.]"[7] A statement which makes no factual assertion cannot be characterized as "false" for an offense predicated on false statements or representations. *Williams v. United States*, 458 U.S. 279, 284 (1982); *see also United States v. Medeles*, 916 F.2d 195, 199–200, 202 (5th Cir. 1990) (reversing § 1344 wire fraud conviction because "deposit of a check is not an assertion about the balance in the account," thus the deposit of the insufficient funds checks alone did not constitute "false or fraudulent pretenses, [or] representations"). Additionally, "[d]ue process demands that the falsity element stand independent of a defendant's subjective intent." *Harra*, 985 F. 3d at 211 (vacating § 1348 conviction where trial environment emphasized legally erroneous theories,

---

[7] Ultimately, whether § 1348(1) applies here does not alter the analysis. That the Indictment's description of counts two through twenty does not identify a particular subsection—and simply lists the separate elements of subsection (1) and (2)—does not alter the Government's burden to prove falsity.

including the government's "references to the falsity of Defendants' representations about past due loans"); *see also United States v. Campbell,* 64 F.3d 967, 974 (5th Cir. 1995) (reversing bank fraud and conspiracy to commit bank fraud convictions and finding government required to prove distinct elements that the statement "was false," that is, objective falsity, and that the defendant "knew the statement was false when he made it," that is, subjective falsity).

This means the government must prove beyond a reasonable doubt that a statement was "objectively false," regardless of the defendant's subjective intent.  *Id*. at 211–12 (citing *United States v. Castro*, 704 F.3d 125, 139 (3d Cir. 2013)); *see also United States v. Ryan*, 580 F. Supp. 3d 359, 371 (E.D. La. 2022) (statute requiring proof of false bank entries "applies solely to statements of fact, not opinions").  And as the Fifth Circuit has recognized: "Of course, fraud claims must be based on misrepresentation of material fact, not opinion."  *United States v. Matthews*, 31 Fed. App'x. 838, 2002 WL 261421, at *9 (5th Cir. 2002).

Constantinescu's allegedly "false" tweets fall within two categories: (1) speculations about the future price of stocks and (2) statements of future intent to hold (not sell) a security.  According to the government, the jury may *infer* those tweets were false because Constantinescu's subsequent trading activity suggests that his *subjective intent* rendered his tweets false at the time the statements were made.  For example, the government suggests Constantinescu never believed CEI would reach $10 because he sold his shares for $2.609.[8]  (Indictment ¶ 99).  Similarly, it suggests his tweet that he was "holding shares [of DATS] LT" was false because he closed his position five days later (with respect to the shares held at the time of the tweet).  (Indictment ¶¶ 107–08).  Likewise, it alleges his tweet "$BBI 1-2 week hold for me.  Looking for .50-$1" was false because he closed his position three days later "at an approximate price of $0.331 per share."  (Indictment

---

[8] The government takes this position even though Constantinescu held CEI shares for two months during this time and did **not** sell them even when the stock reached nearly $5 dollars a share.  (Indictment ¶¶ 93, 98–99).

¶¶ 113, 115).  According to the government, these statements are "false" because Constantinescu's subsequent trading activity was inconsistent with his speculation about the stock's future price and statements of future intent to hold the shares.

At the hearing on Constantinescu's motion for bill of particulars, when asked for particulars to clarify why such statements were "false," the government doubled down on its claim that Constantinescu "did not believe" the statements when he said them *as demonstrated solely by subsequent "trading activity."* [ECF 234 at 6].   This theory cannot square with the constitutional command that "the Government must prove a statement was false beyond a reasonable doubt, regardless of the defendant's subjective intent," based on some objective indicia of falsity.  *Harra*, 985 F. 3d at 211; *see also SEC v. Life Partners Hldgs., Inc.*, 41 F. Supp. 3d 550, 560 (W.D. Tex. 2013) (holding that even in civil cases "predictive statements are typically not actionable" absent objective indicia of falsity "when it was made") (citing *Rubenstein v. Collins*, 20 F.3d 160, 166 (5th Cir. 1994) *recognized at superseded by statute in Heinze v. Tesco Corp.*, 971 F. 3d 475, 482 n.2 (5th Cir. 2020)).   The government was required to allege some objective indicia of falsity.   It has not and cannot.  It failed to do so in the Indictment and came forth with no evidence at the bill of particulars hearing.   Because the Indictment's allegations rely *solely* on Constantinescu's purported subjective falsity, it fails to state a § 1348 securities fraud offense as a matter of law and counts 2, 14, 15, 18, and 20 must be dismissed.  *See, e.g.*, *Fontenot*, 665 F.3d 640 (affirming dismissal of indictment where, as a matter of law, defendant did not make a false statement).

III.   **THIS PROSECUTION OF CONSTANTINESCU, PREMISED ON THE GOVERNMENT'S NOVEL APPLICATION OF § 1348 AND § 1349, VIOLATES THE CONSTITUTIONAL COMMAND THAT A PERSON MUST HAVE FAIR WARNING THAT THEIR CONDUCT FALLS WITHIN THE SCOPE OF THOSE STATUTES.**

"Before criminal liability may be imposed for violation of any penal law, due process requires 'fair warning … of what the law intends.'"  *Lanier*, 520 U.S. at 259 (quoting *McBoyle v. United States*, 283 U.S. 25, 27 (1931)).  The touchstone of the "fair warning requirement" is "whether the statute, either standing alone or as construed by the courts, made it reasonably clear at the time of the charged conduct that the conduct was criminal."  *Id*. at 265.  In this same vein, "due process bars courts from applying a *novel construction* of a criminal statute to conduct that neither the statute nor any prior judicial decision has fairly disclosed to be within its scope."  *Id*. at 266 (citations omitted) (emphasis added).[9]

This prosecution, and the government's application of the statutes to the facts as presented in the Indictment, is unprecedented, unanticipated, and unconstitutional under the vagueness doctrine and its fair warning requirement.  Constantinescu had no warning that the conduct alleged in the Indictment could form the predicate criminal charges under §§ 1348 and 1349.  Indeed, the securities laws and regulations already establish the duties, rights, and obligations governing the conduct alleged in the Indictment, yet the facts as alleged in the Indictment make clear that the Defendants, individually and collectively, acted lawfully and in a manner consistent with the securities laws and regulations.

A.  <u>The securities laws and regulations cover the conduct alleged in the Indictment</u>.[10]

---

[9] *See, e.g., Marinello v. United States*, 138 S. Ct. 1101, 1108 (2018) (finding 26 U.S.C. § 7212(a) Omnibus Clause of Internal Revenue Code did not provide fair notice that defendant's seemingly innocuous conduct would have led him to believe he could "fac[e] a potential felony prosecution of tax obstruction."); *United States v. White Eagle*, 721 F.3d 1108, 1118 (9th Cir. 2013) (reversing 18 U.S.C. § 1001(a)(1) conviction when regulation purportedly creating duty to disclose did not "provide specifics on what kind of information should be reported and to whom."); *City of Chicago v. Morales*, 527 U.S. 41, 41 (1999) (plurality) (finding Chicago ordinance criminalizing loitering unconstitutional because it "violate[d] due process in that it [was] impermissibly vague on its face and an arbitrary restriction on personal liberties" due to the fact that it gave "officers absolute discretion to determine what activities constitute[d] loitering.").

[10] Under 18 U.S.C. § 1348, the alleged "scheme or artifice" must be either "in connection with" (subsection (1)) or "in connection with the purchase or sale of" (subsection (2)) "any security of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l)."  18 U.S.C. § 1348.  Because the statute seeks only to penalize conduct in relation to Section 12 registered securities, securities laws and SEC rules and guidance on securities registered under Section 12 are critical to understanding potential restrictions placed on the Defendants' transfer of securities and any disclosure requirements.

14

For nearly a century, the securities industry has been governed by established laws and regulations that dictate the rights, duties, and obligations of investors with respect to the transfer of securities as well as concomitant disclosures requirements.  Starting with the Securities Act of 1933 (the "Securities Act") (15 U.S.C. § 77 *et seq.*) and the Securities and Exchange Act of 1934 (the "Exchange Act") (15 U.S.C. § 78 *et seq.*), Congress established laws with a two-fold stated purpose: to protect investors and to maintain the integrity of the market.  The Securities Act established formal registration requirements while the Exchange Act established the Securities and Exchange Commission ("SEC"), empowering it with "broad authority over all aspects of the securities industry," including enforcement authority with respect to prohibited conduct in the market.[11]  Along with its enforcement powers under the Exchange Act, the SEC also has the authority to establish its own regulations through the Code of Federal Regulations (C.F.R.).  And, as another tool for protecting investors, Congress enacted the Investment Advisers Act of 1940 ("IAA") (15 U.S.C. § 80 *et seq.*), which requires "firms or sole practitioners *compensated* for advising others about securities investments [to] register with the SEC and conform to regulations designed to protect investors."[12]

***Limitations on the transfer of securities:***

In these established laws and regulations exist enumerated limitations on the transfer of securities in certain circumstances.  For example, 15 U.S.C. § 78i prohibits certain forms of market manipulation effected through "transactions relating to the purchase or sale of securities," including manipulation through wash trading, the entry of fraudulent orders, or entering orders to affect the value of a security without intent to execute the order.  *See, e.g., SEC v. E. Delta Res.*

---

[11] *The Laws That Govern the Securities Industry*, SEC.gov, Last mod. Oct. 1, 2013, https://www.sec.gov/about/about-securities-laws.
[12] *Id.* (emphasis added).

*Corp.*, 2011 WL 13305345, at \*4 (E.D.N.Y. Mar. 22, 2011) (explaining that "[m]arket manipulation 'refers generally to practices, such as wash sales, matched orders, or rigged prices" and defining "wash sales" as "transactions involving no change in beneficial ownership"). *Bona fide* market transactions that are "part of the legitimate forces of supply and demand" cannot be considered "market manipulation." *Cf. United States v. Radley*, 659 F. Supp. 2d 803, 816 (S.D. Tex. 2009) *aff'd* 632 F.3d 177 (5th Cir. 2011) (discussing "price artificiality" in commodities fraud context). In fact, the securities laws expressly permit *even coordinated group trading* of securities without placing limitations on the transfer of securities obtained pursuant to coordinated group trading activity so long as the trading is not done for an unlawful purpose. *See, e.g.*, 15 U.S.C. § 78i(a)(2), (a)(6), (d); Regulations 13D/13G.[13]

As a general matter, a public company's non-restricted securities are freely transferable by market participants other than issuers, underwriters, dealers, and insiders.[14] Indeed, restricted securities aside, SEC regulations and guidance point to only two provisions, applicable only to *insiders*, restricting the buying and selling of non-restricted securities: Section 16(b) and Rule 10b5-1.[15] Section 16(b) of the Exchange Act provides for a *civil disgorgement remedy payable to the issuer of securities* for profits realized from short-swing trading (that is, selling shares during the statutorily prescribed six-month time period). 15 U.S.C. § 78p(b), (c) (emphasis added). And, as an affirmative defense to Rule 10b-5 allegations of insider trading, Rule 10b5-1 enumerates conditions which demonstrate "a person's purchase or sale is not on the basis of material nonpublic information," most notably stock sales plans. 17 C.F.R. § 240.10b5-1. Neither rule places restrictions on a non-insider's sale of non-restricted registered securities.

---

[13] https://www.sec.gov/interps/telephone/cftelinterps_reg13d-13g.pdf
[14] https://www.sec.gov/education/smallbusiness/exemptofferings/faq.
[15] *Insider Trading Policy*, Exhibit 99.4, SEC.gov, last rev. Nov. 11, 2025,
https://www.sec.gov/Archives/edgar/data/1164964/000101968715004168/globalfuture_8k-ex9904.htm.

The securities laws also provide for clear restrictions on the sale of securities by investment advisers under the IAA.  Under the IAA, the term "'Investment adviser' means any person who, *for compensation*, engages in the business of advising others … as to the value of securities or as to the advisability of investing in, purchasing, or selling securities … " 15 U.S.C. § 80b-2(11) (emphasis added).  And under 15 U.S.C. § 80b-6, titled "Prohibited transactions by investment advisers," the IAA places restrictions on the sale of securities by prohibiting investment advisers from, for example, "knowingly selling any security to or purchasing any security *from a client*, while acting as a principal for his own account" "without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction."  15 U.S.C. §§ 80b-6(3) (emphasis added).

***Group trading activity and disclosure requirements:***

The securities laws and regulations expressly permit lawful group trading of securities. *See, e.g.*, 15 U.S.C. § 78i(a)(2), (a)(6), (d); Regulations 13D/13G.  Even so, the requirements placed on group trading largely relate to filing of forms related to ownership, such as the filing of a Schedule 13D/G if a group (or individual) exceeds 5% ownership of a company's outstanding shares.  Specifically, under Section 13(d), any person who becomes a beneficial owner of more than five percent of the class of a security must file a form 13D, sharing certain information with the SEC, on the SEC's EDGAR web platform.  15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d-1. Beneficial owners also file a form once they no longer own 5% of outstanding shares.  The five percent threshold applies to individuals but also when "two or more persons act as a … group for the purpose of acquiring, holding, or disposing of securities."  *Id*. at § 78m(d)(3).[16]  Congress enacted § 78m(d), Section 13(d), "to empower the common investor with adequate information

---

[16] The same applies to the requirements to file a Form 13G.  *See* 15 U.S.C. § 78m(g).

regarding those seeking control of an issuer through a tender offer or other method of acquisition so that an individual investor is able to decide whether to retain or dispose of the stock." *Motient Corp. v. Dondero*, 2006 WL 8437595, at *5 (N.D. Tex. Aug. 7, 2006) *aff'd in part, remanded in part*, 529 F.3d 532 (5th Cir. 2008).

In determining whether a "group" exists under Section 13, a key question is whether the relevant individuals agreed to act together for *these* purposes. *Morales v. Quintel Ent., Inc.*, 249 F.3d 115, 123-24 (2d Cir. 2001); *see also Corenco Corp. v. Schiavone & Sons, Inc.*, 488 F.2d 207, 217 (2d Cir. 1973). "Mere relationship, among persons or entities, whether family, personal or business, is insufficient to create the group which is deemed to be a statutory person." *Transcon Lines v. A.G. Becker Inc.*, 470 F. Supp. 356, 375 (S.D.N.Y. 1979) (internal quotation marks omitted).

As set forth below, because existing securities laws and regulations cover the conduct alleged in the Indictment and the Defendants' actions were lawful, the Indictment's proposed application of § 1348 and § 1349 violates all three aspects of the Constitution's fair warning requirement.

    B.    <u>The five § 1348 counts against Constantinescu, as alleged in the Indictment, violate the fair warning requirement because (i) the government's novel construction of the statute has never been applied by courts and (ii) Constantinescu's alleged conduct falls outside the scope of established securities laws which already regulate the sale of securities</u>.

        1.    *The government's theory with respect to the requisite "falsity" under § 1348 is unprecedented and has never been applied by courts in a manner that would have provided fair warning of the government's proposed application of the statute here.*

The government asks this Court to disregard the fair warning requirement and instruct a jury to conclude that Constantinescu's tweets were false based *solely* on his subsequent trading activity—a novel construction of § 1348 and the concept of "falsity" under other Chapter 63 fraud

violations.   Permitting a jury to infer falsity based *solely* on subsequent conduct allegedly inconsistent with speculations about a security's future price or statements about a future intent to hold the security, would, in effect, either (1) restrict the sale of those securities or (2) criminalize the sale of those otherwise non-restricted securities.   But no prior judicial decision would have provided notice that tweeting a comment such as "$DATS See you on Mars" could be rendered criminal by subsequent sale of the security, even if a sale was executed seven minutes later.

Since its enactment in 2002, § 1348 remains a rarely utilized vehicle for prosecuting securities fraud.   While § 1348 has yet to be interpreted by the Fifth Circuit, the few other cases throughout the country that have charged § 1348 since 2002 almost all involve allegations of insider trading or market manipulation and frequently are accompanied by additional Title 15 securities fraud charges.   *See, e.g.*, *United States v. Dikshit*, 2022 WL 13835072, (S.D.N.Y. Oct. 20, 2022) (defendant was charged with insider trading scheme pursuant to criminal complaint with securities fraud under both Title 15 and § 1348, but pled guilty only to one-count information charging him with Title 15 securities fraud); *Hussain*, 972 F.3d at 1140 (insider CFO of Hewlett-Packard subsidiary convicted of, *inter alia*, securities fraud under § 1348 for approving "false and misleading financial information in an HP press release distributed to the investing public[.]").   The one other known case with a § 1348 charge involving an alleged Twitter "pump and dump" scheme, *United Stated v. Gallagher*, involved allegations of unlawful market manipulation under 15 U.S.C. § 78i based on entry of fraudulent asks and bids as well as false statements based on that defendant's apparent insider status.   *See United States v. Gallagher*, No. 1:22-cr-122 (S.D.N.Y. July 6, 2022) (ECF No. 1); *see also SEC v. Gallagher*, 21 CV 8739 ¶ 41 (S.D.N.Y.).   But that case provides no guidance because ultimately, Gallagher pled guilty to a single count not charged here. *Id*. (ECF No. 1, 11, 24).   This case is the first of its kind—as is the government's proposed novel

construction of § 1348, applying the statute to non-insiders in a manner that seeks significant judicial expansion of existing securities laws.

> 2. *The existing securities laws that establish limitations on the sale of a security after an individual provides advice on that security do not apply to Constantinescu.*

The government's novel construction seeks to judicially expand securities laws by applying the standards of the IAA to Constantinescu.  As mentioned above, the IAA sets forth certain restrictions on the sale of securities by investment advisers.  The IAA applies to persons who advise others about securities "for compensation."  15 U.S.C. § 80b-2(11).  While the IAA undoubtedly covers non-registered investment advisers, at a minimum, a person only falls under the statute where he provides advice "for compensation."  *See, e.g.*, *In re Living Benefits Asset Mgmt., L.L.C.*, 916 F.3d 528, 532–534 (5th Cir. 2019).

It is unlawful for any investment adviser:

> acting as principal for his own account knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to affect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction.

15 U.S.C. § 80b-6(3).  In essence, the government seeks to impose some variant of this duty on Constantinescu without satisfying any of the statute's elements.  Noticeably, the Indictment makes no mention of Constantinescu providing advice as to the purchase and sale of a security "for compensation," because Constantinescu never received any compensation from Twitter users and the Atlas Discord chatroom was free.  (*See* Indictment ¶ 2).  Constantinescu did not qualify as an investment adviser, and therefore could not be restricted from selling stock unless he first communicated with Twitter users or the approximately 250,000 members of the Atlas Discord

chatroom.  That is what the government seeks to do here.  But Constantinescu had no fair warning of the judicial expansion of the IAA sought: a requirement that people who speculate about the future price of a security or their future intent not to sell the stock may not sell the security for some indeterminate amount of time or until after some undefined disclosure.

> 3.   *Remaining securities laws do not provide notice that Constantinescu was restricted from selling shares after speculating about their price or tweeting his intent to hold them.*

Additionally, no remaining securities laws restricting the sale of a public company's registered, non-restricted stock provides warning that Constantinescu's sale of securities could be restricted based on his tweets.  A main feature of the securities laws, including § 1348, has always been aimed at one concern in particular—insider trading.  It is well understood that the securities laws were enacted "to promote fair and transparent securities markets" and that their targeted proscription of insider trading has "play[ed] an essential role in maintaining the fairness and integrity of our securities markets."  *Insider Trading Arrangements and Related Disclosures*, [Release Nos. 33-11138; 34-96492; File No. S7-20-21], SECURITIES AND EXCHANGE COMMISSION, effective date: Feb. 27, 2023, https://www.sec.gov/rules/final/2022/33-11138.pdf.

As part of that structure, "[t]o prevent insiders of a securities issuer from trading on material non-public information … " Section 16(b), known as the "short-swing profit rule," creates a *civil* remedy requiring insiders "to disgorge to the issuer any profits they realize from short-swing trading in the issuer's securities."  *Rubenstein v. International Value Advisers, LLC*, 959 F.3d 541, 543 (2d. Cir. 2020); *see* 15 U.S.C. § 78p(b).  Unlike § 1348, which is a *criminal* statute that does not create a private right of action, Section 16(b) is only enforced through *civil* private actions.  *See* 15 U.S.C. § 78p(b) (short-swing profits are "recoverable by the issuer"); *see also Donaldson*

*v. Severn Sav. Bank, F.S.B.*, No. CV JKB-15-901, 2015 WL 7294362, at *2 (D. Md. Nov. 18, 2015) (noting that 18 U.S.C. § 1348 and other similar statutes are federal criminal statutes and do not prescribe a civil penalty).[17]  And to recover disgorgement, a plaintiff bears the burden of proving "there was (1) a purchase (2) and a sale of securities (3) *by a statutory insider* (4) *within a six-month period*."  *Microbot Med., Inc. v. Mona*, No. 19CIV3782GBDRWL, 2021 WL 1192110, at *3 (S.D.N.Y. Mar. 30, 2021), *appeal dismissed* (Aug. 9, 2021) (emphasis added).  Thus, Section 16(b) provides notice of the conduct it covers through its statutorily prescribed six-month time period, creating a civil remedy whereby *insiders* must disgorge certain profits.  Unlike the notice provided by 16(b), the government's proposed application of § 1348 fails to allege Constantinescu was an insider and fails to provide Constantinescu notice of any specific time frame, for example six months, when he could have sold shares without incurring *criminal* liability.

Equally critical, in 2000, the SEC adopted Rule 10b5-1, which provides an affirmative defense to insider trading liability under Rule 10b-5 where it is evident that material nonpublic information known to the person trading did not play a role in trading decisions.  *See* 17 C.F.R. § 240.10b5-1.  Specifically, Rule 10b5-1 enumerates conditions which demonstrate "a person's purchase or sale is not on the basis of material nonpublic information," including where, for example, "[b]efore becoming aware of the information, the person had: (1) Entered into a binding contract to purchase or sell the security, (2) Instructed another person to purchase or sell the security for the instructing person's account, or (3) Adopted a written plan for trading securities." *Id*. at § 240.10b5-1(c).  The Rule goes on to describe its conditions in detail none of which have any applicability here.

---

[17] *Exchange Act Section 16 and Related Rules and Forms*, Question 103.01, SEC.GOV, Last updated: Oct. 7, 2022, https://www.sec.gov/divisions/corpfin/guidance/sec16interp.

Thus, the securities laws have already clearly delineated *specific* guidelines regarding the sale of non-restricted securities, but those guidelines do not apply here.  A construction of § 1348 that restricts sale of securities based on the notion that the sale conflicts with prior statements speculating about the future price of the security has no basis in the securities laws and the rule of lenity counsels against expanding the scope of § 1348 to create this novel form of criminal liability. *See United States v. Bass*, 92 S. Ct. 515, 523 (1971) ("[L]egislatures not courts should define criminal activity"); *see also Wooden*, 142 S. Ct. at 1083 (Gorsuch, J., concurring) ("lenity's emphasis on fair notice … is about protecting an indispensable part of the rule of law—the promise that, whether or not individuals happen to read the law, they can suffer penalties *only for violating standing rules announced in advance*") (emphasis added).

C.  The Indictment violates due process because the Defendants did not have fair warning that their lawful conduct could give rise to criminal liability under 18 U.S.C. § 1349 for conspiracy to commit securities fraud.

The Indictment's theory underpinning its conspiracy to commit securities fraud charge is not legally cognizable because it relies entirely on *lawful* conduct.  "The elements of conspiracy under 18 U.S.C. § 1349 are: (1) two or more persons made an agreement to commit an unlawful act; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, with the intent to further the unlawful purpose."  *United States v. Simpson*, 741 F.3d 539, 547 (5th Cir. 2014).  But, accepting the Indictment's allegations as true, the Defendants could not have anticipated that their lawful activities could form the basis for a criminal conspiracy.  *See Campbell*, 64 F.3d at 978 (reversing conviction for conspiracy to commit bank fraud under § 1344 because defendant "acted within the perimeters of his legal rights"); *see also Hendricks*, 116 F.3d 1476, 1997 WL 304169, at *4 (reversing a conspiracy to commit bank fraud under § 1344, reasoning "[i]t is clear and undisputed that neither borrowing excess money

nor using a trustee … are crimes"); *Plaisance v. Schiller*, 2019 WL 1205628, *21 (S.D. Tex. Mar. 14, 2019) (dismissing civil securities fraud lawsuit based because "[i]t is undisputed that '[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak'") (quoting *Chiarella v. United States*, 100 S. Ct. 1108, 1118 (1980)).   The Indictment does not adequately allege the Defendants agreed to do something unlawful under the securities laws nor that they concealed something they were required to disclose.  *See White Eagle*, 721 F.3d at 1118 ("Because the alleged object of the conspiracy—the loan modification—was not itself criminal, there can be no conspiracy.").

In fairness, paragraph 1 of the Indictment alleges that the Defendants carried out an alleged "scheme" to "pump and dump" securities through three actions, the Defendants: "(1) purchased shares of a security in their trading accounts; (2) posted messages on social media platforms with false, positive information about the security … , and (3) secretly sold their own shares of the security at a higher price to secure a profit for themselves, at or around the time they posted messages to induce other investors to purchase the same security and concealed their intent to sell."  (Indictment ¶ 1).  But this theory relies on a novel and flawed application of § 1349 because the securities laws permit these alleged activities: (i) making *bona fide* market purchases of non-restricted securities at prevailing market prices, (ii) recommending and encouraging others to buy those securities, (iii) speculating about the price those securities might reach, (iv) sharing truthful information about the companies on social media, and (v) making *bona fide* sales at prevailing market rates of those non-restricted securities without disclosing the sales.

As the first step in the purported conspiracy, the government alleges that "one or more of the Defendants first purchased a security, often notifying other Defendants of the purchase so that they too, could 'load' and buy the security."  (Indictment ¶ 13).  But even accepting this allegation

in the Indictment as true, it alleges nothing unlawful.  There can be no question that discussing personal trading activity with others and encouraging them to purchase *their own shares* of a particular stock is perfectly legal.  And nothing could have warned the Defendants that the government would point to this lawful conduct as the predicate for an alleged conspiracy.

In fact, even if Defendants were intentionally purchasing shares of securities in some coordinated fashion (they were not as the face of the Indictment and trading records make clear), the SEC expressly permits the purchase of securities as a group under Section 13(d) (15 U.S.C. § 78m(d)(3); 17 C.F.R. § 240.13d-1), as long as that activity "by 1 or more other persons" does not constitute unlawful market manipulation, such as that identified in 15 U.S.C. § 78i.  Even setting aside that group trading *is lawful*, the Defendants' alleged conduct here would not even qualify them as a "group" for purposes of Section 13.

In determining whether a "group" exists under Section 13, a key question is whether the relevant individuals agreed to *act together* for the purpose of *acquiring, holding, or disposing* of securities.  *Morales*, 249 F.3d at 123-24.  Indeed, the instances of the Defendants' trading activity alleged in the Indictment make clear that the Defendants were making *independent trading decisions* not contingent upon each other's trading activity.  That is, each Defendant was managing their risk as they saw fit. For example, with respect to CEI, the Indictment describes Matlock, Cooperman, and Deel selling their shares of CEI at different times on August 4, 2021.  (Indictment ¶ 94).  The next day, Deel decided to close his position.  *Id*.  On September 10, 2021, Matlock purchased and sold shares of CEI. (*Id*. at ¶ 96).  Two weeks later, Hrvatin was trading CEI. (*Id*. at ¶ 98).  And, on October 5, 2021, Constantinescu sold shares of CEI.  (*Id*. at ¶ 99).  There is nothing suspect about six day traders buying and selling CEI shares at various times between August and October 2021, especially given that even NASDAQ, the largest United States stock exchange by

volume, was publishing articles actively pumping CEI shares around this time.[18]  The Indictment, similarly, identifies only non-coordinated buying and selling by Defendants of DATS occurring on differing dates and times.  (*Id*. at ¶¶ 93, 105, 107–08) (Hrvatin purchased 10,000 DATS shares on September 14, 2021, and closed his position the same day for "an approximate profit of $3,602.00"; Cooperman purchased 14,000 DATS shares on September 17, 2021, and closed his position the same day for a profit of approximately $2,404.25; Constantinescu purchased DATS shares on August 13, 2021, and sold some of those shares on October 13, 2021, for an approximate profit of $5,337,820.52).

Rather than alleging coordinated purchases (or sales), the Indictment merely alludes to the Defendants trading activity juxtaposed with *their own posts* on Twitter or Atlas Discord.  That is, the Indictment does not even satisfy the SEC's *civil* standard for "group" trading activity.  And, even if it did, such trading is lawful and expressly permitted under the securities laws, requiring only the filing of a 13D/G *if* the group exceed 5% ownership of a company's outstanding shares. But the Indictment does not contain any allegations that the Defendants individually or collectively owned 5% or more of the 19 stocks identified in the Indictment.  As such, Defendants lacked fair warning that the government could pursue a theory, under § 1349, that their *lawful* bona fide market purchases of non-restricted securities in their personal trading accounts could form the predicate for a conspiracy.

Where the Indictment truly fails, however, is the purported second step of the conspiracy, in which "one of more of the Defendants sought to 'pump' the price of that security by posting false and misleading information about the security on Twitter and Atlas Trading Discord so that

---

[18] *See* "Camber Energy Stock Is A Speculative Bet that Could Pay Off Handsomely, Larry Ramer, for InvestorPlace, published on NASDAQ.com and *available at* https://www.nasdaq.com/articles/camber-energy-stock-is-a-speculative-bet-that-could-pay-off-handsomely-2021-10-22 ("[T]here are multiple reasons why this speculative name could potentially reward the owners of CEI stock quite handsomely.") (last visited May 6, 2023).

other investors were induced to purchase the security and artificially increase its price." (Indictment ¶ 13).  For starters, none of the 21 tweets the Indictment attributes to Constantinescu are false as a matter of law.  And its allegations as to the other Defendants are just more of the same.  (Indictment ¶ 96) ("At approximately 15:46:24 EST MATLOCK falsely claimed in Atlas Trading Discord 'CEI looking good'," alleging this statement was "false" because Matlock sold all 130,000 shares of CEI at 15:47:00 EST); (Indictment ¶ 98) ("On or about September 24, 2021, at approximately 11:51:12 EST, HRVATIN falsely claimed in a tweet that '$CEI this can go to $10," alleging this tweet was "false" because at 12:33:00 EST "HRVATIN sold his entire position" while simultaneously alleging that HRVATIN continued to day trade CEI during the subsequent days); (Indictment ¶ 94) ("Deel falsely claimed in a tweet … that he was 'holding and adding more' CEI shares in afterhours and that he was 'holding full into tomorrow.' Prior to and after these messages, DEEL had been consistently selling out of his position in CEI.").  The conspiracy charge rests on a notion of falsity inconsistent with the law and what appears to be a miscomprehension of the concept of day trading.

As the purported final step in this conspiracy, the Defendants allegedly "concealed" from their twitter followers their "intent to sell" securities and "*secretly sold* their own shares of the security at a higher price to secure a profit for themselves."  (Indictment ¶ 1) (emphasis added). But even where the government's theory alludes to allegations of "concealment of a material fact" as opposed to factually "false" affirmative statements, the principles underlying the fair warning requirement apply with equal force.  *Harra*, 985 F. 3d at 213.  In fact, "a conviction for concealing material facts … cannot stand absent fair notice of the legal duty to make the particular disclosure." *Id*. (citing *United States v. Safavian*, 528 F.3d 957, 964–65 (D.C. Cir. 2008) (reversing a [18 U.S.C.

§ 1001(a)(1)] conviction because "vague" government guidance documents were insufficient to create a legal duty to disclose)).

The duties set forth in the securities laws requiring disclosure prior or subsequent to the sale of a public company's non-restricted stock do not apply to Constantinescu, or his Co-Defendants.  The government fails to allege group trading under 13D/G or that Defendants ever collectively owned over 5% of a company's outstanding shares.  But even had the government made these allegations, Exchange Act Sections 13(d) and 13(g) as well as Rule 13d-1 only mandates "that a Schedule 13D must be filed within 10 days after the acquisition of more than 5% of a class of equity shares registered under Section 12 of the Exchange Act."[19]  The forms must be filed with the SEC.  Nothing in the securities laws imposes an obligation to immediately disclose a stock sale and any required disclosures are done on EDGAR, anyhow, not Twitter.  Nor do any IAA disclosure requirements apply, as discussed above.  For these reasons Count 1 fails as a matter of law.

## CONCLUSION

For the reasons set forth herein, Constantinescu respectfully requests the Court dismiss Indictment and all charges against him and award any other relief deemed just and proper.

Dated: May 10, 2023                                      Respectfully submitted,

                                                                        */s/ Matthew A. Ford*
                                                                        Matthew A. Ford
                                                                        Texas Bar No. 24119390
                                                                        mford@fordobrien.com
                                                                        Lead Attorney

                                                                        Cara J. Filippelli
                                                                        Texas Bar No. 2416183
                                                                        cfilippelli@fordobrien.com

---

[19] https://www.sec.gov/corpfin/divisionscorpfinguidancereg13d-interphtm

Associate Attorney

FORD O'BRIEN LANDY, LLP
3700 Ranch Road 620 South, Suite B
Austin, Texas 78738
Telephone: (512)-503-6388
Facsimile: (212) 256-1047

*Attorneys for Defendant*
*Edward Constantinescu*

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 10, 2023, a true and correct copy of the foregoing document was served electronically on all counsel of record via the Court's CM/ECF.

*/s/ Matthew A. Ford*
Matthew A. Ford