IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD CONSTANTINESCU,<br>PERRY "PJ" MATLOCK,<br>JOHN RYBARCZYK,<br>GARY DEEL,<br>STEFAN HRVATIN,<br>TOM COOPERMAN,<br>MITCHELL HENNESSEY,<br>DANIEL KNIGHT. | No. 4:22-CR-00612-S |

**DEFENDANT EDWARD CONSTANTINESCU'S REPLY
IN SUPPORT OF MOTION TO COMPEL DISCLOSURE OF *BRADY* MATERIAL**

The government should be sanctioned for attempting to conceal information from the Court and the Defendants to perpetuate this defective criminal case. The government has all the Defendants 1099-Bs. And these trading summaries directly and succinctly undermine the securities fraud counts against Constantinescu and the notion that Constantinescu engaged in coordinated trading with any of the co-Defendants. In fact, it is impossible to imagine a co-Defendant taking a guilty plea (or being found guilty) of the conspiracy count after reviewing Constantinescu's 1099-Bs, which reveal a pattern of trading inconsistent with the government's theory. Instead, the government has inundated the defense with *incomplete and inadequate trade records and trade blotter reflecting millions of trades* it now claims are "irrelevant."

As made plain on the irs.gov website, a "broker or barter exchange must file [a Form 1099-B], Proceeds from Broker and Barter Exchange" with the IRS for any person "for whom they sold stocks."[1] The government has these records. Whether a specific assistant US Attorney

---

[1] https://www.irs.gov/forms-pubs/about-form-1099-b (last visited June 17, 2023).

claims to not have them does not relinquish the government's obligation to turn them over. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995) ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police."); *United States v. Causey*, 356 F. Supp.2d 681,690–91 (S.D. Tex. 2005) ("In this circuit prosecutors have long been charged with an obligation to produce certain evidence actually or constructively in their possession or accessible to them in the interest of inherent fairness.") (citing *United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980)). Indeed, the "Fifth Circuit has declined to draw a distinction between different agencies under the same government…." *Id.* at 691. It is right in the Justice Manual.[2]

And there is no doubt the government understood the significance of the Defendants' 1099-Bs since it expressly subpoenaed and received *many* of them pursuant to grand jury subpoenas. *See* Exs. A, B, F. Defendants, in turn, have received in discovery 1099-Bs obtained pursuant to grand jury subpoenas, but curiously not from some of the brokerages used by the Defendants, including TD Ameritrade—*the primary brokerage used by Constantinescu*. *See* Ex. A. It appears the government sent the same grand jury subpoena that it sent to WeBull to TD Ameritrade. *See* Exs. A, B. It ultimately received 1099-Bs from WeBull and responsive documents from TD Ameritrade after sending multiple threatening emails to TD Ameritrade. *See* Exs. A, B; *see also* Ex. C (FBI agent scolding TD Ameritrade "is holding up our investigation" and demanding "Provide them immediately"; AUSA John Liolos demanding "the response was grossly inadequate and long overdue" and "TD Ameritrade's failure to adequately response [sic]

---

[2] https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings ("In addition, in complex cases that involve parallel proceedings with regulatory agencies…the prosecutor should consider whether the relationship with the other agency is close enough to make it part of the prosecution team for discovery purposes."). (last visited June 17, 2023).

is hindering our investigation and we expect a status update today."). We have WeBull 1099-Bs, but not 1099-Bs for TD Ameritrade or other primary brokerages used by the Defendants.

These TD Ameritrade records are not merely *exculpatory*, they are potentially case deciding, yet Constantinescu's records have been concealed from his co-Defendants while Constantinescu has been deprived of theirs. Take for example, the government's theory argued in its opposition to his motion to dismiss. It argues Constantinescu committed securities fraud "because he omitted and concealed that he in fact planned to sell shares" of CEI and DATS [ECF 295 at 12]. And then take the allegations in the Superseding Indictment and juxtapose them with his 1099B-s and his tweets.

According to the Superseding Indictment, on October 5, 2021, Constantinescu tweeted "$CEI 10+" and this statement was "false" because it concealed his "privately harbored fraudulent intent" to sell the shares. *See* Ind. ¶ 99; *see also* [ECF 295 at 11] ("the statements were objectively false because Defendant's privately harbored a fraudulent intent that was contrary to their public display."). As the Superseding Indictment alleges, Constantinescu first bought CEI shares on September 1, 2021 (Ind. ¶ 92), six days **after** NASDAQ's InvestorPlace published an article pumping CEI by telling investors: "Fundamentally, there's some justification for bullishness in CEI stock." Constantinescu bought CEI shares weeks after other co-Defendants and held his shares *for over a month* while other co-Defendants day-traded the stock and exited their positions weeks earlier. (Ind. ¶¶ 92, 93–100). His sales are easily summarized in Constantinescu's 1099-B from 2021 (Ex. D, 1099-B excerpt), which does not require synthesizing millions of trades executed by eight highly active day traders:

| CAMBER ENERGY INC COM / CUSIP: 13200M508 / Symbol: CEI | | | | | | | |
|---|---|---|---|---|---|---|---|
| 01/14/21 | 100,000.000 | 116,821.99 | Various | 119,000.00 | ... | -2,178.01 | Total of 11 transactions |
| 10/05/21 | 2,070,000.000 | 5,400,139.68 | Various | 1,098,795.33 | ... | 4,301,344.35 | Total of 73 transactions |
| 10/15/21 | 200,000.000 | 271,310.10 | Various | 267,999.50 | ... | 3,310.60 | Total of 4 transactions |
| 10/20/21 | 1,110,627.000 | 1,945,993.90 | Various | 1,483,332.68 | ... | 462,661.22 | Total of 15 transactions |
| 12/01/21 | 400,000.000 | 490,825.64 | Various | 473,979.50 | ... | 16,846.14 | Total of 7 transactions |
| Security total: | | 8,225,091.31 | | 3,443,107.01 | ... | 4,781,984.30 | |

3

And while Constantinescu had no obligation or duty to disclose his sales by tweeting, he **did** disclose his sales, rendering the government's new theory not only legally baseless but sanctionable:



And the exact same thing is true about DATS. Constantinescu purchased his DATS shares on August 13, 2021, the day of DatChat, Inc's initial public offering.[3] Again, the government alleges that Constantinescu "falsely" tweeted "DATS I'm holding shares LT" on October 13, 2021 at 6:22 p.m. CST (Ind. ¶ 107), because he "concealed" his "present trading intentions" to sell some shares [ECF. 295 pg. 12]. Again, juxtapose these allegations with his 1099-B and his tweets. Even accepting the government's interpretation that LT means "long term," Constantinescu had been holding shares "long term," **for two full months**, with only very small sell orders (as compared to his position size) on August 17 and September 23, 2021. His 1099-B (Ex. E, 1099-B excerpt) shows him making significant sales on October 14–15, 2021 and again on October 18 and 25, 2021.

| DATCHAT INC COM / CUSIP: 23816M107 / Symbol: DATS | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 08/17/21 | 5,000.000 | 19,221.45 | Various | 18,692.97 | ... | 528.48 | Total of 2 transactions |
| 09/23/21 | 15,000.000 | 128,715.95 | Various | 56,150.00 | ... | 72,565.95 | Total of 4 transactions |
| 10/13/21 | 371,880.000 | 5,781,399.14 | Various | 1,400,822.74 | ... | 4,380,576.40 | Total of 122 transactions |
| 10/14/21 | 300,000.000 | 3,442,724.36 | Various | 2,726,839.70 | ... | 715,884.66 | Total of 61 transactions |
| 10/15/21 | 436,000.000 | 4,890,081.00 | Various | 4,290,968.17 | ... | 599,112.83 | Total of 157 transactions |
| 10/18/21 | 438,824.000 | 4,291,759.78 | Various | 5,005,431.41 | ... | -713,671.63 | Total of 170 transactions |
| 10/25/21 | 112,370.000 | 1,018,005.79 | Various | 963,659.46 | ... | 54,346.33 | Total of 27 transactions |
| 11/11/21 | 500.000 | 3,334.97 | 11/10/21 | 3,389.95 | ... | -54.98 | Sale |
| **Security total:** | | 19,575,242.44 | | 14,465,954.40 | ... | 5,109,288.04 | |

---

[3] The Superseding Indictment appears to intentionally obscure this fact by knowingly and falsely alleging that Constantinescu purchased his DATS shares on August 15, 2021, two days after the initial public offering. (Ind. ¶ 101). Because it would have been impossible for the Defendants to do a "pump and dump" on the day of DATS initial public offering of tens of millions of shares, the government appears to have made this knowingly false allegation to support its baseless "pump and dump" theory. https://www.globenewswire.com/en/news-release/2021/08/13/2280228/0/en/DatChat-Inc-Announces-Pricing-of-12-0-Million-Initial-Public-Offering-and-Nasdaq-Listing.html (announcing DatChat, Inc. initial public offering on August 13, 2021) (last visited June 17, 2023).

And just like with CEI, although Constantinescu was not required to disclose his sales of DATS, on October 13, 2021 at 6:23 p.m. *one minute after the government contends he concealed that he was selling shares*, Constantinescu *did disclose that he had sold DATS shares*:



Constantinescu's profits in DATS and CEI *alone* make up 69 percent of the profits attributed to the Defendants by the government in the Superseding Indictment.

But all of Constantinescu's sales reflected in the 1099-Bs, including his losing trades, are exculpatory and impeachment material. While the government deems his $4.6 million loss in WISH irrelevant, it fails to notify the Court that it appears that a substantial amount of purported "victim" statements it has received all have to do with WISH. Further, the government's profit calculations will be easily refuted by reference to the 1099-Bs (*See* Ex. G). And the Defendants' 1099-Bs render the conspiracy count baseless. It appears the government may be withholding other exculpatory evidence and impeachment material as well. Constantinescu is entitled to a hearing to determine the extent and degree of the government's withholding of the 1099-Bs and other *Brady* material.

Matthew A. Ford
Texas Bar No. 24119390

5

mford@fordobrien.com
Lead Attorney

Cara J. Filippelli
Texas Bar No. 24126183
cfilippelli@fordobrien.com
Associate Attorney

Ford O'Brien Landy, LLP
3700 Ranch Road 620 South, Suite B
Austin, Texas 78738
Telephone: (212) 858-0040
Facsimile: (212) 256-1047

*Attorneys for Defendant*
*Edward Constantinescu*

## CERTIFICATE OF SERVICE

I hereby certify that on June 17, 2023, a true and correct copy of the foregoing was served electronically on all persons via the Court's CM/ECF system.

         */s/ Matthew A. Ford*
Matthew A. Ford