135



Thank you for the opportunity to address these issues. We would be happy to schedule a follow-up conversation at your convenience.

Sincerely,

/s/ Lucas Moskowitz

Lucas Moskowitz
Deputy General Counsel & Head of
Government Affairs
Robinhood Markets, Inc.

cc:

Allison Herren Lee, Acting Chair, Securities and Exchange Commission
Robert Cook, President and Chief Executive Officer, Financial Industry Regulatory Author

136

# EXHIBIT A

137

**Revised December 30, 2020**

**Robinhood Financial LLC & Robinhood Securities, LLC Customer Agreement**

In consideration of Robinhood Financial LLC, Robinhood Securities, LLC, and their agents and assigns (collectively, "Robinhood") opening one or more accounts on my behalf ("My Account(s)" or the "Account(s)") for the purchase, sale or carrying of securities or contracts relating thereto and/or the borrowing of funds, which transactions are cleared through Robinhood Securities, I represent and agree with respect to all Accounts, whether margin or cash, to the terms set forth below (the "Agreement"). When used in this Agreement, the words "I", "Me", "My", "We", or "Us" mean the owner(s) of the Account. For purposes of this Agreement, Business Days are Monday through Friday, excluding federal holidays. Any references to "days" found in this Agreement are calendar days unless indicated otherwise.

I UNDERSTAND THAT THE TERMS AND CONDITIONS OF THIS AGREEMENT GOVERN ALL ASPECTS OF MY RELATIONSHIP WITH ROBINHOOD REGARDING MY ACCOUNTS. I WILL CAREFULLY READ, UNDERSTAND AND ACCEPT THE TERMS AND CONDITIONS OF THIS AGREEMENT BEFORE I CLICK "SUBMIT APPLICATION" OR OTHER SIMILARLY WORDED BUTTON. IF I HAVE ANY QUESTIONS ABOUT ANY OF THE PROVISIONS IN THIS AGREEMENT, I WILL EMAIL HELP@ROBINHOOD.COM. I UNDERSTAND THAT CLICKING "SUBMIT APPLICATION" IS THE LEGAL EQUIVALENT OF MY MANUALLY SIGNING THIS AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. BY ENTERING INTO THIS AGREEMENT, I ACKNOWLEDGE RECEIPT OF THE ROBINHOOD PRIVACY POLICY AND PRIVACY AND SECURITY STATEMENT. I UNDERSTAND THAT THIS AGREEMENT MAY BE AMENDED FROM TIME TO TIME BY ROBINHOOD, WITH REVISED TERMS POSTED ON THE ROBINHOOD WEBSITE. I AGREE TO CHECK FOR UPDATES TO THIS AGREEMENT. I UNDERSTAND THAT BY CONTINUING TO MAINTAIN MY SECURITIES BROKERAGE ACCOUNT WITHOUT OBJECTING TO ANY REVISED TERMS OF THIS AGREEMENT, I AM ACCEPTING THE TERMS OF THE REVISED AGREEMENT AND I WILL BE LEGALLY BOUND BY ITS TERMS AND CONDITIONS. IF I REQUEST OTHER SERVICES PROVIDED BY ROBINHOOD THAT REQUIRE ME TO AGREE TO SPECIFIC TERMS AND CONDITIONS ELECTRONICALLY (THROUGH CLICKS OR OTHER ACTIONS) OR OTHERWISE, SUCH TERMS AND CONDITIONS WILL BE DEEMED AN AMENDMENT AND WILL BE INCORPORATED INTO AND MADE PART OF THIS AGREEMENT. I ALSO UNDERSTAND THAT BY CLICKING "SUBMIT APPLICATION" I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 38 HEREIN.

**1. Capacity and Status.**

If an individual, I am of legal age under the laws of the state where I reside and authorized to enter into this Agreement. If an entity, I am duly formed, validly existing and in good standing in My state of organization, have full power and authority to enter and perform this Agreement, and the persons signing the account application are fully authorized to act on My behalf. No person, except Myself, has any interest in the Account opened pursuant to this Agreement. I acknowledge that unless Robinhood receives written objection from Me, Robinhood may provide My name, address, and securities positions to requesting companies in which I hold securities. Except as otherwise disclosed to Robinhood in writing, neither I nor any member of My immediate family is an employee of any exchange, any corporation of which any exchange owns a majority of the capital stock, a member of any exchange or self-regulatory organization, a member of any firm or member corporation registered on any exchange, a bank, trust company, insurance company or any corporation, firm or individual engaged in the business of dealing either as a broker-dealer or as principal in securities. I understand and agree that I am obligated to promptly notify Robinhood in writing if I or a member of My immediate family becomes registered or employed in any of the above-described capacities. Except as otherwise disclosed to Robinhood in writing, I am not a Professional (as defined below). I further agree to promptly notify Robinhood in writing if I am now or if I become a Professional or an officer, director or 10% stockholder of any publicly traded company.

**2. Market Data.**

Robinhood may choose to make certain market data available to Me pursuant to the terms and conditions set forth in this Agreement. By executing this Agreement, I agree to comply with those terms and conditions.

138

### A. Definitions.

1. "Market Data" means (a) last sale information and quotation information relating to securities that are admitted to dealings on the New York Stock Exchange ("NYSE"), (b) such bond and other equity last sale and quotation information, and such index and other market information, as United States-registered national securities exchanges and national securities associations (each, an "Authorizing SRO") may make available and as the NYSE may from time to time designate as "Market Data"; and (c) all information that derives from any such information.

2. "Nonprofessional" means any natural person who receives market data solely for his/her personal, non- business use and who is not a "Professional." A "Professional" includes an individual who, if working in the United States, is: (i) registered or qualified with the Securities and Exchange Commission (the "SEC"), the Commodity Futures Trading Commission (the "CFTC"), any state securities agency, any securities exchange or association, or any commodities or futures contract market or association; (ii) engaged as an "investment advisor" as that term is defined in Section 202 (a) (11) of the Investment Advisers Act of 1940 (whether or not registered or qualified under that Act), or (iii) employed by a bank or other organization exempt from registration under federal and/or state securities laws to perform functions that would require him or her to be so registered or qualified if he or she were to perform such functions for an organization not so exempt. A person who works outside of the United States will be considered a "Professional" if he or she performs the same functions as someone who would be considered a "Professional" in the United States.

### B. Provisions Applicable to All Users.

1. Proprietary Nature of Data. I understand and acknowledge that each Authorizing SRO and Other Data Disseminator (as defined below) has a proprietary interest in the Market Data that originates on or derives from it or its market(s). I agree not to reproduce, distribute, sell or commercially exploit the Market Data in any manner.

2. Enforcement. I understand and acknowledge that (a) the Authorizing SROs are third-party beneficiaries under this Agreement and (b) the Authorizing SROs or their authorized representative(s) may enforce this Agreement, by legal proceedings or otherwise, against Me or any person that obtains Market Data that is made available pursuant to this Agreement other than as this Agreement contemplates.

3. Data Not Guaranteed. I understand that neither Robinhood nor any Authorizing SRO, other entity whose information is made available over the Authorizing SROs' facilities (an "Other Data Disseminator"), or information processor that assists any Authorizing SRO or Other Data Disseminator in making Market Data available (collectively, the "Disseminating Parties") guarantees the timeliness, sequence, accuracy, completeness, reliability, or content of Market Data or of other market information or messages disseminated to or by any Disseminating Party. I understand that neither Robinhood Financial nor any Disseminating Party guarantees the timeliness, sequence, accuracy, completeness, reliability or content of market information, or messages disseminated to or by any party. I understand that neither Robinhood Financial nor any Disseminating Party warrants that the service provided by any such entity will be uninterrupted or error-free. I further understand that Market Data by Xignite provides market data to Robinhood Financial customers. NEITHER ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, NOR ANY DISSEMINATING PARTY SHALL BE LIABLE IN ANY WAY FOR (A) ANY INACCURACY, ERROR OR DELAY IN, OR OMISSION OF, (I) ANY MARKET DATA, INFORMATION OR MESSAGE, OR (II) THE TRANSMISSION OR DELIVERY OF ANY SUCH DATA, INFORMATION OR MESSAGE; OR (B) ANY LOSS (AS DEFINED IN THIS AGREEMENT) OR DAMAGE ARISING FROM OR OCCASIONED BY (I) ANY SUCH INACCURACY, ERROR, DELAY OR OMISSION, (II) NON-PERFORMANCE OR (III) INTERRUPTION IN ANY SUCH MARKET DATA, INFORMATION, OR MESSAGE, WHETHER DUE TO ANY ACT OR OMISSION BY ROBINHOOD FINANCIAL, ANY OF ITS AFFILIATES, THEIR RESPECTIVE OFFICERS OR EMPLOYEES, OR ANY DISSEMINATING PARTY, OR TO ANY "FORCE MAJEURE" (E.G., FLOOD, EXTRAORDINARY WEATHER CONDITIONS, EARTHQUAKE OR OTHER ACT OF GOD, FIRE, WAR, INSURRECTION, RIOT, LABOR DISPUTE, ACCIDENT, ACTION OF GOVERNMENT, OR COMMUNICATIONS OR POWER FAILURE, EQUIPMENT OR SOFTWARE MALFUNCTION) OR ANY OTHER

139

CAUSE BEYOND THE REASONABLE CONTROL OF ROBINHOOD FINANCIAL, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS AND EMPLOYEES, OR ANY DISSEMINATING PARTY.

4. Permitted Use. I shall not furnish Market Data to any other person or entity. If I receive Market Data other than as a Nonprofessional, I shall use Market Data only for My individual use.

5. Dissemination, Discontinuance, or Modification. I understand and acknowledge that, at any time, the Authorizing SROs may discontinue disseminating any category of Market Data, may change or eliminate any transmission method and may change transmission speeds or other signal characteristics. The Authorizing SROs shall not be liable for any resulting liability, loss or damages that may arise therefrom.

6. Duration; Survival. This Section 2 of this Agreement remains in effect for so long as I have the ability to receive Market Data as contemplated by this Section 2. In addition, Sections 2(B)(1)-(3) and the first two sentences of Section 2(5)(7), survive any termination of this Agreement.

7. Miscellaneous. The laws of the State of New York shall govern this Section 2 and it shall be interpreted in accordance with those laws. This Subsection is subject to the Securities Exchange Act of 1934, the rules promulgated under that act, and the joint-industry plans entered into pursuant to that act.

## C. Provisions Applicable to Nonprofessionals.

1. Permitted Receipt. I understand that I may not receive Market Data from Robinhood as a Nonprofessional, and Robinhood may not provide Market Data to Me as a Nonprofessional, unless Robinhood first properly determines that I qualify as a Nonprofessional as defined above and I in fact qualify as a Nonprofessional. I agree that, as a prerequisite to Robinhood Financial qualifying Me as a Nonprofessional, I will provide to Robinhood truthful and accurate information about Me, such as: my occupation, employer, employment position and functions; my use of Market Data, my registration status with any securities agency, exchange, association, or regulatory body, or any commodities or future contract market, association, or regulatory body, whether in the United States or elsewhere; and any compensation of any kind I may receive from any individual or entity for my trading activities, asset management, or investment advice. Except as otherwise declared to Robinhood in writing, by executing this Agreement, I certify that I meet the definition of Nonprofessional as set forth in this Agreement.

2. Permitted Use. If I am a Nonprofessional, I agree to receive Market Data solely for my personal, non-business use.

3. Notification. I shall notify Robinhood promptly in writing of any change in my circumstances that may cause Me to cease to qualify as a Nonprofessional.

## 3. NASDAQ OMX Information.

## A. Definitions.

1. "Information" means certain market data and other data disseminated that has been collected, validated, processed, and recorded by any system NASDAQ OMX has developed for the creation or dissemination of Information or other sources made available for transmission to and receipt from either a distributor such as RHF or from NASDAQ OMX relating to: a) eligible securities or other financial instruments, markets, products, vehicles, indicators, or devices; b) activities of a NASDAQ OMX company; c) other information and data from a NASDAQ OMX company. "Information" also includes any element of Information as used or processed in such a way that the Information can be identified, recalculated or re-engineered from the processed Information or that the processed Information can be used as a substitute for Information.

2. "NASDAQ OMX" means The NASDAQ OMX Group, Inc., a Delaware limited liability company and its subsidiaries and Affiliates (collectively, "NASDAQ OMX").

140

**B. Use of Data.**

I understand that I may use the Information only for personal use and not for any business purpose. I may not sell, lease, furnish or otherwise permit or provide access to the Information to any other natural person or entity ("Person") or to any other office or place. I will not engage in the operation of any illegal business use or permit anyone else to use the Information, or any part thereof, for any illegal purpose or violate any NASDAQ OMX or SEC Rule or any FSA rule or other applicable law, rule or regulation. I may not present the Information rendered in any unfair, misleading or discriminatory format. I shall take reasonable security precautions to prevent any Person other than Myself from gaining access to the Information.

**C. Proprietary Data.**

I acknowledge and agree that NASDAQ OMX has proprietary rights to the Information that originates on or derives from markets regulated or operated by NASDAQ OMX, and compilation or other rights to Information gathered from other sources. I further acknowledge and agree that NASDAQ OMX's third-party information providers have exclusive proprietary rights to their respective Information. In the event of any misappropriation or misuse by Me or anyone who accesses the Information through Me, NASDAQ OMX or its third-party information providers shall have the right to obtain injunctive relief for its respective materials.

**D. System.**

I acknowledge that NASDAQ OMX, in its sole discretion, may from time-to-time make modifications to its system or the Information. Such modifications may require corresponding changes to be made in Robinhood Financial's service. Changes or the failure to make timely changes by Me may sever or affect My access to or use of the Information. I understand that neither NASDAQ OMX nor Robinhood shall be responsible for such effects.

**E. NASDAQ OMX Limitation of Liability.**

Except as may otherwise be set forth herein, NASDAQ OMX shall not be liable to Me for indirect, special, punitive, consequential or incidental loss or damage (including, but not limited to, trading losses, lost profits, or other indirect loss or damage) of any nature arising from any cause whatsoever, even if NASDAQ OMX has been advised of the possibility of such damages. NASDAQ OMX shall not be liable to Me for any unavailability, interruption, delay, incompleteness or inaccuracy of the Information. This Section shall not relieve NASDAQ OMX or Me from liability for damages that result from their own gross negligence or willful tortious misconduct or from personal injury or wrongful death claims. I agree that the terms of this Section reflect a reasonable allocation of risk and limitation of liability.

**F. Disclaimers of Warranties.**

NASDAQ OMX and its third-party information providers make no warranties of any kind with respect to the Information—express, implied or statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), any implied warranties arising from trade usage, course of dealing, course of performance or the implied warranties of merchantability or fitness for a particular use or purpose or noninfringement.

**G. Termination by NASDAQ OMX.**

I acknowledge that NASDAQ OMX, when required to do so in fulfillment of statutory obligations, may by notice to Robinhood unilaterally limit or terminate the right of any or all Persons to receive or use the

141

Information and that Robinhood will comply with any such notice and will terminate or limit the furnishing of the Information.

**4. Authorization.**

I understand that My Account is self-directed. Accordingly, I appoint Robinhood Financial as My agent for the purpose of carrying out My directions to Robinhood Financial in accordance with the terms and conditions of this Agreement and any attendant risks with respect to the purchase or sale of securities. Robinhood Financial is authorized to open or close My Account(s), place and withdraw orders and take such other steps as are reasonable to carry out My directions. All transactions will be effected only on My order or the order of My authorized delegate, except as described in Section 10. I understand Robinhood Financial provides trading and brokerage services through the Robinhood website (the "Website") and the Robinhood mobile application (the "App"). I agree to receive and transmit financial information through such electronic means. My use or My grant of access to My Account to any third party to access information or place transactions in My Account is solely at My risk.

**5. Customer Representations and Responsibilities.**

**A. Self-directed Account.**

I understand that My Account is self-directed, and so that I am solely responsible for any and all orders placed in My Account and that all orders entered by Me or on My behalf are unsolicited and based on My own investment decisions or the investment decision of My duly authorized representative or agent. Accordingly, I agree that neither Robinhood nor any of its employees, agents, principals, or representatives:

    1. provide investment advice in connection with this Account;

    2. recommend any security, transaction or order;

    3. solicit orders;

    4. act as a market maker in any security;

    5. make discretionary trades; and

    6. produce or provide first-party research providing a specific investment strategies such as buy, sell or hold recommendations, first-party ratings and/or price targets. To the extent research materials or similar information are available through the App or the Website or the websites of any entity controlled by, controlling, or under common control with Robinhood (such entity, an "Affiliate"), I understand that these materials are intended for informational and educational purposes only and they do not constitute a recommendation to enter into any securities transactions or to engage in any investment strategies.

**B. Information Accuracy.**

I: (i) certify that the information contained in this Agreement, the account application, and any other document that I furnish to Robinhood Financial in connection with My Account(s) is complete, true and correct, and acknowledge that knowingly giving false information for the purpose of inducing Robinhood Financial to extend credit is a federal crime; (ii) authorize Robinhood Financial to contact any individual or firm noted herein or on the documents referred to in subsection (i) of this Section and any other normal sources of debit or credit information; (iii) authorize anyone so contacted to furnish such information to Robinhood Financial as Robinhood may request; and (iv) agree that this Agreement, the account application and any other document I furnish in connection with My Account is Robinhood's property, as the case may be. I shall promptly advise Robinhood Financial of any changes to the information in such agreements and documents in writing within ten (10) calendar days. I authorize Robinhood Financial to obtain reports and provide information to others concerning My creditworthiness and business conduct. Upon My request, Robinhood agrees to provide Me a copy of any report so obtained. Robinhood may

142

retain this Agreement, the Account application, and all other such documents and their respective records at its sole discretion, whether or not credit is extended.

## C. Risks.

I understand that all investments involve risk, that losses may exceed the principal invested, and that the past performance of a security, industry, sector, market, or financial product does not guarantee future results or returns.

## D. Account Defaults.

I understand that My Account comes with many defaulted service instruction features and preferences. I further understand that I am not required to use these defaulted options or preferences and that once My Account is approved and opened I have the sole discretion to control and adjust such defaulted service preferences that relate to My account.

## E. Knowledge of Account.

I understand that I am solely responsible for knowing the rights and terms for all securities purchased, sold and maintained in My Account including mergers, reorganizations, stock splits, name changes or symbol changes, dividends, option symbols, and option deliverables. I further understand that certain securities may grant Me valuable rights that may expire unless I take specific action. These securities include bonds, convertible securities, warrants, stock rights and securities subject to exchange offers or tenders. I am responsible for knowing all expiration dates, redemption dates, and the circumstances under which rights associated with My securities may be called, cancelled, or modified. Robinhood may, but are not obligated to, notify Me of any upcoming expiration or redemption dates, or take any action on My behalf without My specific instructions except as required by law and the rules of regulatory authorities. I acknowledge that Robinhood may adjust My Account to correct any error. If My Account has an option position on the last trading day prior to expiration, which is one cent or more in the money, Robinhood Financial will generally exercise the option, on My behalf. However, Robinhood Financial reserves the right at its discretion to close any option position prior to expiration date or any position resulting from the exercising/assignment after option expiration. I will be charged a commission for any such transaction. Robinhood Financial is not obligated to take any of these actions and Robinhood Financial is not liable for Losses should it not take them.

## F. Purchases.

All orders for the purchase of securities given for My Account will be authorized by Me and executed in reliance on My promise that an actual purchase is intended. It is My obligation to pay for purchases immediately or on Robinhood's demand. I understand Robinhood may at any time, in its sole discretion and without prior notice to Me, prohibit or restrict My ability to trade securities. I further agree not to allow any person to trade for My Account unless a trading authorization for that person has been received and approved by Robinhood. Robinhood reserve the right to require full payment in cleared funds prior to the acceptance of any order. In the event that I fail to provide sufficient funds, Robinhood may, at its option and without notice to Me, i) charge a reasonable rate of interest; ii) liquidate the Property subject of the buy order, or iii) sell other Property owned by Me and held in any of My Accounts. Robinhood may also charge any consequential Loss to My Account. For purposes of this Agreement, "Property" shall mean all monies, contracts, investments and options, whether for present or future delivery, and all related distributions, proceeds, products and accessions.

143

### G. Sales/Short Sales.

I promise to deliver all securities sold in My Account and to provide collateral of a type and amount acceptable to Robinhood Financial for all short sales in My Account. Robinhood Financial requires that a security be held in My Account prior to the acceptance of a sell order with respect to such security unless the order is specifically designated as a "short sale." If a security is not held in My Account and a sell order is processed, I must promptly deliver such security to Robinhood Financial for receipt in good deliverable form on or before the settlement date. Any order accepted without negotiable certificates or positions in My Account will be subject, at Robinhood Financial's sole discretion, to cancellation or buy-in. To ensure this will not occur, I agree to only place sell orders for securities owned by Me and held in My Account at the time My order is placed.

Proceeds of a sale will not be paid to Me or released into My Account until Robinhood Financial has received the security in good deliverable form, whether from a transfer agent or from Me and the settlement of the security is complete. If the security is not received on or before settlement date, or as market conditions warrant, Robinhood Financial may in its sole discretion purchase the security on the open market for My Account and may liquidate and close out any and all securities in My Account in order to pay for such purchase. In the event a security is bought in, I will be responsible for all resulting Losses incurred by Robinhood Financial.

I understand that I may execute short sales only in a margin Account and that such execution must comply with applicable short sales rules.

### H. Assistance by Robinhood.

I understand that when I request assistance from Robinhood or its employees in using the investment tools available on the Website or the App, it will be limited to an explanation of the tool's functionality and, if requested by Me, to the entry by Robinhood or its employees of variables provided by Me, and that such assistance does not constitute investment advice, an opinion with respect to the suitability of any transaction, or solicitation of any orders.

### I. No Tax or Legal Advice.

I understand that Robinhood does not provide tax or legal advice.

### J. Discontinuation of Services.

I understand that Robinhood may discontinue My Account and any services related to My Account immediately by providing written notice to Me

### K. Electronic Access.

1. I am solely responsible for keeping My Account numbers and PINs confidential and will not share them with third parties. "PINs" shall mean My username and password.

2. I agree and accept full responsibility for monitoring and safeguarding My Accounts and access to My Accounts.

3. I agree to immediately notify Robinhood in writing, delivered via e-mail and a recognized international delivery service, if I become aware of: (i) any loss, theft, or unauthorized use of My PINs or Account numbers; (ii) any failure by Me to receive any communication from Robinhood indicating that an order was received, executed or cancelled, as applicable; (iii) any failure by Me to receive an accurate written confirmation of an order, execution, or cancellation; (iv) any receipt by Me of confirmation of an order, execution or cancellation, which I did not place; (v) any

144

inaccurate information in or relating to My orders, trades, margin status, Account balances, deposits, withdrawals, securities positions or transaction history; or (vi) any other unauthorized use or access of My Account.

4. Each of the events described in subsections (K)(3)(i)-(vi) shall be deemed a "Potential Fraudulent Event". The use and storage of any information including My Account numbers, PINs, portfolio information, transaction activity, account balances and any other information or orders available on My wireless, web-enabled cellular telephone or similar wireless communications device (collectively, "Mobile Device") or My personal computer is at My own risk and is My sole responsibility. I represent that I am solely responsible for and have authorized any orders or instructions appearing in, originating from, or associated with My Account, My Account number, My username and password, or PINs. I agree to notify Robinhood immediately after I discover any Potential Fraudulent Event, but in no event more than twenty-four (24) hours following discovery. Upon request by Robinhood, I agree to report any Potential Fraudulent Event promptly to legal authorities and provide Robinhood a copy of any report prepared by such legal authorities. I agree to cooperate fully with the legal authorities and Robinhood in any investigation of any Potential Fraudulent Event and I will complete any required affidavits promptly, accurately and thoroughly. I also agree to allow Robinhood access to My Mobile Device, My computer, and My network in connection with Robinhood's investigation of any Potential Fraudulent Event. I understand that if I fail to do any of these things I may encounter delays in regaining access to the funds in My Account. I agree to indemnify and hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers, directors, and employees harmless from and against any Losses arising out of or relating to any Potential Fraudulent Event. I acknowledge that Robinhood does not know when a person entering orders with My username and password is Me.

5. Trusted Contact Person. I understand that, pursuant to FINRA regulations, Robinhood is authorized to contact the Trusted Contact Person (as defined by FINRA Rule 4512) designated for My Account and to disclose information about My account to address possible financial exploitation, to confirm the specifics of My current contact information, health status, or the identity of any legal guardian, executor, trustee or holder of a power of attorney, or as otherwise permitted by Rule 2165.

## 6. Clearance of Trades.

I understand that Robinhood Financial has entered into a clearing agreement with Robinhood Securities whereby Robinhood Financial will introduce My Account to Robinhood Securities, and Robinhood Securities will clear all transactions, on a fully-disclosed basis. I understand that Robinhood Securities carries My Account(s) and is responsible for the clearing and bookkeeping of transactions, but is not otherwise responsible for the conduct of Robinhood Financial.

Until receipt from Me of written notice to the contrary, Robinhood Securities may accept from Robinhood Financial, without inquiry or investigation, (i) orders for the purchase or sale of securities and other property on margin, if I have elected to have a margin account, or otherwise, and (ii) any other instructions concerning my Accounts. Robinhood Securities shall look solely to Robinhood Financial unless otherwise directed by Robinhood Financial, and not to Me, with respect to any such orders or instructions; except that I understand that Robinhood Securities will deliver confirmations, statements, and all written or other notices with respect to My Account directly to Me with copies to Robinhood Financial, and that Robinhood Securities will look directly to Me or Robinhood Financial for delivery of margin, payment, or securities. I agree to hold Robinhood Securities harmless from and against any Losses arising in connection with the delivery or receipt of any such communication(s), provided Robinhood Securities has acted in accordance with the above. The foregoing shall be effective as to My Account(s) until written notice to the contrary is received from Me by Robinhood Securities or Robinhood Financial.

## 7. Review of Confirmations and Statements.

I agree that it is My responsibility to review order execution confirmations and statements of My Account(s) promptly upon receipt. I agree to receive all confirmations and account statements, as well as all tax related documents, in electronic format. I understand that account statements will evidence all activity in My Account for the stated period, including securities transactions, cash balances, credits to My Account and all fees paid from My Account. Notwithstanding Section 36.B, confirmations will be considered binding on Me unless I notify Robinhood of any objections within two (2) calendar days from the date confirmations are sent. Account statements will be considered binding on Me unless I notify you

145

of any objections within ten (10) calendar days after My Account statements are posted online. Such objection may be oral or in writing, but any oral objection must be immediately confirmed in writing. In all cases, Robinhood reserves the right to determine the validity of My objection. If I object to a transaction for any reason, I understand and agree that I am obligated to take action to limit any losses that may result from such transaction or I will bear sole responsibility for any losses relating to the transaction, even if My objection to the transaction is ultimately determined to be valid. Nothing in this Section 7 shall limit My responsibilities as described in Section 5 of this Agreement.

**8. Important Information Needed to Open a New Account.**

To help the government better detect the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Therefore, I understand that when I open My Account Robinhood will ask for My name, address, date of birth and other identifying information. Robinhood may also ask copies of My driver's license, passport or other identifying documents. I understand that Robinhood may take steps to verify the accuracy of the information I provide to Robinhood in My Account application or otherwise, and that Robinhood may restrict My access to My Account pending such verification. I will provide prompt notification to Robinhood of any changes in the information including My name, address, e-mail address and telephone number.

I further understand that if I attempt to access My Account from a jurisdiction subject to certain U.S. sanctions or I am ordinarily resident in such a jurisdiction, or if you reasonably believe that I am attempting such access or have become a resident in such a jurisdiction, you may restrict My Account, and any pending orders may be cancelled. If this happens, I understand that I should contact help@robinhood.com, and that I may be asked to provide supplemental information as part of this process. I further understand that I must close My Account before establishing residency in any jurisdiction subject to U.S. sanctions.

**9. Telephone Conversations and Electronic Communications.**

I understand and agree that Robinhood may record and monitor any telephone or electronic communications with Me. Unless otherwise agreed in writing in advance, Robinhood does not consent to the recording of telephone conversations by any third party or Me. I acknowledge and understand that not all telephone or electronic communications are recorded by Robinhood, and Robinhood does not guarantee that recordings of any particular telephone or electronic communications will be retained or capable of being retrieved.

**10. Oral Authorization.**

I agree that Robinhood shall be entitled to act upon any oral instructions given by Me so long as Robinhood reasonably believes such instruction was actually given by Me or My authorized agent.

**11. Applicable Laws and Regulations.**

All transactions in My Account will be subject to federal securities laws and regulations, the applicable laws and regulations of any state or jurisdiction in which Robinhood Financial is registered, the rules of any applicable self-regulatory organization of which Robinhood Financial is a member and the rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. In no event will Robinhood Financial be obligated to effect any transaction it believes would violate any federal or state law, rule or regulation or the rules or regulations of any regulatory or self-regulatory organization.

**12. Erroneous Distributions.**

I agree to promptly return to Robinhood any assets erroneously distributed to Me. In the event that I sell a security prior to its ex-dividend/distribution date, and I receive the related cash/stock dividend or distribution in error, I direct Robinhood on My behalf to pay such dividend/distribution to the entitled purchaser of the securities I sold, and I guarantee to promptly reimburse Robinhood for, or deliver to Robinhood, said dividend or distribution.

146

### 13. Market Volatility; Market Orders; Limit Orders; and Queued Orders.

I understand that, whether I place a market or limit order, I will receive the price at which My order is executed in the marketplace, subject to any clarification stated below. Particularly during periods of high volume, illiquidity, fast movement or volatility in the marketplace, the execution price received may differ from the quote provided on entry of an order, and I may receive partial executions of an order at different prices. I understand that Robinhood Financial is not liable for any price fluctuations. I also understand that price quotes generally are for only a small number of shares as specified by the marketplace, and larger orders are relatively more likely to receive executions at prices that vary from the quotes or in multiple lots at different prices.

I understand that Robinhood Financial does not currently support sending traditional market buy orders and that Robinhood Financial collars all market buy orders (other than dollar-based buy orders executed during market hours) by using limit orders priced up to 5% above the last trade price. This is not the case for market sell orders. I further understand that when I send a market buy order through Robinhood Financial's trading system, the trading system generates a limit order up to 5% above the last trade price, and then Robinhood Financial sends the order to an executing broker. I understand that Robinhood Financial's implementation of market buy orders may vary depending on prices of instruments, market conditions, and other factors. I further understand that Robinhood Financial uses the following rounding mechanics with respect to buy orders: the last trade price is (i) multiplied by 1.05; (ii) rounded down to two decimal places if the last trade price is over $1.00; otherwise, rounded down to four decimal places; and (iii) for securities included in the SEC's Tick Size Pilot Program, rounded down to the nearest $.05 increment. I understand that securities may open for trading at prices substantially higher or lower than the previous closing price or the anticipated price. If I place a market order (whether during normal market hours or when the market is closed), I agree to pay or receive the prevailing market price at the time My market order is executed, subject to the specific clarification above relating to buy orders. I understand that the price I pay may be significantly higher or lower than anticipated at the time I placed the order. To avoid buying a security at a higher price and possibly exceeding My purchasing power, I understand My option to enter a limit order. I also understand that limit orders may not be executed at any particular time, or at all, if there is not sufficient trading at or better than the limit price I specify, and are only good until the end of the trading day in which they are entered. The Website contains further information regarding order types and limitations, which I agree to read and understand before placing such orders.

As a customer of Robinhood Financial, I understand that after the market has closed for the day, I have the ability to place in a queue order requests to be executed the following day upon the opening of the market ("Queued Order"). I understand that My Queued Order request is prioritized based on the order in which it is received by Robinhood Financial, and that the Queued Order requests are sent out for execution shortly after the market opens on the next day of trading. I further understand that each Queued Order request is sent out per customer and per security as Robinhood Financial market orders (described above), and that they are not aggregated.

A limit order may be "good till cancelled" which means the order remains valid until (A) it is executed; (B) I cancel the order; (C) approximately 90 days from when the order is placed; or (D) the contract to which it relates is closed. I understand that Robinhood will cancel a "good till cancelled" order at the end of every trading day (on the exchange on which the instrument to which the contract relates is traded) and place such order again at the start of the following trading day. This process will be repeated every day for as long as the "good till cancelled" order remains valid. I further agree that any "good till cancelled" orders I place should be treated as "do not reduce" orders.

### 14. Bulletin Board/Pink Sheet Stocks.

Bulletin board, pink sheet and other thinly-traded securities (collectively "bulletin board stocks") present particular trading risks, in part because they are relatively less liquid and more volatile than actively traded securities listed on a major exchange. I understand that bulletin board stocks may be subject to different trading rules and systems than other securities and that I may encounter significant delays in executions, reports of executions, and updating of quotations in trading bulletin board stocks. Robinhood Financial in its sole discretion may require limit orders on certain bulletin board stock transactions.

### 15. Research and Internet Links.

News, research, links to outside websites, and other information accessible through the App or Website ("Content") may be prepared by independent external providers not affiliated with Robinhood Financial,

147

including Morningstar, Inc. (all such providers, the "Providers"). I agree not to distribute, reproduce, sell, or otherwise commercially use the Content in any manner. I agree not to distribute, reproduce, sell, My access to the Content. I understand that none of the Content is a recommendation by Robinhood to buy or sell any securities or to engage in any investment strategy.

### 16. Restrictions on Trading.

I understand that Robinhood may, in its discretion, prohibit or restrict the trading of securities, or the substitution of securities, in any of My Accounts. I understand that Robinhood may execute all orders by Me on any exchange or market, unless I specifically instruct Robinhood to the contrary. In the event of a breach or default by Me under this Agreement, Robinhood shall have all rights and remedies available to a secured creditor under all applicable laws and in addition to the rights and remedies provided herein. I understand that Robinhood may at any time, at its sole discretion and without prior notice to Me: (i) prohibit or restrict My access to the use of the App or the Website or related services and My ability to trade, (ii) refuse to accept any of My transactions, (iii) refuse to execute any of My transactions, or (iv) terminate My Account. The closing of My Account will not affect the rights or obligations of either party incurred prior to the date My Account is closed.

Further, Robinhood will not tolerate any foul or abusive language, physical violence, threatening behavior, or other inappropriate conduct directed toward Robinhood, its Affiliates' officers, employees, contractors or customers. If I engage in any such behavior, as determined by Robinhood in its sole discretion, I agree that Robinhood is authorized to: (i) liquidate any securities, instruments or other property in My Account, (iii) send Me the proceeds, and (iii) close My account. Robinhood will not be responsible for any Losses caused by the liquidation of securities, instruments or other property pursuant to this paragraph, including any tax liabilities.

### 17. Waiver; Limitation of Liability; Indemnification.

I agree that My use of the App or the Website or any other service provided by Robinhood Financial or its Affiliates is at My sole risk. The Robinhood Financial service (including the App, the Website, the provision of Market Data, Information, Content, or any other information provided by Robinhood Financial, any of its Affiliates, or any third-party content provider or market data provider) is provided on an "as is," "as available" basis without warranties of any kind, either express or implied, statutory (including without limitation, timeliness, truthfulness, sequence, completeness, accuracy, freedom from interruption), implied warranties arising from trade usage, course of dealing, course of performance, or the implied warranties of merchantability or fitness for a particular purpose or application, other than those warranties which are implied by and incapable of exclusion, restriction or modification under the laws applicable to this Agreement.

Although considerable effort is expended to make the Website, App and other operational and communications channels available around the clock, Robinhood does not warrant that these channels will be available and error free every minute of the day. I agree that Robinhood will not be responsible for temporary interruptions in service due to maintenance, Website or App changes, or failures, nor shall Robinhood be liable for extended interruptions due to failures beyond our control, including but not limited to the failure of interconnecting and operating systems, computer viruses, forces of nature, labor disputes and armed conflicts.

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS AGREEMENT, I UNDERSTAND AND AGREE THAT ROBINHOOD, ITS AFFILIATES, THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES AND AGENTS, AND THE PROVIDERS (COLLECTIVELY THE "ROBINHOOD PARTIES") WILL NOT BE LIABLE TO ME OR TO THIRD PARTIES UNDER ANY CIRCUMSTANCES, OR HAVE ANY RESPONSIBILITY WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING TRADING LOSSES, DAMAGES, LOSS OF PROFITS, REVENUE, OR GOODWILL) THAT I MAY INCUR IN CONNECTION WITH MY USE OF THE SERVICE PROVIDED BY ROBINHOOD OR ANY OF ITS AFFILIATES UNDER THIS AGREEMENT (INCLUDING MY USE OF THE APP, THE WEBSITE, THE MARKET DATA, THE INFORMATION, OR THE CONTENT), BREACH OF THIS AGREEMENT, OR ANY TERMINATION OF THIS AGREEMENT, WHETHER SUCH LIABILITY IS ASSERTED ON THE BASIS OF CONTRACT, TORT (INCLUDING NEGLIGENCE), OR OTHERWISE, AND WHETHER OR NOT FORESEEABLE, EVEN IF ANY ROBINHOOD PARTY HAS BEEN ADVISED OR WAS AWARE OF THE POSSIBILITY OF SUCH LOSS OR DAMAGES. THE ROBINHOOD PARTIES SHALL NOT BE LIABLE BY REASON OF DELAYS OR INTERRUPTIONS OF THE SERVICE OR TRANSMISSIONS, OR FAILURES OF PERFORMANCE OF THEIR RESPECTIVE SYSTEMS,

148

REGARDLESS OF CAUSE, INCLUDING THOSE CAUSED BY GOVERNMENTAL OR
REGULATORY ACTION, THE ACTION OF ANY EXCHANGE OR OTHER SELF REGULATORY
ORGANIZATION, OR THOSE CAUSED BY SOFTWARE OR HARDWARE MALFUNCTIONS.

Except as otherwise provided by law, Robinhood or any of its affiliates or respective partners, officers,
directors, employees or agents (collectively, "Indemnified Parties") shall not be liable for any expenses,
losses, costs, damages, liabilities, demands, debts, obligations, penalties, charges, claims, causes of
action, penalties, fines and taxes of any kind or nature (including legal expenses and attorneys' fees)
(whether known or unknown, absolute or contingent, liquidated or unliquidated, direct or indirect, due or
to become due, accrued or not accrued, asserted or unasserted, related or not related to a third party
claim, or otherwise) (collectively, "Losses") by or with respect to any matters pertaining to My Account,
except to the extent that such Losses are actual Losses and are determined by a court of competent
jurisdiction or an arbitration panel in a final non-appealable judgment or order to have resulted solely from
Robinhood's or any of its affiliates' gross negligence or intentional misconduct. In addition, I agree that
the Indemnified Parties shall have no liability for, and I agree to indemnify, defend and hold harmless the
Indemnified Parties from all Losses that result from: (i) any noncompliance by Me with any of the terms
and conditions of this Agreement; (ii) any third-party actions related to My receipt and use of any
Information, Market Data, Content, market analysis, other third-party content, or other such information
obtained on the App or Website, whether authorized or unauthorized under this Agreement; (iii) any third-
party actions related to My use of the App or the Website; (iv) My or My agent's misrepresentation or
alleged misrepresentation, or act or omission; (v) Indemnified Parties following My or My agent's
directions or instructions, or failing to follow My or My agent's unlawful or unreasonable directions or
instructions; (vi) any activities or services of the Indemnified Parties in connection with My Account
(including any technology services, reporting, trading, research or capital introduction services); or (vii)
the failure by any person not controlled by the Indemnified Parties and their affiliates to perform any
obligations to Me. Further, if I authorize or allow third parties to gain access to Robinhood's services,
including My Accounts, I will indemnify, defend and hold harmless the Indemnified Parties against any
Losses arising out of claims or suits by such third parties based upon or relating to such access and
use. Robinhood does not warrant against loss of use or any direct, indirect or consequential damages or
Losses to Me caused by My assent, expressed or implied, to a third party accessing My Account or
information, including access provided through any other third party systems or sites.

I consent to the use of automated systems or service bureaus by Robinhood and its respective affiliates
in conjunction with My Account, including automated order entry and execution, record keeping, reporting
and account reconciliation and risk management systems (collectively "Automated Systems"). I
understand that the use of Automated Systems entails risks, such as interruption or delays of service,
errors or omissions in the information provided, system failure and errors in the design or functioning of
such Automated Systems (collectively, a "System Failure") that could cause substantial damage,
expense, or liability to Me. I understand and agree that Indemnified Parties will have no liability
whatsoever for any of my Losses arising out of or relating to a System Failure.

I also agree that Indemnified Parties will have no responsibility or liability to Me in connection with the
performance or non-performance by any exchange, clearing organization, market data provider, or other
third party (including other broker-dealers and clearing firms, and banks) or any of their respective agents
or affiliates, of its or their obligations relative to any securities. I agree that Indemnified Parties will have
no liability to Me or to third parties, or responsibility whatsoever for: (i) any Losses resulting from a
cause over which Indemnified Parties do not have direct control, including the failure of mechanical
equipment, unauthorized access, theft, operator errors, government restrictions, force majeure (as
defined in this Agreement), market data availability or quality, exchange rulings or suspension of trading;
and (ii) any special, indirect, incidental, consequential, punitive or exemplary damages (including lost
profits, trading losses and damages) that I may incur in connection with My use of the App, the Website,
Robinhood's brokerage, and other services provided by Indemnified Parties under this Agreement.

## 18. Mutual Fund Transactions.

In the event that I purchase or hold a mutual fund, I agree to read and understand the terms of its
prospectus. I understand that certain mutual funds reserve the right to change their purchasing,
switching or redemption procedures or suspend or postpone redemptions under certain market
conditions. I further understand that any mutual fund order entered with Robinhood is placed by
Robinhood on a best efforts basis as prescribed and recognized by the individual fund, and that
Robinhood is not responsible for unexecuted orders due to the failure of any communication system. I
agree to be fully responsible for the information contained within the mutual fund prospectus and to hold
Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless

2020.12

149

for any deficiencies contained therein. I authorize Robinhood to act as My agent in the purchase and redemption of fund shares.

## 19. Exchange Traded Funds.

I understand that I should consider the investment objectives and unique risk profile of Exchange Traded Funds ("ETFs") carefully before investing, and that ETFs are subject to risks similar to those of other diversified portfolios. I further understand that leveraged and inverse ETFs may not be suitable for all investors and may increase exposure to volatility through the use of leverage, short sales of securities, derivatives, and other complex investment strategies, and that although ETFs are designed to provide investment results that generally correspond to the performance of their respective underlying indices, they may not be able to exactly replicate the performance of the indices because of expenses and other factors. I further understand that ETFs are required to distribute portfolio gains to shareholders at year end, which may be generated by portfolio rebalancing or the need to meet diversification requirements, and that ETF trading will also generate tax consequences. I understand that I can obtain prospectuses from issuers or their third party agents who distribute and make prospectuses available for review. Additional regulatory guidance on ETFs can be found here.

## 20. Effect of Attachment or Sequestration of Accounts.

Robinhood shall not be liable for refusing to obey any orders given by or for Me with respect to any of My Accounts that has or have been subject to an attachment or sequestration in any legal proceeding against Me, and Robinhood shall be under no obligation to contest the validity of any such attachment or sequestration.

## 21. Event of Death.

It is agreed that in the event of My death, the representative of My estate or the survivor or survivors shall immediately give Robinhood written notice thereof, and Robinhood may, before or after receiving such notice, take such proceedings, require such papers and inheritance or estate tax waivers, retain such portion of, or restrict transactions in the Account as Robinhood may deem advisable to protect Robinhood against any tax, liability, penalty or loss under any present or future laws or otherwise. Notwithstanding the above, in the event of My death, all open orders shall be canceled, but Robinhood shall not be responsible for any action taken on such orders prior to the actual receipt of notice of death. Further, Robinhood may in its discretion close out any or all of the Accounts without awaiting the appointment of a personal representative for My estate and without demand upon or notice to any such personal representative. The estate of any of the Account holders who have died shall be liable and each survivor shall continue to be liable, jointly and severally, to Robinhood for any net debit balance or loss in said account in any way resulting from the completion of transactions initiated prior to the receipt by Robinhood of the written notice of the death of the decedent or incurred in the liquidation of the Account or the adjustment of the interests of the respective parties, and for all other obligations pursuant to this Agreement. Such notice shall not affect Robinhood's rights under this Agreement to take any action that Robinhood could have taken if I had not died.

## 22. Tax Reporting; Tax Withholding.

The proceeds of sale transactions and dividends paid will be reported to the Internal Revenue Service ("IRS") in accordance with applicable law.

## A. U.S. Persons.

This subsection is applicable if I am a U.S. person. Under penalties of perjury, I certify that the taxpayer identification number that I have provided or will provide to Robinhood (including any taxpayer identification number on any Form W-9 that I have provided or will provide to Robinhood) is My correct taxpayer identification number. I certify that I am not subject to backup withholding and I am a United States Person (including a U.S. resident alien) as such term is defined in section 7701(a)(30) of the Internal Revenue Code of 1986, as amended ("U.S. Person"). If a correct Taxpayer Identification Number is not provided Robinhood Financial, I understand I may be subject to backup withholding tax at the appropriate rate on all dividends, interest and gross proceeds paid to me. Backup withholding taxes

150

are sent to the IRS and cannot be refunded by Robinhood Financial. I further understand that if I waive tax withholding and fail to pay sufficient estimated taxes to the IRS, I may be subject to tax penalties.

**B. Non-U.S. Persons.**

This subsection is applicable if I am not a U.S. Person. I certify that I fully understand all the information on any Form W-8BEN that I have submitted or will submit to Robinhood. Under penalties of perjury, I declare that (i) I have examined all the information (including all the information in the English language) on any Form W-8BEN that I have submitted or will submit to Robinhood and (ii) to the best of My knowledge and belief all such information is true, correct, and complete. I authorize Robinhood to provide any such Form W-8BEN to Robinhood Securities or any withholding agent that has control, receipt, or custody of the income of which I am the beneficial owner or any withholding agent that can disburse or make payments of the income of which I am the beneficial owner. I agree that I will submit a new Form W-8BEN to Robinhood within 30 calendar days if any certification made on any previously submitted Form W-8BEN becomes incorrect. I understand that the IRS does not require My consent to any provisions of such Form W-8BEN other than the certifications required to establish My status as a non-U.S. Person and, if applicable, obtain a reduced rate of withholding.

**23. Equity Orders and Payment For Order Flow.**

SEC rules require all registered broker-dealers to disclose their policies regarding any "payment for order flow" arrangement in connection with the routing of customer orders. "Payment for order flow" includes, among other things, any monetary payment, service, property, or other benefit that results in remuneration, compensation, or consideration to a broker-dealer from any broker-dealer in return for directing orders. I understand that Robinhood transmits customer orders for execution to various exchanges or market centers based on a number of factors. These include: size of order, trading characteristics of the security, favorable execution prices (including the opportunity for price improvement), access to reliable market data, availability of efficient automated transaction processing and reduced execution costs through price concessions from the market centers. I further understand that certain of the exchanges or market centers may execute orders at prices superior to the publicly quoted market in accordance with their rules or practices and that while a customer may specify that an order be directed to a particular market center for execution, the order-routing policies, taking into consideration all of the factors listed above, are designed to result in favorable transaction processing for customers. The nature and source of any payments or credits received by Robinhood in connection with any specific transactions will be furnished upon written request.

**24. Free Credit Balances and Sweep Service.**

If I enroll in Robinhood Financial Cash Management ("Cash Management"), I understand that I am electing to participate in the Insured Network Deposit ("IND") sweep service (the "Sweep Service"). Under the Sweep Service, free credit balances in My Account will be deposited into interest-bearing accounts at one or more banks ("Participating Depository Institutions"), in accordance with the Insured Network Deposit Sweep Program Disclosures ("IND Disclosures") available on the Website and in the App. By enrolling in Cash Management, I represent and warrant that I have reviewed the IND Disclosures and agree to the terms set forth in the IND Disclosures. If I am not enrolled in Cash Management, free credit balances in My Account will remain in My Account, will not earn interest and will not be eligible for FDIC insurance, but will be eligible for SIPC protection as described in the IND Disclosures.

**25. Fees and Charges.**

I understand that Robinhood does not charge fees or commissions for executing buy and sell orders. However, I understand that other fees may apply. The current fees are included in the fee schedule available in the App and on the Website. I agree to pay any such fees at the then-prevailing rate. I acknowledge that the prevailing fees may change and that change may occur without notice. I agree to be bound by such changes once they are posted in the fee schedule available in the App and on the Website. I also agree to pay all applicable federal, state, local, and foreign taxes. I authorize Robinhood Financial to automatically debit My Account for any such fees and taxes. I also agree to pay such expenses incurred by Robinhood in connection with collection of any unpaid balance due on My Accounts including attorney's fees allowed by law.

151

**26. ACH Transactions.**

**A. Debit Transactions.**

Robinhood will initiate an ACH debit at My request to debit funds from an account that I own at another financial institution ("External Account") for deposit into My Account. I understand that in order for Robinhood to initiate an ACH debit, the financial institution holding my External Account must participate in the ACH system. I understand that for the ACH transfers to be established, at least one common name must match exactly between My Account and My External Account. I authorize Robinhood to take such steps as it deems appropriate to verify my ownership of External Account, including by telling the bank at which such External Account is held that I have authorized and consented to such bank disclosing to Robinhood any information that Robinhood may request about Me or My External Account. I also agree to cooperate with Robinhood's verification of my ownership of such External Account by promptly providing any identification and/or other documentation that Robinhood may request regarding such External Account. I represent and warrant that there are sufficient funds in My External Account to cover the amount of the deposit to My Account. Robinhood will initiate the ACH debit to My External Account on the Business Day or next Business Day after I request the transfer. A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood by 7:00 p.m. (Eastern Time) on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

Within 60 days of the date of My ACH deposit, My funds may only be withdrawn to the External Account from which such funds were debited.

I understand that an ACH debit transfer may be reversed or rejected if: (A) there are insufficient funds in My External Account; (B) there is a duplicate transaction; (C) the transaction is denied by the bank holding My External Account; or (D) My External Account does not support ACH transfers. I acknowledge that in the event of an ACH reversal, I will incur a fee. Before initiating making an ACH debit transfer, I agree to check Robinhood Financial's most recent Commissions and Fees Schedule. I agree that I am solely liable and responsible for any ACH reversal fees that I incur.

**B. Credit Transactions.**

Robinhood will initiate an ACH credit at My request to transfer funds from My Account to a recipient that I designate. I agree that I will have sufficient Available Funds in My Account to cover the amount of any ACH credit that I ask Robinhood to initiate. Robinhood will debit the amount of such request from My Account on the Business Day or next Business Day *after* I request the transfer. A transfer request will be deemed to have been made on a Business Day if it is received by Robinhood on such Business Day; if received after that time, the transfer request will be deemed to have been made on the next Business Day.

I agree that Robinhood may use any means which Robinhood, in its sole discretion, considers suitable to execute my ACH credit transfers.

**27. Fractional Shares.**

I acknowledge and understand that Robinhood rounds all holdings of fractional shares to the sixth decimal place, the value of fractional shares to the nearest cent, and any dividends paid on fractional shares to the nearest cent. I further understand that Robinhood will not accept dollar-based purchases or sales of less than $1.00 and that I will receive proceeds from the sale of any whole or fractional shares rounded to the nearest cent.

I understand that if I enter repeated fractional orders with individual notional values of less than $0.01, my account may be restricted.

I understand that a vendor employed by Robinhood will aggregate any proxy votes for fractional shares of Robinhood's customers with all votes reported to the issuer or issuer's designated vote tabulator and that, while Robinhood will report such proxy votes on fractional shares, the issuer or tabulator may not fully count such votes.

152

I understand that Robinhood will execute all orders that include fractional shares ("Fractional Orders") on a principal basis. To the extent that Robinhood must purchase or sell shares in the market to fulfill any part of my Fractional Order, the fractional component of that order will be fulfilled at the execution price Robinhood received for the corresponding whole shares. To the extent that Robinhood fulfills my Fractional Order for national exchange-listed securities ("NMS Securities") entirely out of its inventory and without purchasing or selling shares in the market ("Inventory Fulfillment"), Robinhood will endeavor to price such shares or fractional shares at a price between the National Best Bid and Offer ("NBBO") at the time of the order for orders made during market hours, or, for such orders made during extended hours trading (9:00-9:30 a.m. and 4:00-8:00 p.m. Eastern), Robinhood will endeavor to price such orders between the best bid and offer at the time of the order, as reported by an external vendor ("Vendor BBO"). For Inventory Fulfillment of Fractional Orders for securities not listed on a national exchange ("Non-NMS Securities") made during market hours as well as extended hours trading, Robinhood will endeavor to price such orders between Vendor BBO.

All non-market orders placed outside market hours and extended hours trading are queued and fulfilled either at or near the beginning of extended hours trading (9:00 a.m. Eastern) or at or near market open (9:30 a.m. Eastern), according to my instructions. All market orders placed outside market hours and extended hours trading are queued and fulfilled at or near market open. To the extent that I trade outside of market hours, these trades are subject to Robinhood's Extended Hours Trading Disclosure.

I understand Robinhood only accepts market orders for fractional shares at this time and does not permit limit orders for fractional shares. I understand that fractional shares within My Account (i) are unrecognized, unmarketable, and illiquid outside the Robinhood platform, (ii) are not transferable in-kind, and (iii) may only be liquidated and the proceeds transferred out via a wire transfer. I acknowledge that, subject to applicable requirements, Robinhood may report holdings and transactions in My Account in terms of either U.S. Dollars, shares, or both.

I agree that my fractional share holdings shall be treated as a "financial asset" under Article 8 of the Uniform Commercial Code.

## 28. Phone Calls.

You agree that, by providing information Robinhood requests, Robinhood and its third party services providers may contact you via mail, phone or email.

Specifically, if you provide us with a phone number: (a) you represent and warrant that the number you provide is your phone number, and you will promptly notify us if that changes, and (b) you consent to receive calls (including text messages) made to that phone number that may be prerecorded and/or completed with an automatic telephone dialing system (automated calls) for purposes including but not limited to providing account-related communications (including security alerts), investigating or preventing fraud, and/or collecting amounts owed to Robinhood. We may share your number with third parties that provide services to us in connection with any of the foregoing purposes, including but not limited to debt collectors. You understand that message, telephone minute and data rates may apply for calls made to a mobile phone number. You may opt out at any time from receiving these types of calls orally or in writing to limitsharing@robinhood.com. Please note, even if you opt out, we may still make other calls as permitted by law.

You consent to our recording of phone calls, including calls we make to you or that we receive from you.

## 29. Dividend Reinvestment Program.

Except as expressly stated otherwise, the provisions of this Section 29 will only apply if I am enrolled in Robinhood's Dividend Reinvestment Program ("DRIP"). My enrollment in the DRIP will be activated within three business days after I notify Robinhood of my intention to enroll an eligible security through the App. "Eligible security" means all shares available for fractional investing through Robinhood. I understand that in order to be eligible for dividend reinvestment, the securities must be held in My Account.

I may specify individual securities or have all Eligible securities in My Account enrolled for dividend reinvestment. If I choose to reinvest dividends from all Eligible securities, I understand that individual securities could subsequently no longer be Eligible securities at Robinhood's discretion or under applicable law. In those cases, only those securities will be discontinued from the DRIP. If I specify individual securities, I may add additional Eligible securities to the DRIP at any time if I hold a position

153

in those securities. Enrollment with respect to these additional Eligible securities will be effective within three business days after Robinhood receives notification from me through the App. If I maintain open orders for securities I do not already hold, I may not enroll those securities for dividend reinvestment until my open orders are executed. If my entire Account is set up for dividend reinvestment, any eligible securities I purchase in the future will automatically participate in the DRIP.

All eligible cash distributions will be reinvested on all securities I have selected in the DRIP, provided that I owned the securities on the record date for determining shareholders eligible to receive dividends, and continue to hold the securities through payable date. "Eligible cash distributions" means most cash distributions, including regular and optional dividends, cash-in-lieu payments, and capital gains distributions. Special dividends, late ex-date, liquidation, and miscellaneous payments may not be eligible distributions. Optional dividends will be processed in accordance with dividend reinvestment instructions. If I have a margin account, Robinhood is permitted to borrow a dividend paying stock in the normal course of business and, as a result, in such situations instead of a dividend payment I may receive a cash in lieu payment. If I receive a cash in lieu payment, I authorize Robinhood to treat such payment as if it was not "in lieu' and reinvest it accordingly.

Robinhood will credit My Account upon completion of the dividend reinvestment. Robinhood will reinvest dividends on the business day following receipt of funds. In the rare instance in which Robinhood is unable to reinvest all dividends on the business day following receipt, it will reinvest the remaining funds as soon as reasonably possible thereafter, which may take up to five business days. I will not have use of the funds prior to reinvestment.

I understand that my participation in the DRIP is voluntary and that Robinhood has not made any recommendation that I should participate. I further understand that Robinhood is not recommending or offering any advice regarding the purchase of any security included as an Eligible security in the DRIP. I further understand that dividend reinvestment does not assure profits on my investments, nor does it protect against losses in declining markets.

I may terminate my participation in the DRIP, or the enrollment of individual securities in the DRIP, at any time by giving notice through the App. Termination will take effect prior to the next Eligible cash distribution provided my notice to terminate was received at least three business days prior to the record date of that distribution. I understand that my notice to terminate my participation in the DRIP will not affect any obligations that may result from transactions initiated prior to Robinhood's receipt and processing of my notice.

If I participate in the DRIP, I understand Robinhood will reinvest the dividends of a particular stock at or near the opening price on the trading day following receipt of the dividend. Robinhood will combine Eligible cash distributions from My Account with those from other Robinhood clients requesting dividend reinvestment in the same security and use these combined funds to purchase securities on my behalf and on behalf of these other clients. If the combined reinvested funds do not total the purchase price of at least one share, the distribution will be invested in fractional shares. On that same day, Robinhood will credit My Account with that number of shares, including fractional shares, equal to my Eligible cash distribution divided by the purchase price per share. Robinhood does not intend to charge a fee for transactions executed pursuant to the DRIP.

Dividend reinvestment may result in my owning interests in fractional shares of a security. I will be entitled to receive future dividend payments on my fractional shares, although other corporate actions may result in allocation of only whole shares and cash in lieu of fractions as determined by the issuer. In mandatory corporate reorganizations, my partial interest will be handled according to the specific terms of the reorganization. In voluntary corporate reorganizations, Robinhood will act on my instructions with respect only to my whole shares.

Because fractional share positions cannot be transferred, reorganized, or issued in certificate form, my partial interest will be liquidated, without commission charges to me, at prevailing market prices in the event My Account is transferred or closed, the stock is reorganized, or stock certificates are ordered out of My Account. The timing of such liquidations will be at the discretion of Robinhood.

Reinvestment of dividends may result in my owning a fractional share position in securities that are callable in part. In the event of a call, fractional shares to be called will be determined through a random selection process. The probability of my fractional share holdings being called will be proportional to the holdings of all Robinhood clients who own a fractional share position in that security. Prior to the publication date of such a call, I have the right to withdraw from My Account cash in lieu of my uncalled, fully paid partial holdings. Once a call is announced, however, all shares, whether registered or held in

154

street name, participate in the random selection process. If my fractional shares are selected and I no longer hold the shares that I held on the publication date of the call, I will be responsible for covering those shares.

## 30. Cash Management Services.

Except as expressly stated otherwise, the provisions of this Section 30 will only apply if I am enrolled in Cash Management.

### A. General.

I understand and agree that by enrolling in Cash Management, I may apply for a Robinhood-branded debit card issued by the bank identified in My Robinhood Debit Card Agreement ("Card"). I further understand and agree that by using My Card, exercising My electronic fund transfer ("EFT") privileges offered in connection with My Account, and/or by successfully completing a request using Pay by Check, I authorize Robinhood to debit My Account immediately whenever an electronic draft or Card transaction is presented for payment on My behalf, when an EFT transaction is effected, when a Pay by Check request is successfully completed on My Account and/or when any fee or charge is due (collectively "Payment" or "Payments"). I further understand and agree that when I request a Payment or withdrawal or instruct Robinhood to make a purchase of securities from My Account, Robinhood is authorized to place a block on the amount of the transaction ("Blocked Amounts") prior to the settlement date of the Payment, withdrawal or trade, and that the Blocked Amounts will not be available for use for additional Payments or the purchase of securities. I agree to maintain Available Funds sufficient to pay for Payments made by Me or any Authorized Card User (as defined below) and to pay for any securities trades and for interest on any margin loans and other transaction fees. For this purpose, "Available Funds" in My Account will fluctuate daily and means the sum of (i) free credit balances, (ii) deposits to Participating Depository Institutions through the Sweep Service, and (iii) available margin loan value if My Account has margin privileges, minus (x) uncleared funds, (y) Blocked Amounts, and (z) deposits subject to a hold. The loan value of eligible securities for the purpose of margin is subject to regulatory requirements and Robinhood credit policies then in effect.

### B. Payments and Withdrawals.

I agree that any Payments that I make from My Account will be lawful. I agree that Payments will be deducted from the Available Funds in My Account in the following order: first, from free credit balances; second, by withdrawal of funds deposited to Participating Depository Institutions as part of the Sweep Service; and third, if My Account has margin privileges, from margin loans on the eligible securities in My margin Account. Robinhood will debit My Account only up to an amount equal to the Available Funds. I understand and agree that (i) if there are insufficient Available Funds in My Account to cover Payments when they become due, Robinhood has no obligation to make such Payments, and (ii) Robinhood has no obligation to make partial Payments. Robinhood will not charge a fee with respect to any declined Payment for which there were insufficient Available Funds. I acknowledge and agree, however, that Robinhood will not be responsible for any costs or losses that I may incur (including fees, costs, charges, attorneys' fees, investment losses, claims, demands, or liability resulting from any litigation or other actions) as a result of Robinhood's decision to decline any Payment or withdrawal or other transaction because My Account has insufficient Available Funds.

I understand that if a Payment is funded by a margin loan, I will incur interest until the margin loan is repaid.

I agree that if my Available Funds at any time falls below zero, Robinhood may suspend my ability to make Payments and terminate My Card. If this occurs, I agree to immediately pay all amounts owed to Robinhood, including any purchases on My Card which will be immediately charged to My Account.

I acknowledge and agree that Robinhood reserves the right to decline any Payments at any time for any reason with or without notice to Me. If Robinhood decides to take such action, I understand and agree that I am responsible for any pending debits, which will be processed and deducted from My Account.

155

I understand that transactions will post to My Account in any order determined by Robinhood and that Robinhood may change that order without prior notice to Me. Robinhood will comply with requirements of applicable law regarding the order of posting transactions.

## C. Limitation of Liability.

I agree that, subject to any limitations imposed by applicable law, and except as otherwise set forth in this Agreement or in the disclosures contained in the Robinhood Debit Card Agreement, which has been provided to Me or made available to me in connection with the opening of My Account, Robinhood, Robinhood's agents, any processing bank, and the Card issuer will not be liable for any loss I incur in connection with My Account and any Payments or other features of My Account unless Robinhood is grossly negligent in fulfilling this Agreement. In no event will Robinhood, Robinhood's agents, any processing bank, and the Card issuer shall not be liable for consequential, special or indirect damages or losses unless applicable law requires otherwise. I also agree that liability regarding online services or use of the App is further limited by the Robinhood Terms and Conditions, available at https://about.robinhood.com/legal/. To the extent I utilize online services or the App I acknowledge that I am bound by such Robinhood Terms and Conditions.

## D. Debit Cards.

I understand and agree that My use of the Card is subject to the terms, conditions and disclosures set forth in the Robinhood Debit Card Agreement, which has been provided to Me in connection with the opening of My Account and which I may access on the Website.

I understand and agree that I cannot request a Card for another person to use. I agree, however, that if I permit another person to have access to use My Card or Card number (an "Authorized Card User"), I am authorizing all Card transactions by such person and I agree that there are no limits to my authorization. I accept all liability with respect to the Card transactions effected by Me and any Authorized Card Users. I further agree that I may terminate the authority of an Authorized Card User only by contacting help@robinhood.com, to cancel my Card. I agree that the cancellation of My Card is effective only after Robinhood has a reasonable period to act on My notice.

If My Card is cancelled, I agree to destroy, or if requested by Robinhood, return the Card to Robinhood. I acknowledge that I will be responsible for any Card transactions that are processed because of My failure to destroy or return the Card following cancellation.

If My Account includes margin privileges, I agree that transactions that exceed My free credit balances and deposits in the Sweep Service may result in margin credit being extended to My Account, for which I will be charged interest. I agree to review the Margin Disclosure Statement, which is available at https://about.robinhood.com/legal/.

## E. Deposits.

The provisions in this Section 30.E shall apply to My Account whether or not I am enrolled in Cash Management.

*General; Holds.* I acknowledge and agree that funds that I deposit to My Account may be subject to one or more hold periods, which are described in the RHF Funds Availability schedule available at https://about.robinhood.com/legal/. I understand and agree that Robinhood reserves the right to modify the RHF Funds Availability schedule at any time by posting an updated schedule at https://about.robinhood.com/legal/, or otherwise providing notice to me. During the applicable hold period, My funds will not be available for Payments, withdrawal, or the settling of securities transactions, in each case as described in the RHF Funds Availability schedule. I further understand and agree that Robinhood reserves the right to further delay making deposited funds available for periods longer than the hold periods specified in the RHF Funds Availability schedule to the extent Robinhood determines that additional time is needed to verify information about the item deposited or the sender or if Robinhood otherwise believes there is a risk of fraud or other unlawful activity with respect to My Account.

156

*Mistaken Deposits.* If funds are deposited or transferred into My Account by mistake or otherwise, I agree that Robinhood may correct the situation and deduct any interest paid by Participating Depository Institutions, if applicable, without prior notice to Me.

*Returned Funds.* I acknowledge and agree that I am responsible for returned transactions. If I have funds transferred into My Account and that transfer is returned for any reason, Robinhood may charge the transfer and interest paid by Participating Depository Institutions, if applicable, against My Account, without prior notice to Me.

## F. Electronic Fund Transfers.

The provisions in this Section 30.F relating to EFTs other than Card transactions shall apply to My Account whether or not I am enrolled in Cash Management.

I understand that My Account may be eligible for a variety of EFTs, which may be subject to separate agreements, terms and conditions. These services may include use of the Card, and the "Move Money" functionality of the App. I understand that I may be required to agree to separate terms and conditions governing the particular service I use to initiate EFTs. In addition, I understand and agree that my use of EFT services are subject to the disclosures set forth in Appendix A (Electronic Fund Transfer Disclosures), and acknowledge that I have received and reviewed such disclosures.

## G. Security.

I agree to protect My Card, and My PINs, from access by anyone not authorized by Me to use them. I acknowledge that I will be liable for all Card and online transactions conducted by anyone to whom I have given access or who has obtained access even if not authorized by Me, up to applicable legal limits. I understand that I am responsible for reviewing My Account statement promptly to discover and report unauthorized activity, including use of My Card, Card number or PIN. I agree to notify Robinhood as provided in Appendix A (Electronic Fund Transfer Disclosures) if I believe or have reason to believe that there has been unauthorized activity in My Account or that My Card, Card number or PIN has been lost, stolen or may be used by an unauthorized person. Unless limited by law or as otherwise set forth in this Agreement or in the disclosures contained in Robinhood Debit Card Agreement, which is provided to Me as part of the Account opening process and is available on the Website, I agree that I will be responsible for losses that arise from My failure to (i) safeguard My Card and PINs, (ii) review My monthly statement for possible unauthorized activity and (iii) report any unauthorized activity to Robinhood as provided herein or in the Robinhood Debit Card Agreement.

## H. No Illegal Purpose.

I agree and understand that I may not use my debit card or any Payments on My Account for any illegal purpose. I agree and understand that Robinhood may, in its discretion, deny any transactions that appear to be made for an illegal purpose.

## I. Pay by Check.

I agree and understand that if I try to stop payment on a check after it has been mailed to the payee, Robinhood will attempt to but cannot guarantee that payment on the check will be stopped. I understand that a stop payment order on a check is valid for six months. I understand that if I wish to renew a stop payment on a check after the six month period, I must contact Robinhood to request another stop payment. I agree and understand that I may still be liable to the holder of the check even if I have requested a stop payment for the amount of the check. I agree and understand that Robinhood may deduct My Account for the amount on the check if the stop payment request is unsuccessful.

157

**J. Disclosure of Information.**

I agree and understand that all disclosures of My non-public personal information shall be made in accordance with the terms of the this Agreement or the Robinhood Privacy Policy (available on the Website at https://about.robinhood.com/legal/, as applicable. I agree that My consent to sharing non-public personal information will remain in effect until I revoke such consent by updating My settings and visibility, which I may do at any time through the App.

In addition, I understand and agree that Robinhood may disclose information about My Account and My related activities to third parties under the following circumstances: - As necessary to complete My Payment transactions; - To investigate any complaint, disputed transaction, transaction inquiry or request I make or as necessary to investigate potential fraud or misuse related to My Account; - To respond to requests from credit bureaus, creditors or other third parties for account-related information, to the extent such inquiries are necessary for processing My transactions or are usual and customary in the course of servicing similar products or accounts; - As necessary to comply with any applicable law, government or court order or subpoena; or - In accordance with My written permission or as otherwise permitted under the Robinhood Privacy Policy.

**I. Termination.**

I understand that Robinhood may terminate my participation in Cash Management or in specific features of Cash Management for any reason, upon notice to me.

**31. Consent to Redeem Shares.**

I understand and agree that whenever it is necessary for Robinhood's protection or to satisfy a margin call, deficiency, debit or other obligation owed to Robinhood, Robinhood may (but is not required to) sell, assign and deliver all or any part of the securities in My Account, or close any or all transactions in My Account. I understand that Robinhood may, but is not obligated to, attempt to contact Me before taking any such action. I understand and agree that Robinhood reserves the right to take any such action without prior notice or demand for additional collateral, and free of any right of redemption, and that any prior demand, call or notice will not be considered a waiver of our right to sell or buy without demand, call or notice.

I further understand that Robinhood may choose which securities to buy or sell, which transactions to close, and the sequence and timing of liquidation, and may take such actions on whatever exchange or market and in whatever manner (including public auction or private sale) that Robinhood chooses in the exercise of its business judgment. I agree not to hold Robinhood liable for the choice of which securities to buy or sell or of which transactions to close or for the timing or manner of the liquidation. I also agree not to hold Robinhood liable for taking such action.

I understand and agree that Robinhood is entitled to exercise the rights described in this section in its sole discretion, including, but not limited to, whenever any of the following occurs:

- The equity level in My Account falls below required minimums;
- Sufficient funds or securities are not deposited to pay for transactions in My Account;
- I reverse any ACH debit transfer to My Account;
- A petition of bankruptcy or for the appointment of a receiver is filed by or against Me;
- An attachment is levied against My Account;
- I die or become incapacitated or incompetent; or
- My Account is closed.

**32. Electronic Delivery of Trade and Account Information; Notice.**

All communications, notices, legal disclosures, and other materials related to My Account or this Agreement, including account statements, trade confirmations, margin calls, notices, disclosures, regulatory communications and other information, documents, data and records regarding My Account (the "Communications"), or an alert that any such Communication has been posted to the secure section of the Website or the App, and is available for viewing, may be sent to Me at the mailing address for My Account or the e-mail address that I have given to Robinhood in My account application or at such other

158

address as I may hereafter give Robinhood in writing or by e-mail at least ten (10) calendar days prior to delivery, and all communications so sent, whether in writing or otherwise, shall be deemed given to Me personally, whether actually received or not.

## 33. API.

### A. Overview; Definitions.

Robinhood may, in Robinhood's sole discretion, provide third parties with an application programming interface and other materials in accordance with any accompanying documentation (collectively, the "API Package") (such third parties, "API Licensees"), to make available certain features and functionality of Robinhood's mobile applications, websites, or technology platform via the API Licensees' products (such products, the "Licensee Products"). The API Package and the Licensee Products are collectively referred to as the "API Products". "Personal Information" means My personally identifiable information (including username, logon password, financial information, trade data, and other financial information) and all data exchanged between Robinhood and the API Products.

### B. Access to My Personal Information.

Through My use of any API Products, I may be providing API Licensees with access to My Account and Personal Information. By using any API Products, I acknowledge that such API Products may employ security, policies, procedures and systems of API Licensees which may or may not be less stringent and secure than Robinhood's policies, procedures and systems. I agree that My use of any API Products shall be subject to the terms and conditions of this Agreement, in addition to any other agreements which I executed with respect to any such API Products. I understand and agree that any end user agreement that I executed with any API Licensee is concluded between Me and such API Licensee only, and not with Robinhood; and such API Licensee, not Robinhood, is solely responsible for such Licensee Product and the content thereof. I understand and agree that the API Products may deliver Personal Information to Robinhood, and that Robinhood is authorized to receive and store such Personal Information consistent with Robinhood's then-in-effect policies and procedures. Further, I agree that the API Products may request Personal Information stored by Robinhood, and I consent to Robinhood's disclosure of such Personal Information to the API Products.

### C. No Recommendations.

To the extent the Licensee Products or API Licensees express opinions or make recommendations, I understand that such opinions and recommendations are expressed solely by API Licensees and are not the opinions or recommendations of Robinhood. The existence of the API Products and Robinhood's consent to any connectivity between any Licensee Products and Robinhood's technology, the App, the Website, or trading platform(s) does not constitute (i) any recommendation by Robinhood to invest in any security or utilize any investment strategy; or (ii) any representation, warranty, or other guarantee by Robinhood as to the present or future value or suitability of any sale, trade, or other transaction involving any particular security or any other investments. The existence of any and all information, tools and services provided by API Licensees or by the Licensee Products shall not constitute Robinhood's endorsement of API Licensees or the Licensee Products.

### D. Data Provided by Robinhood to API.

From time to time, and subject to then-in-effect agreements between Robinhood and API Licensees, Robinhood may, in its own discretion, make market data feeds received from third parties available via the API Products. Robinhood does not make any guarantees in regard to such market data feeds. Furthermore, API Licensees or Licensee Products may make available to Me market data feeds independent of Robinhood. I am aware that from time to time that there may be discrepancy between the market data presented on the App or Website and information provided by any API Products due to a variety of reasons, including the time to update and transmit such data to a mobile application or website

159

and latency caused by such API Product's or My local environment (such as computer set up, connection speed, etc.). Robinhood is not responsible for the accuracy of any market data displayed on any API Products or otherwise made available by API Licensees.

## E. Risks; No Liability.

I acknowledge that there may be latency between the time an order (or other Personal Information) is submitted from the API Products and the time such order or Personal Information is received by Robinhood. Latency may also affect order modification and order cancellation requests. The time an order or a request is actually received by Robinhood (including for execution) will be the official time, including for the purposes of routing the order to the market for execution. In addition, all orders submitted to Robinhood are subject to order vetting by Robinhood. Orders created and submitted through any API Products are not vetted until they are received by Robinhood. It is possible that Robinhood may reject an order placed through any API Products. Robinhood cannot guarantee that any order will be accepted when such order is routed to the market for execution, and Robinhood cannot guarantee that notifications and Personal Information provided to Me by Robinhood will be successfully delivered to or displayed by any API Products.

Without limiting the generality of any other terms in this Agreement, I agree that:

1. Robinhood or its Affiliates shall not be liable for any Losses as a result of any issues addressed in this Section 33 of this Agreement, nor shall Robinhood or its Affiliates be liable for any Losses realized for technical issues involving any API Products or API Licensee technology or product offerings (including system outages or downtime).

2. Robinhood or its Affiliates shall not be responsible for any investment research provided by any API Licensee or any Licensee Products.

3. Robinhood or its Affiliates makes no representations, warranties or other guarantees as to the accuracy, timeliness or efficacy of any market data, information, or other functionality made available by any API Licensee or any API Products.

## F. Intellectual Property.

My use of any API Products will not confer to Me any title, ownership interest or intellectual property rights that otherwise belongs to Robinhood or any of its affiliates. The API Package, including content, is protected under U.S. patent, copyright laws, international treaties or conventions, and other laws and will remain Robinhood's exclusive property, as applicable. Names, logos, and all related product and service names, design marks, and slogans displayed by or relating to Robinhood or any of its Affiliates or API Licensees in the context of the API Products shall remain the property of the respective owner, and use of such property by Robinhood or any API Licensee in marketing or provision of any API Products does not grant ownership or entitle Me to use any such name or mark in any manner.

## G. User's Representations and Warranties.

I represent and warrant that:

1. By virtue of utilizing any API Products, I consent to and accept any risk associated with Robinhood's sharing of Personal Information with any API Licensee and shall not hold Robinhood, its Affiliates, or their respective officers, directors, or employees responsible for any Losses resulting from the sharing of such Personal Information.

2. I agree that My use of any API Products or API Licensee's content, information, technology, or functionality is at My own risk.

3. I agree that Robinhood may revoke any API Licensee or API Products' authorization at any time, for any reason, with or without cause and without prior notice to Me.

160

**34. Electronic Signatures; Modifications to the Agreement.**

I agree to transact business with Robinhood electronically. By electronically signing an application for an Account, I acknowledge and agree that such electronic signature is valid evidence of My consent to be legally bound by this Agreement and such subsequent terms as may govern the use of Robinhood's services. The use of an electronic version of any document fully satisfies any requirement that the document be provided to Me in writing. I accept notice by electronic means as reasonable and proper notice, for the purpose of any and all laws, rules and regulations. I acknowledge and agree that Robinhood Financial may modify this Agreement from time to time and I agree to consult the Website from time to time for the most up-to-date Agreement. The electronically stored copy of this Agreement is considered to be the true, complete, valid, authentic and enforceable record of the Agreement, admissible in judicial or administrative proceedings to the same extent as if the documents and records were originally generated and maintained in printed form. I agree to not contest the admissibility or enforceability of Robinhood Financial's electronically stored copy of the Agreement.

**35. Margin Accounts.**

**A. Election.**

This numbered section applies to my account to the extent I elect and am approved for a Robinhood Gold margin account.

**B. Margin Trading.**

I understand that margin trading involves interest charges and risks, including the potential to lose more than deposited or the need to deposit additional collateral in a falling market. Before using margin, customers must determine whether this type of trading strategy is right for them given their specific investment objectives, experience, risk tolerance, and financial situation. If I have elected to have a margin Account, I represent that I have read the Margin Disclosure Statement, Day Trading Risk Disclosure, and FINRA Investor Information. These disclosures contain information on Robinhood's lending policies, interest charges, and the risks associated with margin accounts.

**C. Hypothecation.**

Within the limitations imposed by applicable laws, rules and regulations, all securities now or hereafter held by Robinhood, or carried by Robinhood in any account for Me (either individually or jointly with others), or deposited to secure same, may from time to time, without any notice, be carried in your general loans and may be pledged, repledged, hypothecated or re-hypothecated, separately or in common with other securities for the sum due to you thereon or for a greater sum and without retaining in your possession or control for delivery a like amount of similar securities. The IRS requires Broker Dealers to treat dividend payments on loaned securities positions as payments received in lieu of dividends for 1099 tax reporting purposes. Taxation of substitute dividend payments may be greater than ordinary on qualified dividends. It is understood, however, that you agree to deliver to Me upon My demand and upon payment of the full amount due thereon, all securities in such accounts, but without obligation to deliver the same certificates or securities deposited by Me originally. Any securities in My margin or short account may be borrowed by you, or lent to others.

**D. Interest.**

Debit balances in My Accounts shall be charged with interest in accordance with your established custom, as disclosed to Me in the Customer Information Brochure pursuant to the provisions of the Securities Exchange Act.

161

**E. Margin.**

I agree to maintain in all accounts with Robinhood such positions and margins as required by all applicable statutes, rules, regulations, procedures and custom, or as you deem necessary or advisable. I agree to promptly satisfy all margin and maintenance calls.

**F. Sales.**

I agree to specifically designate any order to sell a security, which I do not own as a short sale, and understands that Robinhood will mark such order as a short sale. I agree that any order which is not specifically designated as a short sale is a sale of securities owned by me, and that I will deliver the securities on or before settlement date, if not already in the account. If I should fail to make such delivery in the time required, Robinhood is authorized to borrow such securities as necessary to make delivery for the sale, and I agree to be responsible for any loss you may thereby sustain, or which you may sustain as a result of your inability to borrow such securities.

**36. Consent to Electronic Delivery of Documents.**

**A. Consent.**

**By agreeing to electronic delivery, I am giving My informed consent to electronic delivery of all Account Documents, as defined below, other than those I have specifically requested to be delivered in paper form.** "Account Documents" include notices, disclosures, current and future account statements, regulatory communications (such as prospectuses, proxy solicitations, and privacy notices), trade confirmations, tax-related documents, and any other information, documents, data, and records regarding My Account, this Agreement (including amendments to this Agreement), and the agreements and disclosures governing the services delivered or provided to Me by Robinhood Financial, the issuers of the securities or other property in which I invest, and any other parties. I agree that I can access, view, download, save, and print any Account Documents I receive via electronic delivery for My records.

**B. Electronic Delivery System.**

I acknowledge that Robinhood's primary methods of communication with Me include (A) posting information on the Website, (B) providing information via the App, (C) sending email(s) to My email address of record, and, to the extent required by law, (D) providing Me with notice(s) that will direct Me to the App or the Website where I can read and print such information. Unless otherwise required by law, Robinhood reserves the right to post Account Documents on the Website without providing notice to Me. Further, Robinhood reserves the right to send Account Documents to My postal or email address of record, or via the App or Website. I agree that all Account Documents provided to Me in any of the foregoing manner is considered delivered to Me personally when sent or posted by Robinhood, whether I receive it or not.

All e-mail notifications regarding Account Documents will be sent to My e-mail address of record. I agree to maintain the e-mail address that I have provided Robinhood until I provide Robinhood with a new one. I understand that e-mail messages may fail to transmit promptly or properly, including being delivered to SPAM folders. I further understand that it is My sole responsibility to ensure that any emails from Robinhood or its Affiliates are not marked as SPAM. Regardless of whether or not I receive an e-mail notification, I agree to check the Website regularly to avoid missing any information, including time-sensitive or otherwise important communication. If I authorize someone else to access the e-mail account I have provided Robinhood, I agree to tell them to share the Account Documents with Me promptly, and I accept the risk that they will see My sensitive information. I understand that if I use a work e-mail address or computing or communications device, My employer or other employees may have access to the Account Documents.

Additionally, I acknowledge that the Internet is not a secure network and agree that I will not send any confidential information, including Account numbers or passwords, in any unencrypted e-mails. I also

162

understand that communications transmitted over the Internet may be accessed by unauthorized or unintended third parties and agree to hold Robinhood, its Affiliates, and Robinhood and its Affiliates' respective officers and employees harmless for any such access regardless of the cause.

I agree to promptly and carefully review all Account Documents when they are delivered and notify Robinhood Financial in writing within five (5) calendar days of delivery if I object to the information provided (or other such time specified herein). If I fail to object in writing within such time, Robinhood Financial is entitled to treat such information as accurate and conclusive. I will contact Robinhood to report any problems with accessing the Account Documents.

## C. Costs.

Potential costs associated with electronic delivery of Account Documents may include charges from Internet access providers and telephone companies, and I agree to bear these costs. Robinhood Financial will not charge Me additional online access fees for receiving electronic delivery of Account Documents.

## D. Archival.

Upon My request, I may obtain copies of up to six (6) prior years of account statements, and three (3) prior years of trade confirmations.

## E. Revocation of Consent.

Subject to the terms of this Agreement, I may revoke or restrict My consent to electronic delivery of Account Documents at any time by notifying Robinhood Financial in writing of My intention to do so. I also understand that I have the right to request paper delivery of any Account Document that the law requires Robinhood Financial to provide Me in paper form. Robinhood Financial will not treat My request for paper copies as a withdrawal of My consent to electronic delivery of Account Documents. I understand that if I revoke or restrict My consent to electronic delivery of Account Documents or request paper delivery of same, Robinhood Financial, in its sole discretion, may charge Me a reasonable service fee for the delivery of any Account Document that would otherwise be delivered to Me electronically, restrict or close My account, or terminate My access to Robinhood Financial's services. I understand that neither My revocation or restriction of consent, My request for paper delivery, nor Robinhood Financial's delivery of paper copies of Account Documents will affect the legal effectiveness or validity of any electronic communication provided while My consent was in effect.

## F. Duration of Consent.

My consent to receive electronic delivery of Account Documents will be effective immediately and will remain in effect unless and until either I or Robinhood Financial revokes it. I understand that it may take up to three (3) Business Days to process a revocation of consent to electronic delivery, and that I may receive electronic notifications until such consent is processed.

## G. Hardware and Software Requirements.

I understand that in order to receive electronic deliveries, I must have access to a computer or Mobile Device with Internet access, a valid e-mail address, and the ability to download such applications as Robinhood Financial may specify and to which I have access. I also understand that if I wish to download, print, or save any information I wish to retain, I must have access to a printer or other device in order to do so.

2020.12

163

**H. Consent and Representations.**

I hereby agree that I have carefully read the above information regarding informed consent to electronic delivery and fully understand the implications thereof. Additionally, I hereby agree to all conditions outlined above with respect to electronic delivery of any Account Document. I will maintain a valid e-mail address and continue to have access to the Internet. If My e-mail address changes, I agree to immediately notify Robinhood Financial of My new e-mail address in writing.

**37. Miscellaneous Provisions.**

The following provisions shall also govern this Agreement:

**A. Contact Information.**

Robinhood Customer Service may be contacted by visiting support.robinhood.com or by email at help@robinhood.com.

**B. Interpretation.**

The heading of each provision hereof is for descriptive purposes only and shall not be (1) deemed to modify or qualify any of the rights or obligations set forth herein or (2) used to construe or interpret any of the provisions hereunder. When a reference is made in this Agreement to a Section, such reference shall be to a Section of this Agreement unless otherwise indicated. Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation." The word "or," when used in this Agreement, has the inclusive meaning represented by the phrase "and/or." Unless the context of this Agreement otherwise requires: (i) words using the singular or plural number also include the plural or singular number, respectively; and (ii) the terms "hereof," "herein," "hereunder" and derivative or similar words refer to this entire Agreement. References to any law shall be deemed to refer to such law as amended from time to time and to any rules or regulations promulgated thereunder.

**C. Binding Effect; Assignment.**

This Agreement shall bind My heirs, assigns, executors, successors, conservators and administrators. I may not assign this Agreement or any rights or obligations under this Agreement without first obtaining Robinhood's prior written consent. Robinhood may assign, sell, or transfer My Account and this Agreement, or any portion thereof, at any time, without My prior consent.

**D. Severability.**

If any provisions or conditions of this Agreement are or become inconsistent with any present or future law, rule, or regulation of any applicable government, regulatory or self-regulatory agency or body, or are deemed invalid or unenforceable by any court of competent jurisdiction, such provisions shall be deemed rescinded or modified, to the extent permitted by applicable law, to make this Agreement in compliance with such law, rule or regulation, or to be valid and enforceable, but in all other respects, this Agreement shall continue in full force and effect.

**E. Website Postings.**

I agree and understand that Robinhood Financial may post other specific agreements, disclosures, policies, procedures, terms, and conditions that apply to My use of the App, the Website, or My Account

164

on the Website ("Website Postings"). I understand that it is My continuing obligation to understand the terms of the Website Postings, and I agree to be bound by the Web Postings as are in effect at the time of My use.

**F. Entirety of Agreement.**

This Agreement, any attachments hereto, other agreements and policies referred to in this Agreement (including the Website Postings), and the terms and conditions contained in My Account statements and confirmations, contain the entire agreement between Robinhood and Me and supersede all prior or contemporaneous communications and proposals, whether electronic, oral, or written, between Robinhood and Me, provided, however, that any and all other agreements between Robinhood and Me, not inconsistent with this Agreement, will remain in full force and effect.

**G. Amendment.**

Robinhood may at any time amend this Agreement without prior notice to Me. The current version of the Agreement will be posted on the Website and My continued Account activity after such amendment constitutes My agreement to be bound by all then-in-effect amendments to the Agreement, regardless of whether I have actually reviewed them. Continued use of the App, the Website or any other Robinhood Financial services after such posting will constitute My acknowledgment and acceptance of such amendment. I agree to regularly consult the Website for up-to-date information about Robinhood Financial services and any modifications to this Agreement. Robinhood is not bound by any verbal statements that seek to amend the Agreement.

**H. Termination.**

Robinhood may terminate this Agreement, or close, deactivate, or block access to My Account at any time in its sole discretion. I will remain liable to Robinhood for all obligations incurred in My Account, pursuant to this Agreement, or otherwise, whether arising before or after termination. I may terminate this Agreement after paying any obligations owed upon written notice. This Agreement survives termination of My Account.

**I. No Waiver; Cumulative Nature of Rights and Remedies.**

I understand that Robinhood's failure to insist at any time upon strict compliance with any term contained in this Agreement, or any delay or failure on Robinhood's part to exercise any power or right given to Robinhood in this Agreement, or a continued course of such conduct on Robinhood's part, shall at no time operate as a waiver of such power or right, nor shall any single or partial exercise preclude any other further exercise. All rights and remedies given to Robinhood in this Agreement are cumulative and not exclusive of any other rights or remedies to which Robinhood is entitled.

**J. International Customers.**

The products and services described on the Website are offered only in jurisdictions where they may be legally offered. Neither the Website nor the App shall be considered a solicitation for or offering of any investment product or service to any person in any jurisdiction where such solicitation or offering would be illegal. I understand that Robinhood, in its sole discretion, may accept unsolicited accounts from non-U.S. residents, depending on the country of residence and other factors. I understand that Robinhood is based in the United States and that Robinhood accepts only U.S. currency in Robinhood's customer accounts.

165

### K. Governing Law.

This Agreement and all transactions made in My Account shall be governed by the laws of the State of California (regardless of the choice of law rules thereof), except to the extent governed by the federal securities laws, FINRA Rules, and the regulations, customs and usage of the exchanges or market (and its clearing house) on which transactions are executed.

### 38. Arbitration.

A. This Agreement contains a pre-dispute arbitration clause. By signing an arbitration agreement, the parties agree as follows: (1) All parties to this Agreement are giving up the right to sue each other in court, including the right to a trial by jury, except as provided by the rules of the arbitration forum in which a claim is filed. (2) Arbitration awards are generally final and binding; a party's ability to have a court reverse or modify an arbitration award is very limited. (3) The ability of the parties to obtain documents, witness statements and other discovery is generally more limited in arbitration than in court proceedings. (4) The arbitrators do not have to explain the reason(s) for their award unless, in an eligible case, a joint request for an explained decision has been submitted by all parties to the panel at least 20 days prior to the first scheduled hearing date. (5) The panel of arbitrators will typically include a minority of arbitrators who were or are affiliated with the securities industry. (6) The rules of some arbitration forums may impose time limits for bringing a claim in arbitration. In some cases, a claim that is ineligible for arbitration may be brought in court. (7) The rules of the arbitration forum in which the claim is filed, and any amendments thereto, shall be incorporated into this Agreement. B. Any controversy or claim arising out of or relating to this Agreement, any other agreement between Me and Robinhood, any Account(s) established hereunder, any transaction therein, shall be settled by arbitration in accordance with the rules of FINRA Dispute Resolution, Inc. ("FINRA DR"). I agree to arbitrate any controversy or claim before FINRA DR in the State of California. C. This agreement to arbitrate constitutes a waiver of the right to seek a judicial forum unless such a waiver would be void under the federal securities laws. If I am a foreign national, non-resident alien, or if I do not reside in the United States, I agree to waive My right to file an action against Robinhood in any foreign venue. D. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until: (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver of any rights under this Agreement except to the extent stated herein.

ACCEPTED AND AGREED: I acknowledge that I have read the preceding terms and conditions of this Agreement, that I understand them and that I hereby manifest my assent to, and my agreement to comply with, those terms and conditions by accepting this agreement. **I ALSO UNDERSTAND THAT BY ACCEPTING THIS AGREEMENT I HAVE ACKNOWLEDGED THAT THIS AGREEMENT CONTAINS A PREDISPUTE ARBITRATION CLAUSE IN SECTION 38 HEREIN. I ALSO AGREE (1) THAT ANY OF MY MARGIN ACCOUNT SECURITIES MAY BE BORROWED BY ROBINHOOD OR LOANED TO OTHERS; (2) I HAVE RECEIVED A COPY OF THIS AGREEMENT AND (3) I HAVE REVIEWED A COPY OF THE MARGIN DISCLOSURE STATEMENT.**

### Appendix A

### Electronic Fund Transfer Services Disclosures

The following disclosures apply to the use of any EFT services offered by Robinhood, including the Card, ACH transactions and the Move Money functionality of the App.

Solely for purposes of these disclosures: (i) references to the Bank shall include any financial institution that issues the Card or provides services in connection with ACH, Move Money or other EFT transactions; (ii) "you" and "your" mean the owner of the Account; and (iii) "we" and "us" means Robinhood and the Bank collectively.

166

### 1. Your Liability.

Contact Robinhood Customer Service AT ONCE if you believe your Card or PIN has been lost or stolen or if you believe that an electronic fund transfer has been made without your permission. Telephoning is the best way of keeping your losses down. You could lose all the Available Funds in your Account (plus your maximum overdraft line of credit). If you tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, you can lose no more than $50 if someone used your Card or PIN without your permission.

If you do NOT tell Robinhood within 2 business days after you learn of the loss or theft of your Card or PIN, and Robinhood can prove that it could have stopped someone from using your Card or PIN without your permission if you had told Robinhood, you could lose as much as $500.

Also, if your statement shows transfers that you did not make, including those made by Card or using your PIN, tell Robinhood at once. If you do not tell Robinhood within sixty (60) days after the statement was mailed to you, or otherwise made available to you, you may not get back any money you lost after the sixty (60) days if Robinhood can prove that Robinhood could have stopped someone from taking the money if you had told Robinhood in time. If a good reason (such as a long trip or a hospital stay) kept you from telling Robinhood, Robinhood will extend the time periods.

### 2. Contact in event of unauthorized transfer.

If you believe your Card or PIN has been lost or stolen, contact Robinhood by emailing help@robinhood.com.

### 3. Business Days.

Business Days are Monday through Friday, excluding federal holidays.

### 4. Transfer Types and Limitations.

You may use your Card to make purchases at any merchant that accepts Mastercard debit cards or debit cards of other networks in which the Bank participates, and to make ATM withdrawals, in each case subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement. You acknowledge and agree that the value available to you for use with the Card is limited to the Available Funds in your Account. So long as you do not exceed the Available Funds in your Account, you may use the Card to purchase goods or services wherever the Card is honored, and to obtain cash by initiating cash withdrawal transactions through the Card from any financial institution or ATM that accepts the Card. Each time you use the Card, you authorize Robinhood to reduce the Available Funds in your Account by the amount of the purchase or withdrawal and any applicable fees, costs, or holdings. Nevertheless, if you exceed the Available Funds in your Account you shall remain fully liable to Robinhood for the amount of the transactions and any applicable fees and charges.

You may also make ACH withdrawals from your Account, either originated through Robinhood or originated by a third party (a "non-originated" withdrawal), subject to the Available Funds in your Account, the transaction limits described below, and the other terms and conditions of this Agreement. You also may make ACH deposits to your Account, either originated through Robinhood or originated by a third party (a "non-originated" deposit), subject to the transaction limits described below.

There are limits on the dollar amount of transactions you can make with your Card each day and each month, and limits on the amount of ACH withdrawals and deposits you can make each day. The following lists the limits for each type of transaction:

**Originated ACH Withdrawals*** Daily Limit: $50,000.00
Weekly Limit: N/A Monthly Limit: N/A

2020.12

167

**Originated ACH Deposits*** Daily Limit: $50,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Non-Originated ACH Withdrawals*** Daily Limit: $250,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Non-Originated ACH Deposits*** Daily Limit: $250,000.00
Weekly Limit: N/A Monthly Limit: N/A

**Point of Sale Purchases with the Card*** Daily Limit: $5,000.00 Weekly Limit: N/A Monthly Limit:
$15,000.00

**ATM Withdrawals*** Daily Limit: $510.00 Weekly Limit: N/A Monthly Limit: $5,000.00

**Originated ACH*** Daily Limit: N/A, subject to the Weekly Limit Weekly Limit: $2,999 Monthly Limit: N/A

**5. Fees.**

We will not charge you any fees for use of ATMs that are part of the AllPoint or MoneyPass ATM
networks, or for point of sale transactions using the Card, or for initiating other EFTs on your behalf. If
you withdraw funds from ATMs outside the AllPoint or MoneyPass ATM networks, you may be
separately assessed fees by those ATM owners or operators.

**6. Confidentiality.**

We may disclose information to third parties about you, your Card, or the transactions you make using
any of the EFT services we provide:

1. Where it is necessary or helpful for completing or correcting transactions and resolving claims
   regarding transactions;
2. In order to verify the existence and condition of your Card or your Account for a third party, such
   as a merchant;
3. In order to comply with a valid request by a government agency, a court order, or other legal or
   administrative reporting requirements;
4. If you consent by giving us your written permission;
5. To our employees, auditors, affiliates, service providers, or attorneys as needed;
6. In order to prevent, investigate or report possible illegal activity;
7. In order to issue authorizations for transactions on the Card;
8. As permitted by applicable law; or
9. Otherwise as necessary to fulfill our obligations under this Agreement and the terms applicable to
   the EFT service you are using.

Please see Robinhood's privacy policy, available at about robinhood.com/legal, and the applicable
Bank's privacy policy, available at https://www.suttonbank.com/_/kcms-doc/85/49033/WK-Privacy-
Disclosure-1218.pdf, for further details. (The Robinhood privacy policy and the applicable Bank's privacy
policy are referred to collectively as the "Privacy Policies"). You hereby agree to Robinhood's and the
Bank's collection, use and sharing of information about you and the Card as provided in the Privacy
Policies, which are made a part of this Agreement. The Privacy Policies also tell you how you can (i)
limit the ways in which Bank and Robinhood share information about you, or (ii) request corrections to
the information that Bank or Robinhood maintain about you. You agree that information you provide in
connection with your Card or other EFT services you use is being provided directly to both Robinhood as
the holder of the Account associated with the service and the Bank as the Card issuer or provider of the
EFT service, as applicable.

**7. Documentation.**

*Terminal Transfers.* You can get a receipt at the time you make any transfer to or from your Account
using an ATM from the AllPoint or MoneyPass ATM networks or at the point of sale.

168

*Preauthorized Credits.* If you have arranged to have direct deposits made to your Account at least once every 60 days from the same person or company, the person or company making the deposit will tell you every time they send us the money. You can also check your Account online to see if a deposit has been received.

*Periodic Statements.* You will get a monthly Account statement, unless there are no transfers in a particular month. In any case you will get the statement at least quarterly. You may obtain information about the Available Funds in your Account and a history of your Cash Management transactions on the App.

## 8. Preauthorized Payments/Stop Payment Procedure and Notice of Varying Amounts.

You do not have the right to request that Robinhood in advance make regular payments out of your Account, although you may ask third parties to initiate regular payments out of your Account.

*Right to stop payment:* If you have automatic recurring payments taken out of your Account, you can stop any of these payments by contacting us at help@robinhood.com.  You must contact us in time for us to receive your request at least three business days before the payment is scheduled to be made.

*Notice of varying amounts:* If these regular payments vary in amount, the party you are going to pay will tell you, 10 days before each payment, when the payment will be made and how much it will be. (The party you are going to pay may allow you to choose to get this notice only when the payment would differ by more than a certain amount from the previous payment, or when the amount would fall outside certain limits that you set.)

*Liability for failure to stop payment of a preauthorized transfer:* If you order us to stop a payment at least three business days before the transfer is scheduled and we do not do so, we will be liable for your losses or damages.

## 9. Our Liability.

If we do not complete a transaction to or from your Account on time or in the correct amount according to our Agreement with you, we will be liable for your losses or damages. However, there are some exceptions.  We will not be liable, for instance:

1. If through no fault of Robinhood or the Bank, you do not have enough Available Funds in your Account to complete the transaction;

2. If a merchant refuses to accept your Card;

3. If an electronic terminal where you are making a transaction does not operate properly, and you knew about the problem when you initiated the transaction;

4. If access to your Card has been blocked after you reported your Card lost or stolen;

5. If there is a hold or your funds are subject to legal or administrative process or other encumbrance restricting their use;

6. If Robinhood or the Bank have reason to believe the requested transaction is unauthorized;

7. If circumstances beyond the control of Robinhood or the Bank (such as fire, flood, or computer or communication failure) prevent the completion of the transaction, despite reasonable precautions that Robinhood or the Bank have taken; or

8. For any other exception stated in this Agreement with you or by applicable law.

169

**10. Errors or Questions About Electronic Transfers.**

In case of errors or questions about your electronic transfers, including your Card transactions, or if you think your statement or receipt is wrong or if you need more information about a transaction listed on the statement or receipt, contact Robinhood by emailing help@robinhood.com. Robinhood must hear from you no later than sixty (60) days after you were sent the FIRST statement on which the problem or error appeared.

1. Tell Robinhood your name and account number.

2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe it is an error or why you need more information.

3. Tell Robinhood the dollar amount of the suspected error.

Robinhood will determine whether an error occurred within ten (10) business days after Robinhood hears from you and will correct any error promptly. If Robinhood needs more time, however, it may take up to forty-five (45) days to investigate your complaint or question. If Robinhood decides to do this, Robinhood will credit your Account within ten (10) business days for the amount you think is in error, so that you will have the use of the money during the time it takes Robinhood to complete our investigation.

For errors involving new accounts, point of sale, or foreign initiated transactions, Robinhood may take up to ninety (90) days to investigate your complaint or question. For new accounts, Robinhood may take up to twenty (20) business days to credit your Account for the amount you think is in error.

Robinhood will tell you the results of our investigation within three (3) business days after completing the investigation. If Robinhood decides that there was no error, Robinhood will send you a written explanation. You may ask for copies of the documents that Robinhood used in our investigation.

170

# EXHIBIT B

1   Antony L. Ryan (*pro hac vice* pending)
        aryan@cravath.com
2   Kevin J. Orsini (*pro hac vice* pending)
        korsini@cravath.com
3   CRAVATH, SWAINE & MOORE LLP
    825 Eighth Avenue
4   New York, New York 10019-7475
    Telephone:  (212) 474-1000
5   Facsimile:  (212) 474-3700

6   Naeun Rim (State Bar No. 263558)
        nrim@birdmarella.com
7   Grace W. Kang (State Bar No. 271260)
        gkang@birdmarella.com
8   BIRD, MARELLA, BOXER, WOLPERT, NESSIM,
    DROOKS, LINCENBERG & RHOW, P.C.
9   1875 Century Park East, 23rd Floor
    Los Angeles, California 90067-2561
10  Telephone:  (310) 201-2100
    Facsimile:  (310) 201-2110

11

12  *Attorneys for Defendants Robinhood Financial LLC;*
    *Robinhood Securities, LLC; and Robinhood Markets, Inc.*

13            **UNITED STATES DISTRICT COURT**

14            **CENTRAL DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16   LEVI COBOS, an individual and those similarly situated, | Case No. 21-cv-00843-VAP-MRW |
| 17 | [Related Cases 2:21-cv-00835-VAP (MRWx); 2:21-cv-00837-VAP (MRWx)] |
| 18   Plaintiff(s), | |
| 19   v. | **ROBINHOOD FINANCIAL LLC, ROBINHOOD SECURITIES, LLC AND ROBINHOOD MARKETS, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S *EX PARTE* APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ORDER SHOWING CAUSE FOR A PRELIMINARY INJUNCTION** |
| 20   ROBINHOOD FINANCIAL LLC, a Delaware limited liability company; | |
| 21   ROBINHOOD SECURITIES, LLC, a Delaware limited liability company; | |
| 22   and ROBINHOOD MARKETS, INC., | |
| 23   a Delaware corporation, | |
| 24   Defendants. | |
| 25 | |
| 26 | Judge:  Hon. Virginia A. Phillips |
| 27 | Courtroom:  8A
Hearing Date:  February 10, 2021
Hearing Time:  10:00 A.M. |

28   OPPOSITION TO PLAINTIFF'S EX PARTE                                    CASE NO. 21-cv-00843-VAP-MRW
     APPLICATION FOR A TRO                        - 1 -

172

1

**TABLE OF CONTENTS**

2

**Page**

3   TABLE OF AUTHORITIES.................................................................3

4   PRELIMINARY STATEMENT..........................................................6

5   FACTUAL BACKGROUND...............................................................8

6   I.    Robinhood, the Customer Agreement and Trading Mechanics. ....................8

    II.   Robinhood's Response to Unprecedented Trading Volatility. .....................10

7   LEGAL STANDARD.......................................................................13

8   ARGUMENT..................................................................................14

9   I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS. ..............14

10        A.   Plaintiff's Securities Exchange Act Claim Fails................................14

11             i.    Plaintiff Does Not Have a Viable Private Right of
                     Action. ...............................................................................14

12             ii.   Plaintiff Cannot Prove Section 9(a) Market Manipulation......15

13                   (1)   Plaintiff Fails to Allege Manipulative Conduct ............15

14                   (2)   Plaintiff Cannot Prove Scienter....................................17

15        B.   Plaintiff's Computer Fraud and Abuse Act Claim Fails....................18

16        C.   Plaintiff's Unfair Competition Law Claim Fails. ............................20

17             i.    Plaintiff Lacks Standing to Pursue His UCL Claim. ................20

               ii.   Plaintiff's UCL Claim Cannot Succeed on the Merits. ...........21

18             iii.  Robinhood's Lawful Acts Cannot Violate the UCL. ...............23

19        D.   Plaintiff's Negligence Claim Fails.................................................24

20   II.   PLAINTIFF CANNOT CLEARLY SHOW IRREPARABLE HARM. .......25

21        A.   Plaintiff Has Not Demonstrated Past, Present or Imminent
                Harm. ......................................................................................25

22        B.   Any Alleged Harm Can Be Remedied with Damages.........................27

23   III.  THE BALANCE OF THE EQUITIES FAVORS DEFENDANTS. ............27

24   IV.   A TEMPORARY RESTRAINING ORDER IS NOT IN THE
           PUBLIC INTEREST. .................................................................29

25   V.    PLAINTIFF WOULD HAVE TO POST A BOND SUFFICIENT TO
26         COVER ALL POTENTIAL HARM TO ROBINHOOD. .....................30

27   CONCLUSION...............................................................................30

18

19

20

21

22

23

24

25

26

27

28

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3  **Cases**

4  *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531 (1987) .....................................27

5  *Bejou v. Bank of Am.*, No. CV F 13-0125 LJO SMS,
   2013 WL 1759126 (E.D. Cal. Apr. 24, 2013) ...................................................21

6

   *Bofi Fed. Bank v. Erhart*, 2016 WL 4680291 (S.D. Cal. Sept. 7, 2016) ................27

7

   *Byars v. SCME Mortg. Bankers, Inc.*, 109 Cal. App. 4th 1134 (2003) ..................23

8

   *Caribbean Marine Servs. Co. v. Baldrige*,

9    844 F.2d 668 (9th Cir. 1988) ...........................................................................25

10  *Connolly v. Havens*, 763 F. Supp. 6 (S.D.N.Y. 1991) ............................................17

11  *Crane Co. v. Westinghouse Air Brake Co.*,
    419 F.2d 787 (2d Cir. 1969) .............................................................................16

12

   *de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293 (2d Cir. 2002) ..........24, 25

13

   *Dekalb Cty. Pension Fund v. Transocean Ltd.*,

14    817 F.3d 393 (2d Cir. 2016) .............................................................................18

15  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ...........................................14, 18

16  *Gurfein v. Ameritrade, Inc.*, 312 F. App'x 410 (2d Cir. 2009) ............................22

17  *Herb Reed Enterprises, LLC v. Florida Ent. Mgmt., Inc.*,
    736 F.3d 1239 (9th Cir. 2013) ..........................................................................26

18

   *In the Matter of Scottrade, Inc.*, Exchange Act Release No. 58012,

19    93 S.E.C. Docket 1550, 2008 WL 2510611 (June 24, 2008) .....................22, 25

20  *In re Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007) ...............................27

21  *In re Wet Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148 (C.D. Cal. 2007) ................18

22  *Jewelcor Inc. v. Pearlman*, 397 F. Supp. 221 (S.D.N.Y. 1975) .............................17

23  *John Labatt Ltd. v. Onex Corp.*, 890 F. Supp. 235 (S.D.N.Y. 1995) .....................29

24  *Jolley v. Welch*, 904 F.2d 988 (5th Cir. 1990) .....................................................17

25  *Lanovaz v. Twinings N. Am., Inc.*, 726 F. App'x 590 (9th Cir. 2018) ...................21

26  *Lopez v. Brewer*, 680 F.3d 1068 (9th Cir. 2012) .............................................13, 25

27  *Los Angeles Mem'l Coliseum Comm'n v. Nat'l Football League*,
    634 F.2d 1197 (9th Cir. 1980) ..........................................................................27

28  OPPOSITION TO PLAINTIFF'S EX PARTE                                 CASE NO. 21-cv-00843-VAP-MRW
    APPLICATION FOR A TRO                              - 3 -

| | |
|---|---|
| 1 | *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ...........................................21 |
| 2 | *LVRC Holdings LLC v. Brekka*, 581 F.3d 1127 (9th Cir. 2009) ..........................20 |
| 3 | *Mackell v. Wells Fargo Home Mortg.*, No. 16-CV-04202-BLF, 2017 WL 373077 (N.D. Cal. Jan. 26, 2017)...................................................24 |
| 4 | |
| 5 | *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873 (9th Cir. 2009) ..............................................................................14 |
| 6 | *Martin v. Int'l Olympic Comm.*, 740 F.2d 670 (9th Cir. 1984) ............................13 |
| 7 | *Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007 (C.D. Cal. July 13, 2020)...........................................................................17 |
| 8 | |
| 9 | *McElroy v. Majchrzak*, No. EDCV 20-2228 (JGB), 2020 WL 7248373 (C.D. Cal. Oct. 27, 2020)............................................................................17 |
| 10 | *Moroccanoil, Inc. v. Zotos Int'l, Inc.*, 230 F. Supp. 3d 1161 (C.D. Cal. 2017)...............................................................................................30 |
| 11 | |
| 12 | *N. Cheyenne Tribe v. Norton*, 503 F.3d 836 (9th Cir. 2007)................................27 |
| 13 | *Nuvasive, Inc. v. Cadwell Indus., Inc.*, No. 12CV3065 JLS (JMA), 2013 WL 12096625 (S.D. Cal. Nov. 4, 2013)...........................................23 |
| 14 | *Onel v. Top Ships, Inc.*, 806 F. App'x 64 (2d Cir. 2020) ....................................15 |
| 15 | *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150 (9th Cir. 2011).................................................................13 |
| 16 | *Peredia v. HR Mobile Servs., Inc.*, 25 Cal. App. 5th 680 (2018)........................24 |
| 17 | *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648 F.3d 295 (6th Cir. 2011) ............................................................................19 |
| 18 | |
| 19 | *Richardson v. Shearson/Am. Express Co.*, 573 F. Supp. 133 (S.D.N.Y. 1983)..................................................................................15 |
| 20 | |
| 21 | *SEC v. Malenfant*, 784 F. Supp. 141 (S.D.N.Y. 1992)........................................16 |
| 22 | *SEC v. Resch-Cassin & Co.*, 362 F. Supp. 964 (S.D.N.Y. 1973)..........................16 |
| 23 | *Sheen v. Wells Fargo Bank, N.A.*, 38 Cal. App. 5th 346 (2019) ...........................24 |
| 24 | *Sierra Military Health Servs., Inc. v. United States*, 58 Fed. Cl. 573 (2003)....................................................................................27 |
| 25 | *Stuhlbarg Int'l Sales Co. v. John D. Brush & Co.*, 240 F.3d 832 (9th Cir. 2001)..................................................................................28 |
| 26 | |
| 27 | *Thurmond v. Compaq Comp. Corp.*, 171 F. Supp. 2d 667 (E.D. Tex. 2001)................................................................................................19 |
| 28 | |

1   *United States v. Raisley*, 466 F. App'x 125 (3d Cir. 2012) .................................... 19

2   *Video Gaming Techs., Inc. v. Bureau of Gambling Control*, 356 F.
        App'x 89 (9th Cir. 2009) ................................................................................. 29

3
    *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008) ........................... 7, 13, 29
4
    *Wright v. Gen. Motors Acceptance Corp.*, 545 F. App'x 686 (9th Cir.
5        2013) ............................................................................................................. 20

6   *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952) ........................... 27

7   **Statutes & Rules**

8   15 U.S.C. § 78i .......................................................................................... *passim*

9   15 U.S.C. § 78u-4 ............................................................................................. 18

10  18 U.S.C. § 1030 ........................................................................................ 19, 21

11  Cal. Bus. & Prof. Code § 17200, *et seq.* ....................................................... 20, 21

12  Fed. R. Civ. P. 9 ............................................................................................... 18

13  Fed. R. Civ. P. 65 ............................................................................................. 30

14  Financial Industry Regulatory Authority (FINRA) Rule 5310 ....................... 22, 25

15  **Other Authorities**

16  62 Fed. Reg. 520 (Jan. 3, 1997) ........................................................................ 15

17  Joe Wallace, Amrith Ramkumar, Gunjan Banerji, *GameStop Mania
        Hits a Wall of Tighter Trading Terms*, Wall St. J. (Feb. 2, 2021,
18       6:06 PM) ......................................................................................................... 16

19  Quentin Webb, *Volatility Index Soars*, Wall St. J. (Jan. 27, 2021,
        10:43 PM) ....................................................................................................... 10
20
    Securities and Exchange Comm'n, "Thinking About Investing in the
21       Latest Hot Stock?" (Jan. 30, 2021) ..................................................... 6, 13, 23, 30

22  Telis Demos, *Why Did Robinhood Ground GameStop? Look at
        Clearing*, Wall St. J. (Jan. 29, 2021, 7:33 PM) ............................................... 9

23

24

25

26

27

28

176

**PRELIMINARY STATEMENT**

1
2    Plaintiff Levi Cobos seeks an extraordinary temporary restraining
3 order to force Defendants Robinhood Financial LLC ("RHF"), Robinhood
4 Securities, LLC ("RHS") and Robinhood Markets, Inc. ("RHM") (collectively,
5 "Robinhood") to accept customer trades for *any* stock without *any* limitation.  This
6 demand flies in the face of the statement issued *after the events at issue* by the
7 responsible government agency—the Securities and Exchange Commission
8 ("SEC")—confirming in no uncertain terms that "broker-dealers may reserve the
9 ability to reject or limit customer transactions.  This may be done for legal,
10 compliance, or risk management reasons, and is typically discussed in the customer
11 account agreement."[1]  In fact, Robinhood explicitly reserved that very right to
12 reject or limit customer transactions in the agreement that Mr. Cobos accepted
13 upon opening his account.  Granting Plaintiff's requested relief would strip RHS
14 (the Robinhood clearing broker) of the ability to prudently manage risk and stay in
15 compliance with applicable deposit requirements and regulations.

16    Robinhood—a broker-dealer that is democratizing finance for all—made the
17 difficult decision to limit customer purchases for a select number of highly volatile
18 securities from January 28 through February 4, 2021.  It did not make the decision
19 as part of a nefarious conspiracy to benefit hedge funds.  To the contrary, it made
20 that decision for entirely lawful reasons.  RHS is obligated to pay deposits to
21 centralized clearinghouses to cover Robinhood customers' trades during a two-day
22 settlement period in which the clearinghouse processes the transactions.  The
23 purpose of the deposits—which RHS covers with its own capital—is to cover
24 potential risk to the firm.  Clearinghouses require these deposits to protect the
25 integrity and stability of the stock market as a whole.

26
27   [1] *See* Securities and Exchange Comm'n, "Thinking About Investing in the Latest Hot Stock?" (Jan. 30, 2021) ("SEC Statement"),
28 https://www.sec.gov/oiea/investor-alerts-and-bulletins/risks-short-term-trading-based-social-media-investor-alert.

OPPOSITION TO PLAINTIFF'S EX PARTE       CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

6

177

1     On the days at issue here, high trading volume and extreme volatility
2  in certain stocks that had become "memes" on the internet resulted in an
3  unprecedented deposit demand from a major clearinghouse.  As a result, to manage
4  its risk, Robinhood exercised the discretion that it reserved in its Customer
5  Agreement and, consistent with the SEC's guidance, decided to "limit customer
6  transactions" in a small number of stocks.  This temporary measure allowed
7  Robinhood to continue to support customer trading in as many securities as
8  possible for Robinhood's entire customer base.  This decision was made by
9  Robinhood acting on its own, and not at the behest, or for the benefit, of any third
10  party.  As market conditions eased, Robinhood lifted *all* of the restrictions by
11  February 5, 2021.

12     Plaintiff does not meet any of the four prongs of the *Winter* test
13  necessary to obtain the requested injunction.  *See Winter v. Nat. Res. Def. Council,*
14  *Inc.*, 555 U.S. 7, 20 (2008).  Robinhood's temporary restrictions were authorized
15  by its Customer Agreements, and did not violate the Securities Exchange Act, the
16  Computer Fraud and Abuse Act or California's Unfair Competition Law.  As such,
17  Plaintiff is highly unlikely to succeed on the merits.  *See infra* Arg. Part I.

18     Plaintiff also cannot show that he has suffered or will suffer
19  irreparable harm.  Robinhood never prevented its customers from selling securities
20  they already held; the temporary restrictions—which have now been lifted
21  entirely—related only to the purchase of certain *additional* securities.  It is entirely
22  speculative whether Plaintiff would make or lose money on such purchases, and it
23  is entirely speculative as to whether any restrictions will be implemented in the
24  future and, if so, whether they will have any effect on Plaintiff.  Moreover, there
25  are other broker-dealers available from which Plaintiff could have purchased the
26  securities that were temporarily restricted, or can purchase any other securities in
27  the future.  *See infra* Arg. Part II.

28

1    The balance of equities also clearly weighs in favor of Defendants

2  (*see infra* Arg. Part III), and an injunction would not be in the public interest (*see*

3  *infra* Arg. Part IV).  The requested injunction would threaten to interfere with

4  Robinhood's compliance with clearinghouse deposit requirements and SEC net

5  capital regulations.  Those requirements and regulations are designed to protect the

6  stability of broker-dealers like Robinhood, safeguard its more than 13 million

7  customers, and protect the stability of the stock market.  An injunction overriding

8  Robinhood's contractually permitted discretion to take steps required in its

9  judgment to protect customers and meet regulatory requirements would risk

10  irreparable harm to the Company, its customers and the investing public.

11                    **FACTUAL BACKGROUND**

12  **I.      Robinhood, the Customer Agreement and Trading Mechanics.**

13    Robinhood is an industry-changing financial services company

14  founded on the ethos of putting financial power into the hands of everybody—not

15  just the few and wealthy.  Started in 2013 by Vladimir Tenev and Baiju Bhatt,

16  Robinhood's securities business currently comprises three entities:  RHM, which

17  wholly owns RHF, the customer-facing introducing broker, and RHS, the clearing

18  broker.  Robinhood provides intuitive, easy access to the financial markets by

19  offering zero commission trades and a logical trading platform available on a

20  computer or mobile device.

21    Customers sign up for Robinhood by accessing Robinhood's website

22  or downloading the app.  Prospective customers are required to review and agree to

23  certain terms and conditions.  One of the required agreements, the Customer

24  Agreement, provides that Robinhood "may, in its discretion, prohibit or restrict the

25  trading of securities, or the substitution of securities" in "any" of the customer's

26  accounts.  (Declaration of Brianna Bain ("Bain Decl.") Ex. D ¶ 16; *see also* Bain

27  Decl. ¶¶ 12-13; Bain Decl. Ex. D ¶ 5.F.)  The Customer Agreement further

28

1    provides that "Robinhood may at any time, at its sole discretion and without prior

2    notice to [the customer]: (i) prohibit or restrict [the customer's] access to the use

3    of the App or the Website or related services and [the customer's] ability to trade,

4    (ii) refuse to accept any of [the customer's] transactions, (iii) refuse to execute any

5    of [the customer's] transactions, or (iv) terminate [the customer's] Account".

6    (Bain Decl. Ex. D ¶ 16.)

7            Once an approved customer would like to place a trade, a number of

8    steps occur behind the scenes.  The basic mechanics works as follows:  when a

9    customer submits a "buy" or "sell" order for a security and RHF accepts the trade,

10   RHF sends the order to RHS, which in turn sends the order to market makers to

11   execute the trade.  (Declaration of Jim Swartwout ("Swartwout Decl.") ¶ 10.)

12   Market makers send a record of the trade back to RHS, which works with a

13   clearinghouse to process the trade.  (*Id.* ¶ 6.)  Clearinghouses are SEC-registered

14   organizations that act as the central depository for securities.  (*Id.* ¶¶ 5-7.)  The

15   main United States clearinghouse for equities is the National Securities Clearing

16   Corporation ("NSCC"), part of a larger clearing organization called Depository

17   Trust & Clearing Corporation ("DTCC").[2]  (*Id.* ¶ 6.)  It takes two days for the

18   clearinghouse to transfer the stock to the buyer and funds to the seller.  (*Id.* ¶ 10.)

19   This is known as the "settlement period" or the "T+2" settlement.  (*Id.*)

20           The two-day period between execution and settlement leaves open a

21   risk that a participant in the transaction will be unable to meet its obligations.  A

22   number of protections are in place to reduce this risk.  First, clearinghouses require

23   clearing brokers, like RHS, to pay a deposit to clearinghouses to facilitate and clear

24   trades until the trades are settled.  (*Id.* ¶ 11.)  The deposit amount is based on risk,

25   which the clearinghouses calculate by looking to, among other things, a firm's

26

27       [2] Telis Demos, *Why Did Robinhood Ground GameStop? Look at Clearing*,
     Wall St. J. (Jan. 29, 2021, 7:33 PM), https://www.wsj.com/articles/how-clearing-
28   demands-grounded-the-wallstreetbets-stocks-for-a-day-11611966092.

OPPOSITION TO PLAINTIFF'S EX PARTE                           CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

9

180

1   customer holdings and using a volatility multiplier.  (*Id.*)  To clear and settle

2   customer transactions, clearing brokers, like RHS, must satisfy those deposit

3   requirements, which can change throughout the course of a single day.  (*Id.* ¶ 12.)

4          Second, SEC regulations require broker-dealers like RHS and RHF to

5   maintain a certain level of net capital to ensure the ability to promptly satisfy their

6   liabilities at all times.  (*Id.* ¶ 14.)  Together, the clearinghouse deposits and the net

7   capital requirements require Robinhood to carefully monitor liquidity.  This can be

8   particularly challenging for any broker-dealer during periods of volatility.  But the

9   purpose of these requirements is simple—to protect investors.  (*Id.* ¶ 15.)

10   **II.   Robinhood's Response to Unprecedented Trading Volatility.**

11          The week of January 25 to 29, 2021 presented unprecedented

12   challenges to Robinhood's ability to satisfy its obligations to clearinghouses.  That

13   week, the financial markets experienced extreme levels of volatility and

14   unprecedented volume, well outside the bounds expected in the ordinary course of

15   business.  For example, on January 27, 2021, the Chicago Board Options Exchange

16   Volatility Index, or "VIX", spiked by 62%, a dramatic increase that the Wall Street

17   Journal reported was the third-largest percentage daily gain since 1990.[3]

18          During this period, Robinhood observed that a number of specific

19   securities were subject to particularly rapid price fluctuations, including GameStop

20   Corp. ("GME"), whose stock opened on January 22, 2021 at $42.59 per share, rose

21   to $76.79 by the end of January 25, 2021, and then spiked to $347.51 per share at

22   market close January 27, 2021, a 716% increase over four trading days.  In

23   response to these securities' price volatility, beginning on January 25, 2021, RHF

24   (the Robinhood introducing broker) began proactively increasing the stocks'

25   margin maintenance requirements to 100%—requiring purchasers to pay for their

26

27      [3] Quentin Webb, *Volatility Index Soars*, Wall St. J. (Jan. 27, 2021, 10:43 PM),

28   https://www.wsj.com/livecoverage/amc-gamestop-stock-market/card/G0TKmyrTdokxPNjwtwje.

181

1   shares in full—to begin to mitigate the risks that extreme market volatility posed to

2   both the company and investors.  (Declaration of Shiv Verma ("Verma Decl.")

3   ¶ 10.)  RHF also limited the number of options contract for these stocks that could

4   be acquired on Robinhood's platform to ensure that RHF and RHS could

5   sufficiently apply their capital to serve *all* of its customers.  (*Id.*)

6        This surge in volatility and volume also led to a surge in

7   clearinghouse-mandated deposit requirements.  (*Id.* ¶¶ 11-12; Swartwout Decl.

8   ¶¶ 25-26.)  From January 25 to 27, 2021 alone, the NSCC increased RHS's deposit

9   requirements by several hundred million dollars, which RHS met.  (Verma Decl.

10   ¶ 11.)  In response, Robinhood strengthened its cash position by drawing down on

11   an existing line of credit from January 25 to 28, 2021.  (*Id.* ¶ 18.)

12        Then, early in the morning on January 28, 2021, Robinhood's

13   operations team was notified that the NSCC had again responded to the immense

14   volatility in the markets, this time increasing RHS's deposit requirements by more

15   than $3 billion.  (*Id.* ¶ 12; Swartwout Decl. ¶ 25.)

16        A substantial portion of the increased deposit requirement was due to

17   NSCC's value-at-risk ("VaR") calculation for specific stocks, including GME and

18   AMC Entertainment Holdings, Inc. ("AMC").  (Verma Decl. ¶ 13; Swartwout

19   Decl. ¶ 26.)  To mitigate this sudden increase, Robinhood proposed that, as a

20   temporary measure, it would limit customer purchases for certain volatile stocks

21   driving the increased deposit requirements.  (Verma Decl. ¶ 13; Swartwout Decl.

22   ¶ 26.)  Robinhood left available the option for customers to sell their positions, a

23   "position closing only" restriction.  (Verma Decl. ¶ 14; Swartwout Decl. ¶ 27.)

24        The purchase restrictions were a necessary, but difficult step, which

25   RHS instructed RHF to take to protect the company, its customers and the markets.

26   Following this preventative measure, the NSCC lowered the deposit requirement

27   for January 28.  (Verma Decl. ¶¶ 15-16; Swartwout Decl. ¶ 28.)  While the balance

28

OPPOSITION TO PLAINTIFF'S EX PARTE                                      CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO
                                            11

182

1   remained hundreds of millions of dollars above typical levels, Robinhood

2   immediately paid all such requirements that morning.  (Verma Decl. ¶ 13;

3   Swartwout Decl. ¶ 26.)  RHS was therefore able to meet its deposit requirements

4   and serve its growing customer base.  (Verma Decl. ¶ 14; Swartwout Decl. ¶ 27.)

5           Beginning after market close on January 28, 2021, Robinhood began

6   taking steps to ease the restrictions that it had placed on the most volatile stocks.

7   (Swartwout Decl. ¶¶ 30-32.)  Rather than marking the relevant tickers "position

8   closing only," Robinhood set a maximum number of shares or options contract for

9   each customer on a security-by-security basis, providing customers with an

10   opportunity to buy the impacted securities, albeit with caps.  (*Id.*)  RHM also raised

11   approximately $3.4 billion in additional capital from private investors between

12   January 28 and February 1, 2021, $1 billion of which it contributed to RHS so

13   RHS could further reduce trading restrictions.  (Verma Decl. ¶¶ 17-21.)

14           Robinhood did not take any of the above steps at the behest, or for the

15   benefit, of any third party.  (Verma Decl. ¶¶ 22-24; Swartwout Decl. ¶¶ 33-34.)

16   Nor did Robinhood take these steps to protect any positions it held on its own

17   account in the relevant securities.  Robinhood did not hold any short positions in

18   any of the "meme" stocks during the relevant time period.  (Verma Decl. ¶ 25;

19   Swartwout Decl. ¶ 35; Bain Decl. ¶ 35.)

20           The measures described above were not unique to Robinhood's

21   platform during this period.  (Swartwout Decl. ¶ 29.)  The SEC released an

22   investor alert and bulletin on January 30, 2021, titled *Thinking About Investing in*

23   *the Latest Hot Stock? Understand the Significant Risks of Short-Term Trading*

24   *Based on Social Media*, which not only warned retail investors of the risks of

25   short-term investing in a volatile market, but also made clear that broker-dealers

26           may reserve the ability to reject or limit customer

27           transactions.  This may be done for legal, compliance or risk management reasons, and is typically discussed in the customer account agreement.  In certain circumstances,

28           broker-dealers may determine not to accept orders where

1 a transaction presents certain associated compliance or
 legal risks.

2 *See* SEC Statement.  This guidance was consistent with the rationale behind

3 Robinhood's Customer Agreement trade restriction provisions, as discussed above.

4 Indeed, the trading restrictions that Robinhood put in place were limited—just one

5 week later, by February 5, 2021, Robinhood lifted *all* of the restrictions.

6 (Swartwout Decl. ¶ 32.)

7 **LEGAL STANDARD**

8 A temporary restraining order ("TRO") is "an extraordinary and

9 drastic remedy, one that should not be granted unless the movant, *by a clear*

10 *showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072

11 (9th Cir. 2012) (citation omitted) (emphasis in original).  To obtain either a TRO or

12 a preliminary injunction, a plaintiff must prove, by a clear showing, that:  (i) he is

13 likely to succeed on the merits; (ii) he is likely to suffer irreparable harm in the

14 absence of preliminary relief; (iii) the balance of equities tips in his favor; and

15 (iv) an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council,*

16 *Inc.*, 555 U.S. 7, 20 (2008).  Where a plaintiff shows only "serious questions going

17 to the merits", he must compensate by showing "a balance of hardships that tips

18 sharply towards the plaintiff", along with the irreparable harm and public interest

19 prongs.  *Brewer*, 680 F.3d at 1072 (citation omitted).  Any injunctive relief

20 awarded "must be tailored to remedy the specific harm alleged".  *Park Vill.*

21 *Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir.

22 2011) (emphasis omitted) (citation omitted).

23 The Ninth Circuit has also made clear that when "a party seeks

24 mandatory preliminary relief that goes well beyond maintaining the status quo

25 *pendente lite*", the court "should be extremely cautious".  *Martin v. Int'l Olympic*

26 *Comm.*, 740 F.2d 670, 675 (9th Cir. 1984).  That heightened standard applies here.

27 Plaintiff seeks an Order requiring Robinhood to accept all customer-requested

28

OPPOSITION TO PLAINTIFF'S EX PARTE     CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

184

1   trades on its transaction platform absent a court or government order.  (Pl.'s Br.

2   at 7.)  That is not the status quo.  *See Marlyn Nutraceuticals, Inc. v. Mucos Pharma*

3   *GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (ordering affirmative steps "did

4   not operate simply to preserve the status quo").  As the SEC's January 30, 2021

5   guidance confirms, Robinhood has always maintained the discretion to refuse to

6   accept a transaction.  (*See* Bain Decl. ¶¶ 12-13; Bain Decl. Exs. C, D ¶¶ 5.F, 16.)

7                           **ARGUMENT**

8   **I.    PLAINTIFF IS UNLIKELY TO SUCCEED ON THE MERITS.**

9              Plaintiff brings four legal claims.  Each fails for a variety of legal and

10   factual reasons.  The first prong of the *Winter* test therefore favors denial.

11        A.    Plaintiff's Securities Exchange Act Claim Fails.

12              Plaintiff claims that Defendants violated Sections 9(a), 9(d) and 9(i)

13   of the Securities Exchange Act.  (Compl. ¶¶ 22, 43, 44.)  None of these claims

14   supports an injunction.

15        i.    *Plaintiff Does Not Have a Viable Private Right of Action.*

16              A civil plaintiff can seek relief under the Exchange Act only with

17   respect to those sections for which a private right of action was created.

18   Section 9(f) of the Exchange Act creates potential civil liability for any person who

19   "'willfully participates' in the manipulation of securities on a national exchange"

20   in violation of one of Sections 9(a), 9(b) or 9(c).  *Ernst & Ernst v. Hochfelder*, 425

21   U.S. 185, 211 n.28 (1976) (provision was then codified as section 9(e)).  This list

22   notably excludes Sections 9(d) and 9(i), for which there is no private right of

23   action.  Plaintiff therefore has no claim under sections 9(d) or 9(i).

24              Plaintiff also has no claim under Section 9(a).  While Section 9(f)

25   provides a private right of action for violations of Section 9(a), it does so only for

26   persons "*who shall purchase or sell any security* at a price which was affected by"

27   the alleged violation of Section 9(a).  15 U.S.C. § 78i(f) (emphasis added).  Here,

28

OPPOSITION TO PLAINTIFF'S EX PARTE                                CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

185

1   Plaintiff does not allege he bought or sold a security at an inflated or deflated price;

2   rather, he alleges Robinhood *prevented him* from buying certain securities.

3   (Compl. ¶¶ 25-26.)  He therefore lacks standing under Section 9(f).  *See*

4   *Richardson v. Shearson/Am. Express Co.*, 573 F. Supp. 133, 136 (S.D.N.Y. 1983)

5   ("[P]laintiffs do not claim that they purchased or sold [a security] at a price that

6   was affected by [defendant's] alleged violation of section 9.  Rather, they assert

7   that [defendant's] conduct induced them not to sell the stock.  For this reason

8   alone, Count IV [alleging a violation of Section 9(f)] must be dismissed.").[4]

9           ii.   *Plaintiff Cannot Prove Section 9(a) Market Manipulation.*

10          Plaintiff's Exchange Act claim also lacks merit because (i) he fails to

11  allege any conduct that courts consider manipulative under Section 9(a)(2); and

12  (ii) he fails to allege sufficiently that Robinhood acted with scienter.

13              (1)   *Plaintiff Fails to Allege Manipulative Conduct.*

14          By Plaintiff's own admission, actionable manipulation involves

15  "deception of investors" (Pl.'s Br. at 6), and requires "a showing that the

16  defendants took some action that was intended to mislead the investing public".

17  *Onel v. Top Ships, Inc.*, 806 F. App'x 64, 67 (2d Cir. 2020).

18          Plaintiff does not allege such "deception" here.  Instead, Plaintiff

19  concedes that Robinhood's stock purchase restrictions were publicly announced,

20  noting in the Complaint that Robinhood's CEO discussed the restrictions publicly

21  on television on the same day Plaintiff unsuccessfully attempted to buy BlackBerry

22  stock.  (Compl. ¶ 28.)  Not mentioned in the Complaint are the facts that

23

24          [4] Plaintiff also alleges violations of Section 9(a)(6).  (Compl. ¶ 43; Pl.'s Br.
     at 12.)  A violation of Section 9(a)(6) requires "pegging, fixing, or stabilizing the
25   price of such security in contravention of such rules or regulations as the
     Commission may prescribe".  15 U.S.C. § 78i(a)(6).  However, the SEC has
26   repealed the rules (Rules 10b-6 to 10b-8) formerly issued under Section 9(a)(6)
     and replaced them with rules that apply only to underwriters and other offering
27   participants.  *See* 62 Fed. Reg. 520 (Jan. 3, 1997).  Because there are no longer any
     SEC rules applicable to broker-dealers under Section 9(a)(6), Plaintiff has no claim
28   under that section.

186

1  Robinhood publicly posted its restrictions on its website (Bain Decl. ¶ 29) and the

2  restrictions were one of the most covered news stories of the year.[5]

3          The cases Plaintiff cites in support of his argument that Robinhood

4  engaged in "manipulation" only underscore the extent to which Robinhood's

5  conduct differs from the covert and deceptive conduct that courts have previously

6  found to be manipulative.  For example, Plaintiff cites *SEC v. Resch-Cassin & Co.*,

7  362 F. Supp. 964, 978 (S.D.N.Y. 1973) and *SEC v. Malenfant*, 784 F. Supp. 141,

8  142 (S.D.N.Y. 1992), both of which involve pump-and-dump schemes in which

9  the defendants inflated the price of stock they owned through false and misleading

10  statements in order to sell the stock later at a higher price.  Each of these cases

11  involved allegations that the defendant held a position in the relevant securities and

12  used deceptive conduct to profit on those positions by tricking other market

13  participants into engaging in their own purchases or sales.  No such allegations

14  exist here.  Indeed, Robinhood did not hold a short position in any of the relevant

15  stocks, and therefore did not stand to profit at all from a decrease in the relevant

16  stock prices.  (Verma Decl. ¶ 25; Swartwout Decl. ¶ 35; Bain Decl. ¶ 35.)[6]

17          Plaintiff does allege a conspiracy theory that Robinhood implemented

18  trading restrictions beginning on January 28 at the behest, or for the benefit, of

19  third parties such as Citadel Securities, which he incorrectly alleges has an

20  ownership stake in Robinhood.  (Compl. ¶ 12; Pl.'s Br. at 7.)  This is nothing more

21  than rank speculation, completely unsupported by any factual allegations and

22  conclusively refuted by the sworn declarations submitted herewith.  No third party

23

24  [5] *See, e.g.*, Joe Wallace, Amrith Ramkumar, Gunjan Banerji, *GameStop Mania*
*Hits a Wall of Tighter Trading Terms*, Wall St. J. (Feb. 2, 2021, 6:06 PM),
25  https://www.wsj.com/articles/silver-etf-at-center-of-reddit-fueled-surge-
11612281290.
26  [6] *Crane Co. v. Westinghouse Air Brake Co.*, 419 F.2d 787 (2d Cir. 1969), also
cited by Plaintiff, involved a defendant that sought to prevent a corporate takeover
27  by engaging in "extraordinary buying [of target company stock] . . . coupled with
[] large secret sales off the market", *id.* at 793—a type of deception utterly absent
28  here.

OPPOSITION TO PLAINTIFF'S EX PARTE                              CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

16

187

1    directed, or requested, that Robinhood implement the trading restrictions.  (Verma

2    Decl. ¶¶ 22-24.)  And, contrary to Plaintiff's allegations, Citadel does *not* hold any

3    ownership stake directly, or to Robinhood's knowledge indirectly, in Robinhood.

4    (Verma Decl. ¶ 23; Swartwout Decl. ¶ 34.)  These conspiratorial allegations and

5    claims of conflict of interest are "incomprehensible, conclusory statements about

6    harm, and [are] devoid of any facts or authorities to support Plaintiff's claims".

7    *McElroy v. Majchrzak*, No. EDCV 20-2228 (JGB) (PLAx), 2020 WL 7248373, at

8    *1 (C.D. Cal. Oct. 27, 2020).  "A preliminary injunction is an extraordinary and

9    drastic remedy", *id.*, and one that requires more than such "mere allegations of

10   wrongdoing".  *Maxlite, Inc. v. ATG Elecs., Inc.*, 2020 WL 6260007, at *2 (C.D.

11   Cal. July 13, 2020).

12           Finally, none of the claimed "deceptive" conduct is even alleged to

13   have affected the price of securities.  *See Jolley v. Welch*, 904 F.2d 988, 992 (5th

14   Cir. 1990) ("[S]ection 9 does not govern manipulative practices that do not directly

15   affect the market or purchase price of a security."); *Jewelcor Inc. v. Pearlman*, 397

16   F. Supp. 221, 244 (S.D.N.Y. 1975) (same).  While Plaintiff contends that

17   Robinhood deceived its users "into believing that they were trading on a platform

18   adequately capitalized" and that Robinhood did not disclose that Citadel Securities

19   was a "major investor" in Robinhood (Pl.'s Br. at 7), Plaintiff does not even

20   attempt to show that these alleged misrepresentations or omissions actually

21   affected the price of any securities.  Rather, to the extent Plaintiff alleges that

22   Robinhood's conduct affected the securities market, it is only through the publicly

23   disclosed purchase restrictions Robinhood implemented.  (*See* Compl. ¶¶ 16-17.)

24           (2)  *Plaintiff Cannot Prove Scienter.*

25           Plaintiff's claim fails for the separate and independent reason that

26   Plaintiff cannot prove scienter, as required for a Section 9(a) claim.  *See Connolly*

27   *v. Havens*, 763 F. Supp. 6, 11-12 (S.D.N.Y. 1991).  In fact, because the scienter

28

OPPOSITION TO PLAINTIFF'S EX PARTE            CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

188

1    element is subject to the heightened pleading requirements of Rule 9(b) and the

2    Private Securities Litigation Reform Act of 1995, *see* Fed. R. Civ. P. 9(b); 15

3    U.S.C. § 78u-4(b)(2)(A), this claim will not even survive a motion to dismiss.

4            Plaintiff contends that he can satisfy the scienter requirement by a

5    showing of mere negligence. (Pl.'s Br. at 9-10.) The 50-year-old precedents

6    Plaintiff cites for this contention have been overruled. Section 9 of the Exchange

7    Act "contains a state-of-mind condition requiring something more than

8    negligence"—specifically, it requires a showing of "willful[] participat[ion]" in the

9    manipulation of securities. *Ernst & Ernst*, 425 U.S. at 211 n.28; *see also Dekalb*

10   *Cty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 403 (2d Cir. 2016) (same).

11           Robinhood implemented temporary purchase restrictions as a risk

12   mitigant to reduce the amount of the clearinghouse deposit requirement and ensure

13   the stability of its trading platform. (Verma Decl. ¶¶ 26-28; Swartwout Decl.

14   ¶¶ 25-28.) It did not do so to benefit itself, and it did not do so at the behest, or for

15   the benefit, of any third-party. (*See* Verma Decl. ¶¶ 22-25; Swartwout Decl. ¶¶ 33-

16   35.) Contrasted against these sworn statements, Plaintiff offers nothing more than

17   conclusory allegations. (*See, e.g.*, Compl. ¶ 18 ("Robinhood's actions were done

18   purposefully and knowingly to manipulate, or with reason to know, that its

19   customers would be harmed and without employing any reasonable protections for

20   its retail investor customers affected . . . .").) These are insufficient. *See In re Wet*

21   *Seal, Inc. Sec. Litig.*, 518 F. Supp. 2d 1148, 1157 (C.D. Cal. 2007) ("[P]laintiffs

22   cannot allege 'intent' in general terms or simply 'motive and opportunity' or

23   'recklessness,' but instead must 'plead, at a minimum, particular facts giving rise

24   to a strong inference of deliberate or conscious recklessness.'" (citation omitted)).

25       B.    Plaintiff's Computer Fraud and Abuse Act Claim Fails.

26           Plaintiff asserts a claim under Section 1030(a)(5)(A) of the Computer

27   Fraud and Abuse Act ("CFAA"). (Compl. ¶ 49.) To prevail, Plaintiff must prove

28

OPPOSITION TO PLAINTIFF'S EX PARTE                    CASE NO. 21-cv-00843-VAP-MRW
APPLICATION FOR A TRO

18

189

1   that Robinhood (1) "knowingly" caused the "transmission of a program,

2   information, code, or command" (2) to "intentionally" cause damage (3) "without

3   authorization, to a protected computer". *See Thurmond v. Compaq Comp. Corp.*,

4   171 F. Supp. 2d 667, 675 (E.D. Tex. 2001); 18 U.S.C. § 1030(g) (private right of

5   action for a violation of Section 1030). Plaintiff cannot do so.

6         *First*, Robinhood's purchase restrictions did not involve an actionable

7   "transmission". Plaintiff's misunderstanding of how Robinhood's app works is

8   apparent from his brief, where he asserts that "Robinhood transmitted a program,

9   code, or command to Plaintiff's computer and smartphone device (and to those

10   similarly situated) that disabled the 'buy' feature/button on its app." (Pl.'s Br.

11   at 14.) As set forth in the Bain Declaration, that is simply untrue. When a

12   customer uses the Robinhood app (or the web-based Robinhood interface) to make

13   trades, the customer views information on Robinhood's servers. (Bain Decl. ¶¶ 27-

14   29.) In implementing the purchase restrictions, Robinhood did not "transmit" a

15   program, code or command to customers' smartphones or computers to alter the

16   functionality of the app. To the contrary, it implemented the purchase restrictions

17   in software and databases on its own servers. (*Id.* ¶ 31.)[7]

18         *Second*, Robinhood did not "damage" Plaintiff's computer or

19   smartphone. The customer device, and the Robinhood app installed on that device,

20   work just as before. The only change is to the cloud-based functionality available

21   on Robinhood's own servers. (*Id.* ¶¶ 27-29.)

22         *Third*, any alleged "transmission" was not unauthorized within the

23   meaning of the CFAA. *Pulte Homes, Inc. v. Laborers' Int'l Union of N. Am.*, 648

24   F.3d 295, 304 (6th Cir. 2011) (defining "without authorization" as used in CFAA

25   _____

26   [7] It is for this reason that Plaintiff's citation to *United States v. Raisley* is
    unavailing. 466 F. App'x 125 (3d Cir. 2012). In that case, the defendant
    distributed a "malware" program, which installed itself (unbeknownst to their
27   owners) on thousands of computers, which then launched a "Distributed Denial of
    Service" attack to render a webpage unavailable for its intended users. *Id.* at 127.
28   There was no such unauthorized transmission (or damage) here.