IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD CONSTANTINESCU,<br>PERRY "PJ" MATLOCK,<br>JOHN RYBARCZYK,<br>GARY DEEL,<br>STEFAN HRVATIN,<br>TOM COOPERMAN,<br>MITCHELL HENNESSEY,<br>DANIEL KNIGHT. | No. 4:22-CR-00612-S |

**DEFENDANT EDWARD CONSTANTINESCU'S REPLY IN
SUPPORT OF HIS THIRD MOTION TO COMPEL BRADY MATERIAL AND
OPPOSITION TO THE GOVERNMENT'S
VINDICTIVE MOTION TO REVOKE BAIL CONDITIONS**

In continuing to justify its disregard for its *Brady* obligations, the government has filed an opposition brief that fails to account for the primary relevance the requested information has to assisting the defense: (1) it undermines the veracity of the government's prior sworn statements that Constantinescu's funds were criminally derived property and (2) it challenges the integrity of the government's investigation. Rather, the government responds to Constantinescu asserting his constitutional right to *Brady* material by asking the Court to have Constantinescu *jailed* for speaking with his sometimes-estranged, sometimes-not wife and making three money transfers to his girlfriend nearly seven months ago. This Court should reject the government's vindictive attempt to shift the focus away from its failure to produce *Brady* material, grant Constantinescu's requested relief for material he is constitutionally entitled to receive, and deny the government's motion to detain Constantinescu.

1

**1. Documents and information surrounding what appears to be the investigative case team's lack of investigation into $100,000 of trading profits being sent to a federal agent is exculpatory and relevant to undercut the credibility of the government's testifying witnesses.**

As laid out in Constantinescu's opening brief, the government must turn over information regarding the $100,000 transfer of trading profits to Special Agent B because the facts and circumstances surrounding the transfer are exculpatory and may be used to challenge actions and sworn statements made by the investigating case agents. The government, in response, spends considerable time trying to shift the focus away from the investigating team and instead to Special Agent B, claiming summarily that "[t]he nature and circumstances of that transfer have no relevance to this case" because Special Agent B did not investigate the case.[1] Opp. at 4.

The government's position ignores the $100,000's relevance to the government's testifying witnesses in the case, that is, the investigating case agents (including the agent identified as the "Financial Case Agent" in our opening brief), the financial analyst assigned to this case (who potentially assisted in the preparation of the seizure warrant) who the government has said will be a testifying "summary" witness, and the government's purported "expert" witness who reverse engineered a bloated figure that the government alleges represents illegal trading profits.

The inconsistencies and contradictions surrounding the government's investigation and indictment are plainly important to the defense. For example, the government has proffered several different trading profit figures through the course of this case. The Superseding

---

[1] If Special Agent B did in fact disclose this money in a financial disclosure form to the FBI, as he stated, that financial disclosure form is relevant to Constantinescu's defense that the government does not actually believe its own allegations regarding the scope of Constantinescu's purported fraudulently derived profits, and the jury should be permitted to evaluate that when weighing the credibility of the government's case. It seems that the government's refusal to turn these documents and information over is because it knows they undercut the prior positions they have taken regarding Constantinescu's assets.

2

Indictment contains a figure of $114 million in trading profits, the seizure warrant affidavit suggests a different figure based on different stocks and trades, and the government's purported "expert" report calculates a figure of $121 million, again based on a different set of stocks and trades. Information and materials undercutting the credibility of these figures is important for the jury to see in evaluating the credibility of these calculations.

Moreover, as highlighted in Constantinescu's opening brief, the same investigating case agent who knew that Special Agent B received $100,000 in Constantinescu's trading profits, Financial Case Agent, swore out an affidavit (only a few weeks after learning of the $100,000 money transfer) that included several statements regarding Constantinescu's funds that are inconsistent with a federal agent being permitted to maintain $100,000 of Constantinescu's money. *See* Mot. at 7 (highlighting several of the sworn statements regarding Constantinescu's funds). Tellingly, the government's response does not address how the requested *Brady* material is irrelevant to Financial Case Agent's statements in the affidavit or the obvious contradiction between ignoring a $100,000 money transfer of purportedly illegal proceeds to a federal agent while swearing in an affidavit that Constantinescu's funds are criminally derived property.

Instead, the government again creates a straw man argument, claiming that the money transfer is only relevant if Constantinescu concedes that the $100,000 was illegally derived. Opp. at 4-5. But Constantinescu needs to do no such thing: the relevance stems from *the government's prior assertions* that Constantinescu's funds were illegally derived and how the government has treated those funds, which *is completely inconsistent with their behavior in the investigation and their testifying witnesses' statements in this case*. The government's attempt to confuse the issue by focusing on Special Agent B and ignoring its own case inconsistencies should be rejected, and this Court should grant Constantinescu's request for this *Brady* material.

## 2. The government should be required to produce material regarding its case and asset related conversations with a third-party lawyer because they further contradict the government's prior characterizations of Constantinescu's funds.

The government's opposition now confirms what it previously had not disclosed—that one of the prosecutors in this case bizarrely "spoke by phone several times and exchanged several emails" with Constantinescu's wife's divorce attorney about this case, including, presumably, conversations about Constantinescu's available finances. Opp. at 5. The government then chose to insert itself further into a family court proceeding against Constantinescu by facilitating Constantinescu's payments of spousal support to his wife, a move the government made, it says, "to ensure that Defendant could not use this case to avoid his financial obligations." *Id*.

But that is the point. The government's inconsistent treatment of Constantinescu's assets undercuts the credibility of its assertions in the Superseding Indictment, the sworn statements in the seizure warrant affidavit, and the anticipated testimony of the government's expert who has presented bloated and unsupportable profit calculations. The government cannot, on the one hand, make sweeping assertions that Constantinescu's money is *entirely* the result of an illegal scheme, and then, on the other hand, facilitate payments of that purportedly illegal money to a third party, all while claiming that material documenting this obvious contradiction is not exculpatory. The government should be required to turn over the substance of its conversations with this third-party, including any emails or notes reflecting the substance of these conversations, along with calendar entries, phone call logs, and other proof of the inappropriate meetings.

## 3. The Court should deny the government's vindictive request to put Constantinescu in jail.

Finally, the government's request for a warrant and bail revocation should be denied outright.[2] Bail revocation is not intended to be a punitive measure undertaken by a prosecutor who is angry that a defendant requests *Brady* material. Constantinescu unequivocally contests the government's characterization that he made up his wife's prior assertion that she told Financial Crimes Agent the information contained in his *Brady* motion, or that Constantinescu's interactions with his estranged wife in any way could be understood as "witness intimidation" or "obstruction."[3]

The government should be more circumspect about the veracity of an individual who has initiated multiple divorce proceedings against Constantinescu and recently became aware of a publicly filed motion highlighting her brother's receipt of $100,000 of Constantinescu's trading profits (among other issues).[4] This is especially true where the agent who most recently interviewed the wife *is the same agent who she previously spoke with and who wrote what appears to be an incomplete report*. See Exs. 1 and 2 to Mot. to Revoke. It does not appear from his latest report that Financial Crimes Agent even bothered to ask the wife whether she previously told Constantinescu that she told Financial Crimes Agent the information that appears in his *Brady* motion.

---

[2] Tellingly, the government's brief makes no mention of a conversation with Constantinescu's pretrial services officer regarding its allegations or the position of pretrial services as to whether it agrees with the outrageous position that detention is necessary.

[3] The government's attack on undersigned counsel appearing at the bottom of page 6 and the top of page 7 of its motion is disgusting, baseless, and part of an ongoing Sixth Amendment violation whereby the government has sought to thwart Constantinescu from paying for legal services to defend against this "cutting edge" "securities fraud" case.

[4] To the extent the Court wishes to entertain a hearing on this matter, Constantinescu reserves his right to set forth additional information and evidence regarding any purported "intimidation," including additional text messages between him and his now estranged wife as well as video recordings and third-party testimony from the past few weeks reflecting interactions far different from the government's characterization that she was intimidated or made uncomfortable by Constantinescu.

Indeed, the government has been less then circumspect. For starters, it should have read the couple's texts messages which corroborate the events set forth in Constantinescu's opening brief and undermine the government's new version of events. Consider the fact that on June 23 and 24, 2023, just a few days before the government alleges Constantinescu "intimidated" his wife, she sent him a text message complimenting a brief filed in this case by the undersigned, in which she admonished that "The feds love reshaping the current laws to fit their means" while encouraging Constantinescu, "I like that they are pointing that out here," before attaching a picture of Constantinescu's dog Charlie and then making plans for drinks.

 

What's more, when Constantinescu attached the inaccurate FBI 302 for his wife to review, along with a video he had taken of her joking about work, *she sent the following commiserating response about her new boyfriend*:



These friendly texts are also consistent with his wife's repeated criticisms of the government's case, including the government's bloated profit calculations (as much 90% of his profits appear to have derived from meme stocks) that fail to account for losses, for example:



As should be clear from these texts, the government continues its ongoing pattern of distorting facts by concealing and omitting evidence that contradicts its Indictment—the very reason Constantinescu has been forced to seek assistance from this Court in obtaining *Brady* material.

7

In fact, from the government's own reports, it appears that the government never otherwise considered Constantinescu's wife a potential witness in this case because, notwithstanding the government's assistance in her divorce proceedings, she knows very little, if anything, about this federal securities case. The government certainly did not interview her during the course of the investigation, and it appears that its intention of speaking with her was limited to seeing if she knew Constantinescu's phone passcode. The government's attempt to transform Constantinescu's request for *Brady* material into a threatened criminal charge so they can throw him in jail by distorting his relationship with his wife is offensive to notions of fair justice and due process. This attempt should be denied.

Lastly, the government also complains about three relatively low-dollar money transfers purportedly made in January 2023 to Constantinescu's girlfriend.[5] The government does not explain when it became aware of these money transfers or how it obtained access to financial statements for a time period outside the scope of its investigation. But the curious timing of the government's motion filed only moments before the government's response to Constantinescu's *Brady* request, highlights the government's inappropriately punitive motivation in seeking detention. These transfers certainly do not suggest Constantinescu is a danger to the community, an unreasonable risk of flight, or otherwise demands pretrial detention. The government also states that these transfers represent a larger "pattern of moving assets," and cites to statements made by Constantinescu's wife regarding transferring assets to undersigned counsel. Mot. to Revoke at 4. This characterization is misleading. As acknowledged by the government in its May 24, 2023 filing, this Court's asset-transfer restriction does not include asset transfers of Constantinescu's legal fees.

---

[5] In the event the Court holds a hearing on these allegations, Constantinescu reserves his right to present additional information and evidence regarding these transfers.

In the event that the Court wants to entertain a hearing on these allegations, there is certainly nothing in the government's brief suggesting that a warrant is necessary to secure Constantinescu's appearance at a hearing. Obviously, if the government truly believed that a warrant was necessary, the government would not have filed publicly its warrant demand for Constantinescu to see. This Court should not fan the flames of the government's bloodlust for Constantinescu, and their vindictive motion should be denied outright. He plans to be in Court, which is where he will clear his name.

* * * *

Accordingly, Constantinescu respectfully requests that the Court grant his motion to compel *Brady* material and deny the government's motion to revoke his bail conditions.

Dated:  July 29, 2023

Respectfully submitted,

_____
Matthew A. Ford
Texas Bar No. 24119390
mford@fordobrien.com
Jamie Hoxie Solano
Admitted Pro Hac Vice
jsolano@fordobrien.com
FORD O'BRIEN LANDY, LLP
3700 Ranch Road 620 South, Suite B
Austin, Texas 78738
Telephone: (512)-503-6388
Facsimile: (212) 256-1047

Attorneys for Defendant
Edward Constantinescu

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 29, 2023, a true and correct copy of the foregoing document has been electronically served on all counsel of record via the Court's CM/ECF system.

<u>*/s/ Matthew A. Ford*</u>
Matthew A. Ford