

September 20, 2023

**VIA EMAIL**

Thomas H. Carter III, AUSA
U.S. Attorney's Office
1000 Louisiana, Ste 2300
Houston, TX 77002
713-567-9000
thomas.carter.III@usdoj.gov

Scott Armstrong, Assistant Chief
John Liolos, Trial Attorney
U.S. Department of Justice, Criminal Division
1400 New York Ave., NW
Washington, DC 20005
scott.armstrong@usdoj.gov
john.liolos@usdoj.gov

Re:     **United States v. Constantinescu et al., No. 4:22-CR-00612**

Dear Messrs. Carter, Armstrong & Liolos:

On behalf of Edward Constantinescu and in relation to the Court's September 12, 2023 Order (the "September 12 Order") [ECF 414], we respectfully write again to request prompt production of any and all materials, including documents and information in the possession, custody, or control of the government, including the United States Department of Justice and the United States Attorney's Office for the Southern District of Texas, the Federal Bureau of Investigation ("FBI"), the Securities and Exchange Commission ("SEC"), and the Financial Industry Regulation Authority ("FINRA"), pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and its progeny, including *Giglio v. United States*, 405 U.S. 150 (1972), *United States v. Bagley*, 473 U.S. 667 (1985), the Fifth and Sixth Amendments to the Constitution of the United States, and all other applicable law (collectively, "*Brady* Material"). As the September 12 Order directs, "The government is to produce all exculpating SEC and FINRA records." [ECF 414 at 1].

##   I.     Background

As the government well knows, "a defendant's due process rights are violated when the prosecution suppresses evidence that is exculpatory." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017) (citing *Brady*, 373 U.S. at 87). Evidence is exculpatory if it is "material either to guilt or punishment." *United States v. Sipe*, 388 F.3d 471, 477–78 (5th Cir. 2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)).

Thomas H. Carter III
Page 2 of 6
September 20, 2023

There is no question that "[i]mpeachment evidence falls within *Brady*'s reach." *United States v. Miller*, 520 F.3d 504, 514 (5th Cir. 2008); *see also Cessa*, 861 F.3d at 128. The principle also applies to evidence that could be used to impeach prosecution witnesses (citing *Giglio*, 405 U.S. at 152–54). "[I]f the impeaching evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." *Sipe*, 388 F.3d at 478 (quotations omitted). Simply put, "[i]mpeachment evidence falls within the *Brady* disclosure rule because such evidence may make the difference between conviction and acquittal." *Banks v. Thaler*, 583 F.3d 295, 311 (5th Cir. 2009) (citing *Bagley* 473 U.S. 676) (quotations and alterations omitted). And, to be clear, prosecutors have an affirmative duty to "learn of any favorable evidence known to the others acting on the government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

Here, the primary theory of prosecution is that the defendants, including Mr. Constantinescu, "engaged in a scheme to 'pump and dump' securities based on false and misleading information and material omissions about those securities that the defendants published on social media platforms" and that "defendants profited at least approximately $114 million from their scheme." Superseding Indictment ¶ 1, ECF No. 134. According to the government, the key element of the defendants' alleged $114 million pump-and-dump scheme involved "artificially driv[ing] up [the] price" of a security before selling the security at the artificially inflated price. *Id.*; *see also id.* ¶ 13 ("After purchasing or 'loading' the security, one or more of the defendants sought to 'pump' the price of that security by posting false and misleading information about the security on Twitter and Atlas Trading Discord so that other investors were induced to purchase the security and artificially increase its price."). Indeed, the Superseding Indictment utilizes the terms "pump," "dump," "pump and dump," or their variants over 30 times throughout its 44 pages.

The government parroted this language in a press release issued the same day the defendants were charged: "defendants used their extensive social media presence on Twitter and Discord to hype interest in particular securities by posting false and misleading information in order to 'pump' the prices of those securities, while concealing their intent to later 'dump' their shares by selling them at *the artificially inflated prices*." Dep't of Justice, *Eight Men Indicted for $114 Million Securities Fraud Scheme Orchestrated Through Social Media* (Dec. 14, 2022), https://www.justice.gov/opa/pr/eight-men-indicted-114-million-securities-fraud-scheme-orchestrated-through-social-media (last accessed Sept. 20, 2023) (emphasis added).

Such language tracks how the government has presented—and courts have evaluated—pump-and-dump allegations in prior cases. *See, e.g.*, *United States v. Skelly*, 442 F.3d 94, 96 (2d Cir. 2006) (alleging that broker-dealer "used manipulative techniques to artificially inflate ('pump') the price of certain thinly-traded securities in which they held a substantial interest, and then used fraudulent and high-pressure tactics to unload ('dump') the securities on unsuspecting customers."); *United States v. Downing*, 297 F.3d 52, 55 (2d Cir. 2002) ("'Pump and dump,' according to the government, denotes a stock-market manipulation scheme in which 'the schemers first artificially inflate, or pump, the price of a stock by bribing stock promoters to sell it, and then dump the stock once the price becomes sufficiently high.'"). Put differently, an essential component of any pump-and-dump theory is that defendants artificially inflate the price

Thomas H. Carter III
Page 3 of 6
September 20, 2023

of a particular stock prior to selling that stock at the artificially inflated price. The SEC acknowledges this non-controversial notion in its definition of a "pump and dump" in its publications. *See, e.g.*, Sec. & Exch. Comm., *Pump and Dump Schemes*, https://www.investor.gov/introduction-investing/investing-basics/glossary/pump-and-dump-schemes (last accessed Sept. 20, 2023).

Against that backdrop, Mr. Constantinescu has filed motions for *Brady* Material emphasizing that factors other than his (or his co-defendants) social-media posts were the cause of price movements in stocks the government has alleged are part of the alleged $114 million pump-and-dump scheme. At the recent September 7, 2023 hearing, the Court highlighted the significance of Mr. Constantinescu's repeated requests:

> Well, here's the problem, and it's -- I'm not saying [the government is] wrong for doing it, but I'm saying it's partly [the government's] making, and this is what I'm hearing today. If you're going to bring in 397 stocks that aren't related to the indictment . . . . [the defendants are] entitled to say, "Wait a minute. That doesn't have anything to do with the price of tea in China." GameStop, you know, went through the roof because there was this underground movement of "stick it to the man," and, you know, people all over the United States, you know, got in on it, you know. And if there is an SEC -- if that's part of your case -- . . . . they're entitled to combat that, and if you've got an SEC investigation that says, you know, these defendants didn't have anything to do with GameStop going through the roof, they're entitled to see that.

Tr. 56:23–57:18. The Court continued that perhaps some of the requested material doesn't exist, but defendants had "giv[en] somewhat cogent evidence that it exists," so the government must "find out if it does, and if it's exculpatory, . . . produce it." *Id.* at 57:24–58:2. The Court memorialized its ruling in its September 12 Order, explaining: "The Government is to produce all exculpating SEC and FINRA records." Order at 1 [ECF No. 414]. This includes "exculpatory records concerning the stocks that are the basis of the charges and the stocks included in all of the extraneous trades that the Government is seeking to admit into evidence." *Id.*

Notwithstanding this clear directive, the government appears once again to be seeking to avoid its obligations under *Brady* and attempting to circumvent the Court's recent ruling. *See* Response in Opposition to Defendant Rybarczyk's Motion to Exclude ("Opp. to Mot. to Exclude") [ECF No. 424]. Following the September 7 hearing, the government claims that it "has narrowed the initial list of 397 trading episodes down to 54 trial episodes." *Id.* at 1. But such an approach, even if the government adheres to it, does not absolve the government of its responsibility to search for and locate exculpatory material for all 397 episodes. Indeed, the government's main expert has predicated her analysis on "397 At-Issue Trading Episodes covering 127 unique securities and trading activity between January 2020 and April 2022." Garibotti Decl. ¶ 5 (footnote omitted). And only by tallying up the purported 397 episodes can the government engineer its headline-grabbing "$114 million" pump-and-dump figure that it no doubt wishes to put before the jury after having previously presented it to the grand jury.

Case 4:22-cr-00612   Document 448-1   Filed on 10/16/23 in TXSD   Page 4 of 6

Thomas H. Carter III
Page 4 of 6
September 20, 2023

Moreover, the government has repeatedly articulated its intent to introduce any or all of the 397 episodes as Rule 404(b) evidence.

While the government now seeks to transform the theory it charged into a theory it thinks will be easier to prove at trial, Mr. Constantinescu categorically disagrees that causation is irrelevant to proving a pump-and-dump scheme. A key component of such a scheme is that a defendant has "pumped," that is, artificially inflated, a stock's price prior to "dumping" the stock at the artificially inflated price. The government cannot, on the one hand, spend page after page of its charging instrument alleging that defendants "pumped" the prices of certain stocks so that they could sell out of the stocks at "artificially inflated" prices and then, on the other hand, claim without citation that "the charged conduct does not require any proof of actual manipulation of a stock's price." *See* Opp. to Mot. to Exclude at 7 [ECF No. 424]; *see also id.* at 8 (same). Evidence tending to undermine the notion that any of the defendants caused stock prices to increase (or decrease) is plainly *Brady* Material. The government thus has a constitutional duty to locate and produce any evidence tending to show that factors other than Mr. Constantinescu's (or his co-defendants') social-media activity and/or stock trading caused price movements in the purported 397 episodes relied on by the government to reach its bloated and baseless $114 million loss calculation highlighted on the Daily Show and in hundreds of local, national, and international news articles.

With that background in mind, Mr. Constantinescu provides below an illustrative, but non-exhaustive, list of items believed to be within the possession, custody, or control of the SEC and/or FINRA that should be examined for *Brady* Material. Such materials are likely to be relevant to several elements of the charged offenses, including, but not limited to, alleged falsity of certain representations, materiality, intent, and causation.

## II. Specific Materials Likely to be within the Possession, Custody, or Control of the SEC and/or FINRA to be Searched for *Brady* Material

1. Any interviews the SEC and/or FINRA conducted concerning any of the stocks at issue, any of the purported 397 episodes, and/or any of the defendants in this action, including, but not limited to, interview notes and calendar entries reflecting the date of the interview and its participants.

2. Any documents or analyses by the SEC and/or FINRA that differ from the valuations calculated by Maria Garibotti in her June 15, 2023 Declaration, including all records regarding the valuation conducted by the SEC in connection with its Complaint filed in the matter *SEC v. Constantin, et al.*, No. 4:22-cv-04306 (S.D. Tex. Dec. 13, 2022).

3. Any other files, records, internal or external communications, or analyses conducted by the SEC and/or FINRA concerning any of the stocks at issue, any of the purported 397 episodes, and/or any of the defendants in this action.

4. Any SEC and/or FINRA communications with the following individuals and/or their lawyers or agents concerning any of the stocks at issue, any of the purported 397 episodes, and/or any of the defendants in this action:

FORD O'BRIEN LANDY   |   3700 Ranch Road South, Suite B, Austin, TX 78738   |   P: 212.858.0040   |   fordobrien.com

Thomas H. Carter III
Page 5 of 6
September 20, 2023

- Tim O'Connell, Redacted

- Donis Cachavicius, Redacted

- Hutchinson Bernot, Redacted

- Tripanjeet Ghuman, a/k/a "Ripster" or "Ripster47," Redacted

- Nathan Michaud, contact information unknown; and

- Any other individual listed as a witness on the government's witness list.

5. Any documents, records, internal or external communications, or the like concerning the October 14, 2021 Staff Report on Equity and Options Market Structure Conditions in Early 2021 (the "Meme-Stock Report"), including the underlying investigation that led to the Meme-Stock Report and preparations for all congressional hearings and testimony regarding the Meme-Stock Report and related issues, including notes, communications, and preparatory materials related to Gary Gensler's May 2021 testimony before congress.

6. Any documents, records, or communications defining a "meme stock," any lists of stocks designated as "meme stocks," or any documents, records, or communications regarding whether a specific stock constitutes a "meme stock," including, but not limited to, any such document, record, list, or communication that includes any stock ticker included in the purported 397 episodes identified by the government.

7. Any calculations of profits earned by Mr. Constantinescu as a result of trading "meme stocks," as defined by Congress, the SEC, or FINRA.

8. Any documents, records, internal or external communications, or the like concerning issues raised in or arising from the Meme-Stock Report including:

- "Gamification" of stock trading through mobile applications such as Robinhood;

- Broker–dealers, clearing companies, and the like prohibiting retail investors from executing trades on volatile stocks;

- The operation and regulation of "dark pools";

- Reducing the "settlement time" for trades from T+2 to T+1; and

- Short-selling of stocks by major institutional investors.

Thomas H. Carter III
Page 6 of 6
September 20, 2023

       9.    Any documents, financial data, trade blotter, records, or internal or external communications related to the cause of price or volume changes of any of the stocks at issue or any of the purported 397 episodes.

       10.   Any other files, records, internal or external communications, or analyses conducted by the SEC and/or FINRA concerning any of the stocks at issue, any of the purported 397 episodes, and/or any of the defendants in this action, including any "FINRA Referral Report."

       11.   Any other files, records, internal or external communications, or analyses conducted by the SEC and/or FINRA concerning, with respect to any of the stocks at issue or any of the purported 397 episodes, the reason or reasons for any increase or decrease in share prices or volume as a result of factors extraneous to the defendants.

\* \* \*

       To reiterate, the list provided above is meant to be illustrative, rather than exhaustive, regarding the categories of information likely to be within the possession, custody, or control of the SEC and/or FINRA and likely to yield exculpatory information that the government is required to produce as *Brady* Material under its preexisting obligations and the Court's recent rulings. If you disagree, please advise us promptly so that we may raise the issue with the Court. In the interim, we stand available to discuss this letter as well as to provide any additional information that may assist you in complying with the September 12 Order and your obligations under the Constitution.

Sincerely,

Matthew A. Ford
Jamie H. Solano
Stephen R. Halpin III
Ford O'Brien Landy LLP
3700 Ranch Road 620 South, Suite A
Austin, Texas 78738
Tel.: (212) 858-0040
mford@fordobrien.com