# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EDWARD CONSTANTINESCU,<br>PERRY "PJ" MATLOCK,<br>JOHN RYBARCZYK,<br>GARY DEEL,<br>STEFAN HRVATIN,<br>TOM COOPERMAN,<br>MITCHELL HENNESSEY,<br>DANIEL KNIGHT. | Case No.: 4:22-cr-00612-S<br><br>Honorable Andrew S. Hanen |

**DEFENDANT EDWARD CONSTANTINESCU'S MOTION TO CONTINUE TRIAL DATE AND FOR ORDER TO SHOW CAUSE WHY THE GOVERNMENT AND SECURITIES AND EXCHANGE COMMISSION SHOULD NOT BE HELD IN CONTEMPT FOR FAILING TO DISCLOSE *BRADY* MATERIAL**

## TABLE OF CONTENTS

PREMLIMINARY STATEMENT ................................................................................. 1

SUMMARY OF FACTS .......................................................................................... 4

LEGAL STANDARD ............................................................................................. 9

ARGUMENT ..................................................................................................... 11

I.      The government has failed to comply with the Court's orders to disclose
        *Brady* material to Defendants. ............................................................... 11

II.     The government's violation of the Court's orders warrants a continuance
        of the current April 1, 2024 trial date and a finding of contempt to coerce
        compliance. ............................................................................................ 15

CONCLUSION ................................................................................................... 16

TABLE OF AUTHORITIES

*Acord v. Saenz*,
　No. CIV.A. H-09-2587, 2009 WL 2870009 (S.D. Tex. Aug. 28, 2009) ................................10

*Armstrong v. Guccione*,
　470 F.3d 89 (2d Cir. 2006)................................................................................................10

*Banks v. Thaler*,
　583 F.3d 295 (5th Cir. 2009) .............................................................................................11

*Brady v. Maryland*,
　373 U.S. 83 (1963)..............................................................................................................10

*Jim Walter Resources v. Int'l Union, United Mine Workers of America*,
　609 F.2d 165 (5th Cir. 1980) .............................................................................................10

*Kyles v. Whitley*,
　514 U.S. 419 (1995)............................................................................................................11

*Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*,
　283 F.3d 282 (5th Cir. 2002) ...............................................................................................9

*Mahler v. Kaylo*,
　537 F.3d 494 (5th Cir. 2008) .............................................................................................15

*Martin v. Trinity Indus., Inc.*,
　959 F.2d 45 (5th Cir. 1992) ...............................................................................................10

*Petroleos Mexicanos v. Crawford Enters., Inc.*,
　826 F.2d 392 (5th Cir. 1987) .............................................................................................10

*Shillitani v. United States*,
　384 U.S. 364 (1966)..............................................................................................................9

*Spence v. Johnson*,
　80 F.3d 989 (5th Cir. 1996) ...............................................................................................15

*Texas v. United States*,
　Civ. No. B-14-254, 2017 WL 11698657 (S.D. Tex. Jan. 19, 2017).........................................11

*United States v. Bagley*,
　473 U.S. 667 (1985)............................................................................................................11

*United States v. Bases*,
　549 F. Supp. 3d 822 (N.D. Ill. 2021) ...................................................................................2

*United States v. Cessa,*
  861 F.3d 121 (5th Cir. 2017) ...........................................................................10, 14

*United States v. Kohring,*
  637 F.3d 895 (9th Cir. 2011) ...................................................................................15

*United States v. Miller,*
  520 F.3d 504 (5th Cir. 2008) ...................................................................................10

*United States v. Sipe,*
  388 F.3d 471 (5th Cir. 2004) .......................................................................10, 14, 15

*Whitfield v. Pennington,*
  832 F.2d 909 (5th Cir. 1987) ...................................................................................10


Statutes and Rules:

28 U.S.C. § 530B ...............................................................................................................9

28 C.F.R. § 77.2 .................................................................................................................9

Defendant Edward Constantinescu, by and through his undersigned counsel, and joined by Defendants PJ Matlock and Stefan Hvartin, respectfully requests that the Court continue the current April 1, 2024 trial date and order the government to show cause why it should not be held in contempt for failing to obey this Court's orders to disclose exculpatory *Brady* material to Defendants.

## PRELIMINARY STATEMENT

More than four months ago on September 12, 2023, the Court ordered the government to request, search for, and produce to Defendants *Brady* material in the possession of the SEC and FINRA after Constantinescu sought to compel exculpatory material related to his Meme Stock trading. Rather than abiding by the Court's order, the government produced what it refers to as the SEC's "investigative file"—hundreds of thousands of documents (tens of millions of pages) of primarily duplicative trading data already produced by the government. Buried in those duplicative files are folders containing information that appears to have no relation to this case at all. For example, one folder titled "FINRA" contains random documents that have nothing to do with any of the Defendants, any of the stock tickers at issue, or any of the allegations in the Indictment. The government has wrongly presumed that dumping these documents absolved it and the SEC of complying with the Court's September 12 *Brady* order. It has not.

This past September, counsel for the government stood before the Court and represented he could "guarantee" that complying with the Court's order to obtain *Brady* material from the SEC and FINRA would be a "bigger deal" than the Court understood, observing: "I've dealt with these bureaucracies before, and it's nearly impossible, and things that you think could take a week take 12 weeks just on the most basic, fundamental issues."[1] To avoid its constitutional

---

[1] Counsel spoke from experience: In February 2021, he and the other DOJ attorney of record in this case were ordered—over the same objections the Court overruled here—to review and produce *Brady* material in the

1

mandate here, the government has attempted to recast its obligations by (1) disregarding specific, detailed requests from defense counsel, (2) unilaterally circumscribing what it believes to be the possible universe of *Brady* material, (3) and asking the SEC and FINRA for a dump of data that is largely useless, irrelevant, or duplicative of what the government has already produced. Simply because "FINRA and [the] SEC have expended significant resources," at least according to the government, [*see* ECF No. 446 at 4], does not mean the prosecution has fulfilled its constitutional duties and that Defendants can be assured they will receive a fair trial.

The government chose to allege a baseless but headline-grabbing $114 million conspiracy charge against Constantinescu, yet now seeks to shield from the Court, the public, and the jury evidence in the possession of the SEC and FINRA that will exculpate Constantinescu of these allegations and render the government's expert witnesses not credible. Among other *Brady* material, it appears the government may be shielding internal SEC documents describing CEI and DATS shares (the focal point of the government's Indictment of Constantinescu) as "Meme Stocks"—a class of stocks that the SEC concluded, in response to a congressional hearing, experienced price and volume movement not as a result of any individual's meme tweets but due to several complex market conditions and actors. In fact, it appears that as much as $70 million of $80 million attributed to Constantinescu in the Indictment was Meme Stock earnings.

As critical, the government—having sought to and in part successfully limited Constantinescu's subpoena of documents from purported SEC whistleblower Hutchinson Bernot—now refuses to turn over evidence in the possession of the SEC further corroborating Bernot's statements to the FBI and DOJ that Bernot was unaware of Constantinescu ever saying

---

possession, custody, or control of the Commodities Futures Trading Commission that it had failed to turn over. *See generally United States v. Bases*, 549 F. Supp. 3d 822 (N.D. Ill. 2021).

anything false about the stocks he tweeted about. These are simply two examples of the *Brady* material the government appears to be withholding: the SEC undoubtedly possesses a trove more.

The government *has* sought to limit its obligations by abandoning $80 million of purported "profit" resulting from the alleged $114 million conspiracy and by claiming it will seek to prove only 54 rather than 397 "episodes" in which Constantinescu purportedly failed to disclose his stock sales on Twitter after tweeting memes. But this does not alter the government's *Brady* obligations for three reasons. *First*, the Indictment (and Superseding Indictment) alleges a $114 million conspiracy (based on Constantinescu's trading in AMC, NAKD, SNDL, KOSS, JAGX, HOFV, and other Meme Stocks in January and February 2021, when he made over $50 million on such stocks). Evidence tending to undermine the conspiracy charge and those calculations is exculpatory. The government has had ample time to supersede again to narrow its charging instrument, but it has strategically chosen not to do so. *Second*, the SEC's conclusion that multiple factors caused price and volume volatility tends to undermine the specific-intent element of the conspiracy charge and substantive securities fraud charges, as well as the materiality element of the § 1348 securities fraud charges. *Third*, the "expert" witness identified on the government's revised January 19, 2024 witness list—Maria Garibotti—previously filed an expert report relying on all 397 episodes, including Constantinescu's trading of and tweeting about Meme Stocks such as NAKD, SNDL, and others, to reach her purported expert opinions. The government has represented that its other expert, Peter Melley of FINRA, intends to opine at trial that Constantinescu caused volume and price changes in these stocks. That the SEC (1) told Congress something *different* than Melley will say at trial and (2) possesses substantial internal communications and material undermining Melley's conclusion requires production of that

evidence related to Meme Stock volume and price volatility. The *Brady* material in the SEC's possession, including internal SEC communications and notes, contradicting these expert opinions constitute impeachment evidence that the government must produce prior to trial. More fundamentally, given that Constantinescu's fame derives from *trading Meme Stocks and tweeting memes about stocks*, one cannot envision a trial that precludes reference to the Meme Stock phenomenon.

The government has made no effort to search for this or other *Brady* material, as contemplated by the Court's orders and reiterated in defense counsel's repeated requests through letter and email. Accordingly, Constantinescu respectfully requests that the Court (1) continue the current April 1, 2024 trial date to permit time for the government to comply with the Court's orders and (2) direct that the government to show cause why it should not be held in contempt.

## <u>SUMMARY OF FACTS</u>

In December 2022, the Honorable Christina A. Bryan entered *Brady* orders here that noted the government's obligations and warned that "potential consequences" for violating the orders include "sanctions such as delaying trial or other proceedings, excluding evidence, giving adverse jury instructions, granting a new trial, dismissing the case, or finding the Government in contempt." *See, e.g.*, Ord. (Constantinescu) [ECF No. 42]; *see also* Arraignment Tr. 20:7–12 [ECF No. 226]. On April 27, 2023, this Court entered a Scheduling Order, setting July 7, 2023, as the government's "[d]eadline for *Brady* material, *Giglio* material, and witness statements." [ECF No. 254].

Thereafter, on June 6, 2023, after months of discovery demonstrated the government was unwilling to produce exculpatory evidence, Constantinescu filed his first Motion to Compel Disclosure of *Brady* Material ("First *Brady* Motion"). [*See* ECF Nos. 286, 311]. On July 8, 2023,

4

after the Court's deadline for *Brady* material passed and no such material was forthcoming from the government, Constantinescu—joined by Defendants Perry "PJ" Matlock, Gary Deel, Stefan Hrvatin, and Tom Cooperman—filed his Second Motion to Compel *Brady* Material ("Second *Brady* Motion"). [*See* ECF No. 322]. The Second *Brady* Motion focused on the fact that the Department of Justice ("DOJ"), along with the United States Attorney's Office for the Southern District of Texas and the Federal Bureau of Investigation, conducted a joint investigation with the Securities and Exchange Commission ("SEC") into the underlying facts purportedly giving rise to this case. [*See* ECF Nos. 322, 339]. Accordingly, the government was required to identify, review, and produce *Brady* material in the possession of the SEC.

On September 7, 2023, the Court held a pretrial conference with the parties ("September 7 conference"). The Court heard argument on Constantinescu's then-pending motions for *Brady* material and instructed counsel for the government:

> It's the United States versus these defendants. If [*Brady* material is] in the possession of the United States, it's in your possession. . . . [I]f it's exculpatory, I'm ordering you to produce it. . . . [If it] has to do with any of the stocks in the indictment or it has to do with any of these extraneous stocks that you think you're going to offer into evidence. . . . [Y]ou're going to have to explain Brady to [the SEC], to the extent they don't already know what Brady material is, and say that the defendants -- the judge says if there's Brady material inside of this -- your investigation, you have to produce it. And so if there's exculpatory evidence, you know, you're going to have to get it from the SEC and give it to the defendants.

Sept. 7 Tr. 55:15–58:18; *id.* at 64:23–25 (indicating that records from FINRA would also be covered by the order). Later during the September 7 conference, the following exchange unfolded between the Court and counsel for the government regarding the likely timing for obtaining *Brady* material from the SEC and FINRA:

> **MR. ARMSTRONG:** So I hear Your Honor on scheduling for next year. My only concern is that, given Your Honor's order about both FINRA and the SEC, we are, to some extent, beholden to bureaucracies --
>
> **THE COURT:** And you may need to report back to me --

**MR. ARMSTRONG:** Yeah.

**THE COURT:** -- and say, "Judge, this is a bigger deal than you thought it was."

**MR. ARMSTRONG:** I can guarantee you that's going to be the case, Your Honor, because I've dealt with these bureaucracies before, and it's nearly impossible, and things that you think could take a week take 12 weeks just on the most basic, fundamental issues.

**THE COURT:** Well, and we may have to change. We may have to -- we may have to move. April may not work, but I'm hoping it will. I'm trying to be realistic, which is why I didn't take February.

**MR. ARMSTRONG:** So I -- I have one suggestion for Your Honor. I think Your Honor -- I may stand corrected. I think Your Honor said that we need to make the request to the SEC and FINRA as to all 397. Did I hear you right? So if Your Honor is inclined to limit our proof at trial to a more discrete set of episodes, I think that would go a long way in, fingers crossed, helping speed along our request to --

**THE COURT:** Well, I'm not sure --

**MR. ARMSTRONG:** -- either of these agencies.

**THE COURT:** I'm not sure that I'm in a position to do that. You're actually in the better position. If you want to -- if you want to limit it to the 45 that you've already figured out that these are the most relevant, but the -- the key here, though, is that if -- if it's exculpatory, they get it.

**MR. ARMSTRONG:** Understood. I --

**THE COURT:** I don't want to try this twice. It's going to be hard enough to try once.

*Id.* at 84:14–85:23.

On September 12, 2023, the Court memorialized a number of its rulings from the September 7 conference in a written Order ("September 12 Order"). [ECF No. 414]. The Court reiterated that the government must disclose "exculpatory records concerning the stocks that are the basis of the charges *and* the stocks included in all of the extraneous trades that the Government is seeking to admit into evidence," including "all exculpating SEC and FINRA records." *Id.* at 1 (emphasis added). The Court also directed the government to provide "an

update on this production by October 13, 2023," given that "this production may be problematic." *Id.*

On September 20, 2023, counsel for Constantinescu sent the government a letter reiterating its *Brady* obligations and outlining specific items likely in the possession, custody, or control of the SEC and/or FINRA that should be reviewed for *Brady* material, consistent with the Court's rulings at the September 7 conference and in its September 12 Order ("September 20 *Brady* Letter"). [*See* ECF No. 448-1]. The government never responded to Constantinescu's September 20 *Brady* Letter.

On October 13, 2023, without conferring with defense counsel, the government represented to the Court that it had asked FINRA for "[d]ocuments evidencing the conclusion of investigations or reviews" for the relevant time period concerning the Defendants or "any of the stock tickers . . . appended as Exhibit 1 [to its Access Request letter]." [ECF No. 446]. Exhibit 1 to the Access Request letter is a list of 54 episodes selected by the government, not the 397 episodes forming the basis of the conspiracy charge and the basis for the government's prior expert reports. [*See* ECF No. 446-1]. The Access Request letter itself, which the government also attached to its October 13 filing, makes no reference to *Brady* or "exculpatory" material, no reference to Meme Stocks, and does not reference or attach the Court's September 12 Order.[2] The government maintained that what it requested from FINRA was "broader than the Court's Order requiring the production of only 'exculpatory' materials." [ECF No. 446 at 2].

---

[2] The letter also indicates that DOJ "will inform FINRA in the event that [it] institutes public proceedings based upon the information obtained through this grant of access." Access Request letter at 3 [ECF No. 446-1]. In other words, the Access Request letter was little more than a cut-and-paste from a form letter DOJ would send FINRA during an investigation.

As for the SEC, the government likewise contended that it had "sought . . . a broader universe of information than required by the Order." *Id.* at 2. And as with the FINRA request, the government appears to have limited its request to the SEC to the same 54 episodes, not the 397 episodes that form the basis of the conspiracy charge against Defendants and the government's initial expert opinions. *See id.* at 3. The government stated that it would be producing the SEC's "Investigative File," including "notes of interview[s] of three individuals," *id.* at 3, although the government has only produced notes of the DOJ's and FBI's—not notes reflecting conversations between these individuals and the SEC without the DOJ or FBI present. As with the requests to FINRA, the government did not indicate in its October 13 filing whether it sent the Court's September 12 Order to the SEC or otherwise explained to the SEC what constitutes *Brady* material.

On October 16, 2023, Constantinescu responded to the government's October 13 filing, attaching the September 20 *Brady* Letter and explaining why the government's efforts as outlined in its October 13 reflect direct defiance of the Court's *Brady* order and what is required under *Brady*. [*See* ECF Nos. 448, 448-1]. Constantinescu requested that the Court enter an additional order to prompt the government to comply with the Court's prior orders or otherwise hold a hearing on the issue. Constantinescu also pointed out that the government's refusal to search for *Brady* material doomed its money-laundering charge against him (Count Twenty-One) under controlling Fifth Circuit precedent. [ECF No. 448 at 4].

On October 18, 2023, the government filed a Notice indicating "it will not pursue Count 21 of the Superseding Indictment at trial in this case and will move to dismiss it at the pretrial conference." [ECF No. 449]. The same day, the government replied to other aspects of Constantinescu's October 16 filing, reiterating its position that it would not ask the SEC or

FINRA to search beyond the 54 episodes identified by the government (even though the conspiracy charge reflects 397 episodes) *or for any Meme Stock materials*. [*See* ECF No. 450].

On October 20, 2023, Constantinescu filed a Notice of Applicable Law outlining why the government's unilateral efforts to purportedly limit its trial presentation did not absolve it of its obligations to search for exculpatory material relevant to all stocks forming the basis of the charges in this case, specifically Count 1, the conspiracy charge. [*See* ECF No. 453]. Counsel for Constantinescu also sent the government yet another letter outlining concerns regarding the government's failure to properly search for and produce exculpatory material under *Brady*; the Court's orders; and Rules 3.09(d) and 3.04(a) of the Texas Disciplinary Rules of Professional Conduct, which are applicable under the McDade Amendment, 28 U.S.C. § 530B; 28 C.F.R. § 77.2 ("October 20 *Brady* Letter").

In the interim, on January 5, 2024, the government indicated it would request that the Court enter a deadline of January 26, 2024, for Defendants' expert reports, one week after the government's supplemental exhibit and witness list is to be filed on January 19, 2024. On January 9, 2024, the government so moved. [ECF No. 490]. On January 10, 2024, the Court ordered Defendants to disclose experts reports on January 31, 2024. [ECF No. 493].

## LEGAL STANDARD

The Supreme Court has often observed: "There can be no question that courts have inherent power to enforce compliance with their lawful orders through civil contempt." *E.g.*, *Shillitani v. United States*, 384 U.S. 364, 370 (1966) (citations omitted).[3] The "inherent

---

[3] Although the underlying proceedings here are criminal, the nature of the contempt relief sought through this Motion is civil, not criminal. *See Shillitani*, 384 U.S. at 370 (concluding that holding individual in contempt for failing to appear for criminal grand-jury subpoena was civil in nature because it was intended to compel compliance and not intended to punish); *Lyn-Lea Travel Corp. v. Am. Airlines, Inc.*, 283 F.3d 282, 290–91 (5th Cir. 2002) ("A contempt order is civil in

authority" to enforce court orders through contempt "is of ancient and traditional origins." *Acord v. Saenz*, No. CIV.A. H-09-2587, 2009 WL 2870009, at *6 (S.D. Tex. Aug. 28, 2009) (quoting *Armstrong v. Guccione*, 470 F.3d 89, 101-102 (2d Cir. 2006)).

A litigant moving for contempt "bears the burden of establishing by clear and convincing evidence 1) that a court order was in effect, 2) that the order required certain conduct by the respondent, and 3) that the respondent failed to comply with the court's order." *Martin v. Trinity Indus., Inc.*, 959 F.2d 45, 47 (5th Cir. 1992) (citing *Petroleos Mexicanos v. Crawford Enters., Inc.*, 826 F.2d 392, 401 (5th Cir. 1987)). "Intent is not an issue in civil contempt proceedings; rather, the question is whether the alleged contemnors have complied with the court's order." *Whitfield v. Pennington*, 832 F.2d 909, 913 (5th Cir. 1987) (citing *Jim Walter Resources v. Int'l Union, United Mine Workers of America*, 609 F.2d 165, 168 (5th Cir. 1980)). Once a movant has shown a violation of a court order, the "burden" falls on the respondent "to show either mitigating circumstances that might cause the district court to withhold the exercise of its contempt power, or substantial compliance with the . . . order." *Id.* (citations omitted).

As to the government's *Brady* obligations, it is well settled that "a defendant's due process rights are violated when the prosecution suppresses evidence that is exculpatory." *United States v. Cessa*, 861 F.3d 121, 128 (5th Cir. 2017) (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). Evidence is exculpatory if it is "material either to guilt or to punishment." *United States v. Sipe*, 388 F.3d 471, 477–78 (5th Cir. 2004) (quoting *Brady*, 373 U.S. at 87).

There is also no question that "[i]mpeachment evidence falls within *Brady*'s reach." *United States v. Miller*, 520 F.3d 504, 514 (5th Cir. 2008) (citation omitted); *Sipe*, 388 F.3d at

---

nature if the purpose of the order is . . . to coerce compliance with a court order[.]" (citation omitted)).

478 ("[I]f the impeaching evidence would seriously undermine the testimony of a key witness on an essential issue or there is no strong corroboration, the withheld evidence has been found to be material." (internal quotation marks and citation omitted)). In other words, "[i]mpeachment evidence falls within the *Brady* disclosure rule because such evidence may make the difference between conviction and acquittal." *Banks v. Thaler*, 583 F.3d 295, 311 (5th Cir. 2009) (citing *United States v. Bagley*, 473 U.S. 667, 676 (1985) (quotations and alterations omitted)). And prosecutors have an affirmative duty to "learn of any favorable evidence known to the others acting on the government's behalf." *Kyles v. Whitley*, 514 U.S. 419, 437 (1995).

The government is also bound by any local rules that enlarge or expand its ethical obligations, including under *Brady*. This Court has observed: "It goes without saying that the law requires Justice Department attorneys to act in conformance with the ethical standards of the locales in which they practice." *Texas v. United States*, Civ. No. B-14-254, 2017 WL 11698657, at *6 (S.D. Tex. Jan. 19, 2017) (Hanen, J.).

## ARGUMENT

### I. The government has failed to comply with the Court's orders to disclose *Brady* material to Defendants.

There can be no dispute that Constantinescu satisfies the first two prongs required for the Court to make a finding of contempt: the Court ordered the government to produced *Brady* material, including from the DOJ, the SEC, and FINRA. Constantinescu also satisfies the third prong because the government has failed to follow the Court's orders, notwithstanding repeated prodding by counsel for Constantinescu.

For example, shortly after the Court's September 12 Order Constantinescu requested under the heading "**Specific Materials Likely to be within the Possession, Custody, or Control of the SEC and/or FINRA to be Searched for Brady Material**" that the government

search for *Brady* material in "[a]ny SEC and/or FINRA communications with the following

individuals and/or their lawyers or agents concerning any of the stocks at issue, any of the

purported 397 episodes, and/or any of the defendants in this action: . . . Hutchinson Bernot[.]"

*See* September 20 *Brady* Letter at 4–5 [ECF No. 448-1]. In the same letter, Constantinescu also

requested the government search for *Brady* material in:

> 5. Any documents, records, internal or external communications, or the like
> concerning the October 14, 2021 Staff Report on Equity and Options Market
> Structure Conditions in Early 2021 (the "Meme-Stock Report"), including the
> underlying investigation that led to the Meme-Stock Report and preparations for all
> congressional hearings and testimony regarding the Meme-Stock Report and
> related issues, including notes, communications, and preparatory materials related
> to Gary Gensler's May 2021 testimony before [C]ongress.

> 6. Any documents records, or communications defining a "meme stock,"
> any lists of stocks designated as "meme stocks," or any documents, records, or
> communications regarding whether a specific stock constitutes a "meme stock,"
> including, but not limited to, any such document, record, list, or communication
> that includes any stock ticker included in the purported 397 episodes identified by
> the government.

*Id.* at 5. The government did not respond to Constantinescu's September 20 *Brady* letter or indicate

that it had sent the letter to the SEC or FINRA. Instead, it opted to reproduce hundreds of thousands

of documents comprising tens of millions of pages it previously disclosed, hardly indicative of a

meaningful review for *Brady* material.

As to Bernot, the government has not produced statements made by him in the possession

of the SEC that Constantinescu has reason to believe exist and has reason to believe are

exculpatory. The limited communications regarding Bernot the government has disclosed to date

identify him as a purported "SEC whistleblower" who worked on co-defendant Dan Knight's

podcast: Pennies Going In Raw. It is thus inconceivable the SEC does not have additional

communications with Bernot—whom the government listed on both its August 11, 2023 and

January 19, 2024 witness lists—regarding Constantinescu and the facts underlying this case.

The government also appears to have produced nothing about "meme stocks" or information regarding the "Meme-Stock Report" since September. That is notwithstanding that this was the primary focus of Constantinescu's Second *Brady* Motion and his specific requests that it search such documents for *Brady* material in the September 20 *Brady* Letter. That letter followed on the heels of the Court's instruction to the government at the September 7 pretrial conference hearing invoking GameStop as a meme stock similar to ones that form the basis of the government's charges against Constantinescu:

> **THE COURT:** . . . [I]f you are [going to bring in a stock like GameStop], [the Defendants are] entitled to say, "Wait a minute. That doesn't have anything to do with the price of tea in China." GameStop, you know, went through the roof because there was this underground movement of "stick it to the man," and, you know, people all over the United States, you know, got in on it, you know. And if there is an SEC -- if that's part of your case -- and I'm using that one as an example just because I happen to know about that one. . . . you know, they're entitled to combat that, and if you've got an SEC investigation that says, you know, these defendants didn't have anything to do with GameStop going through the roof, they're entitled to see that.

> **MR. ARMSTRONG:** Your Honor, I think we have that report. I -- I don't -- sitting here today, I have no idea what the analysis was that --

> **THE COURT:** Well, and I don't know either, but what I hear is you haven't -- you don't -- you've never seen it. I hear the defendants giving somewhat cogent evidence that it exists. Now, some of it may be speculation. Maybe it doesn't exist. But I'm ordering you to find out if it does, and if it's exculpatory, I'm ordering you to produce it.

*See* Sept. 7 Tr. 56:23–58:2.[4] It is worth noting again that the government has purported to limit its trial proof but has decided not to narrow its charging instrument, apart from conceding it must drop Count Twenty-One.

---

[4] Notably, GameStop and AMC (AMC being a stock that Constantinescu "called" and that led to him gaining hundreds of thousands of Twitter followers) are routinely discussed in the same breath, including by SEC Chair Gary Gensler. *See, e.g.*, https://www.nytimes.com/2022/02/09/business/stock-market-trades-sec-robinhood.html (last visited Jan 22, 2024).

The *Brady* material the government refuses to search for, or otherwise continues to withhold, is relevant both to Defendants' potential cases in chief and to impeach the credibility of the government's witnesses, including its purported experts. As to case in chief, one or more Defendants may seek to affirmatively present to the jury evidence that (1) a Defendant's particular statement about a specific stock was not false and (2) even if arguably false, the Defendant's statement was not the cause of any loss suffered by the reader. Material likely in the possession of the SEC, including additional information from Bernot and analyses regarding the price movements of Meme Stocks, is relevant to both aspects of such a defense, among other exculpatory evidence likely in the possession of the SEC and FINRA. *See United States v. Cessa*, 861 F.3d 121, 129 (5th Cir. 2017) (reversing and remanding finding of no *Brady* violation where, "[a]t trial, Colorado's defense theory was that he bought horses for the Zetas using his own (or his company's) money. He explained that he spent millions of dollars on horses for the Zetas because he feared them. Nayen's statements in the [previously undisclosed] 302s supported both points.").

As for impeachment, the Fifth Circuit's opinion in *Sipe* is instructive. There, the court of appeals affirmed the district court's decision to grant the defendant a new trial after it came to light that "the prosecution violated its *Brady* duty by suppressing favorable material evidence." *United States v. Sipe*, 388 F.3d 471, 473 (5th Cir. 2004). Among the evidence suppressed was a "Prosecution Memorandum revealing [a government witness's] dislike for [defendant] Sipe." *Id.* at 480. The Fifth Circuit turned aside the government's argument—similar to arguments made by the government here—that Sipe had the opportunity to cross examine the witness about his dislike for Sipe and that the Prosecution Memorandum was not actually favorable to Sipe, reasoning that the argument "permits the government to usurp the role of the court and unfairly

limit the options of a criminal defendant." *Id.* at 482. As to another piece of suppressed evidence,

the court of appeals struck a similar note in response to arguments from the government, pointing

out that "[e]vidence may be material under *Brady* even though it is inadmissible." *Id.* at 485

(citing *Spence v. Johnson*, 80 F.3d 989, 1005 n.14 (5th Cir. 1996)).  To the extent the SEC has

evidence reflecting Bernot's interpersonal issues with co-defendant Dan Knight, that too should

be produced. Constantinescu's counsel has strong reason to believe such evidence exists and that

it will be damaging to Bernot's testimony, which provides color as to why the government has

undergone such lengths to seek to quash and successfully modify Constantinescu's subpoena of

Bernot.

It is no answer to repeated requests for *Brady* material for the government to state, as it

has here: "To be sure, the United States will prosecute this case at trial with the information

already produced to Defendants in discovery in this case." *See* Oct. 13 Notice at 3 [ECF No.

446]. That the government intends to prosecute its case without relying on evidence that

exculpates Defendants should shock no one. The government still has a duty to identify and

disclose such evidence.

## II.    The government's violation of the Court's orders warrants a continuance of the current April 1, 2024 trial date and a finding of contempt to coerce compliance.

The Court observed during the September 7 conference: "I don't want to try this twice.

It's going to be hard enough to try once." Proceeding to trial before the government has satisfied

its *Brady* obligations is a proven method for inviting reversible error and having to try this case

twice. *See, e.g.*, *Sipe*, 388 F.3d at 473; *United States v. Kohring*, 637 F.3d 895, 898 (9th Cir.

2011) ("We conclude that the newly-disclosed information, when viewed collectively, is material

and that the prosecution violated *Brady/Giglio*. We vacate Kohring's conviction and remand to

the district court for a new trial."); *see also Mahler v. Kaylo*, 537 F.3d 494, 503 (5th Cir. 2008)

("Because we conclude that the State did violate its *Brady* obligations, we reverse the district court's denial of Mahler's writ of habeas corpus and remand with instructions to grant it.").

As acknowledged in the first *Brady* order entered in this case, and consistent with the Court's observations at the September 7 conference, the Court is well within its authority to continue the current trial date of April 1, 2024, so as to prompt the government to fulfill its *Brady* obligations. Constantinescu also respectfully submits that the government's repeated refusal in this case to look for and disclose exculpatory information within its possession, custody, or control, notwithstanding clear orders to do so, warrants a finding of civil contempt.

## CONCLUSION

For all the foregoing reasons, the government has violated the Court's *Brady* orders. Constantinescu respectfully requests that the Court continue the current trial date to prompt compliance with the Court's orders and direct the government to show cause why it should not be held in civil contempt.

Dated: January 22, 2024               Respectfully submitted,

FORD O'BRIEN LANDY LLP

By: */s/ Matthew A. Ford*
     Matthew A. Ford
     Texas Bar No. 24119390
     3700 Ranch Road 620 South, Suite B
     Austin, Texas 78738
     Tel.: (512) 503-6388
     Fax: (212) 256-1047
     mford@fordobrien.com

Jamie Hoxie Solano
Admitted *pro hac vice*
Stephen R. Halpin III
S.D. Tex. Bar No. NY5944749
275 Madison Avenue, 24th Floor
New York, NY 10016
Tel.: (212) 858-0040
Fax: (212) 256-1047
jsolano@fordobrien.com
shalpin@fordobrien.com

*Attorneys for Defendant*
*Edward Constantinescu*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served on all counsel of record via the Court's CM/ECF system.

Dated: January 22, 2024

/s/ Matthew A. Ford
Matthew A. Ford