**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § § § | |
| v. | § § § | Case No. 4:22-cr-00612 |
| MITCHELL HENNESSEY, | § § § | |
| *Defendant.* | § | |

## MITCHELL HENNESSEY'S OMNIBUS MOTION IN LIMINE

Mitchell Hennessey respectfully moves the Court to enter an order prohibiting the government from presenting improper argument and inadmissible, unduly prejudicial evidence.[1]
The government should be precluded from:

1. Arguing or implying that Mr. Hennessey had a fiduciary or fiduciary-like duty to social media users;

2. Presenting evidence or argument that is contrary to the SEC's definition of "long" as that term relates to a stock position;

3. Presenting evidence or arguing that Defendants profited any purported amount from the alleged fraud;

4. Using the inflammatory and inapplicable phrases "pump and dump" and "victim";

5. Presenting evidence or argument regarding stocks not at issue in the superseding indictment, or, at the very least, stocks outside of the 54 trading episodes the government stated it would present at trial;

6. Presenting evidence or arguing that any statement was false unless that statement was included on the list of "allegedly false" statements the government provided on June 15, 2023;

---

[1] Defendants Edward Constantinescu, Perry Matlock, John Rybarczyk, Gary Deel, Stefan Hrvatin, and Tom Cooperman join this motion and respectfully request that, to the extent they are similarly situated to Mr. Hennessey, the Court also prohibit the presentation of any such evidence or argument as to them.

7.    Presenting evidence or arguing at trial that any individual is an alleged co-conspirator unless the government has already disclosed to Defendants that it considers the individual a co-conspirator;

8.    Presenting to the jury Government's Exhibit 1, a photo-montage that is irrelevant and unduly prejudicial;

9.    Presenting highly prejudicial video and audio recordings of conversations that Mr. Hennessey was not part of and were not made in furtherance of the alleged conspiracy; and

10.    Objecting to the authenticity of any documents contained in the government's own production.

## I.    LEGAL STANDARD

"Although the Federal Rules of Evidence do not explicitly authorize in limine rulings, the practice has developed pursuant to the district court's inherent authority to manage the course of trials." *Luce v. United States*, 469 U.S. 38, 41 n.4 (1984). "A motion in limine is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds." *O'Rear v. Fruehauf Corp.*, 554 F.2d 1304, 1306 (5th Cir. 1977) (citation omitted).

## II.    ARGUMENT

Mr. Hennessey respectfully requests that the government and its witnesses be prohibited from offering any evidence or presenting any argument as set forth below.

### 1.    The government should be precluded from arguing or implying that Mr. Hennessey had a fiduciary or fiduciary-like duty to social media users.

The government should be prohibited from claiming that Mr. Hennessey or any other Defendant had any duty to disclose their trades to social media users.

It is well-established that "[w]hen an allegation of fraud is based upon nondisclosure, there can be no fraud absent a duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235 (1980).

**MR. HENNESSEY'S OMNIBUS MOTION IN LIMINE – PAGE 2**

Following *Chiarella*, absent a statutory or regulatory requirement, a duty to disclose may arise in only two circumstances: (1) when disclosure is required by virtue of a fiduciary or fiduciary-type relationship; or (2) when disclosure is necessary to make statements that have been made not misleading.[2]

The government has conceded that Mr. Hennessey had no statutory, regulatory, fiduciary, or fiduciary-like duty to disclose when he intended to sell stock. *See* ECF 296 at 11–14. The government should accordingly be prohibited from arguing or implying that Mr. Hennessey had such a duty.

The government's necessary concession leaves it with only the half-truth theory as a means to argue that Mr. Hennessey had some duty to speak at all. Under the half-truth theory, "a duty to speak the full truth *on a particular subject* arises when a defendant undertakes to say anything *on that particular subject*." *SEC v. Mapp*, 240 F. Supp. 3d 569, 584 (E.D. Tex. 2017) (citing *McNamara v. Bre–X Minerals Ltd.*, 57 F. Supp. 2d 396, 416 (E.D. Tex. 1999)). In its response to Mr. Hennessey's Motion to Dismiss, the government disregarded this well-established law and unilaterally asserted that Mr. Hennessey assumed a duty to disclose any intent to sell the minute he "chose to speak on the subject of [his] stock trades." *See* ECF 296 at 12.

The government's version of the half-truth theory is unequivocally not the law, and the jury should not hear such prejudicial, erroneous misstatements. Accordingly, the government should be prohibited from arguing to the jury that Mr. Hennessey had a duty to disclose when he would sell a particular stock. *See, e.g.*, *Mapp*, 240 F. Supp. 3d at 584; *McNamara*, 57 F. Supp. 2d

---

[2] *See In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. 1446, 2016 WL 4095973, at *8 (S.D. Tex. Aug. 2, 2016), *aff'd sub nom. Giancarlo v. UBS Fin. Servs, Inc.*, 725 F. App'x 278 (5th Cir. 2018); *New Jersey v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1128 (D. Kan. 2004) (collecting cases).

at 416; *In re K-tel Int'l., Inc. Sec. Litig.*, 300 F.3d 881, 898 (8th Cir. 2002); *FindWhat Inv'r Grp.*

*v. FindWhat.com*, 658 F.3d 1282, 1306 (11th Cir. 2011).

2. **The government should be precluded from presenting evidence or argument that is contrary to the SEC's definition of "long" as that term relates to a stock position.**

It is a fundamental principal of fairness and the rule of law that the government cannot take

one position in published guidance and then, in the prosecution of an individual who relied on such

guidance, take a position contrary to its own guidance. *See F.C.C. v. Fox Television Stations, Inc.*,

567 U.S. 239, 253 (2012) (stating a fundamental principle of our legal system is that fair notice of

forbidden conduct must be given before one can be found culpable for such conduct). This is

precisely what the government intends by arguing that "long," in the context of stock purchases,

means something different than the definition of "long" published by the SEC—the very body that

Congress entrusted with regulating the securities market.[3]

The government should be precluded from asserting a definition contrary to the SEC's

clear, unambiguous published definition of the term "long."[4]

Contrary to basic principles of fairness, the government seeks to present testimony and

argue that "long" means something other than the SEC's definition of "long." The SEC has

provided a clear, unambiguous definition of "long" in the context of a stock position:

> Having a "long" position in a security means that you own the security. Investors maintain "long" security positions in the expectation that the stock will rise in value in the future. The opposite of a "long" position is a "short" position.
>
> A "short" position is generally the sale of a stock you do not own. Investors who sell short believe the price of the stock will decrease

---

[3] *See generally* Securities Exchange Act of 1934, 15 U.S.C. § 78b (providing that the Securities & Exchange Commission will provide for the regulation and control of transactions in securities).

[4] *See also* 17 CFR § 240.17a-3, 4 (requiring certain exchange members, brokers, and dealers to create and preserve "long" and "short" positions).

> in value. If the price drops, you can buy the stock at the lower price and make a profit. If the price of the stock rises and you buy it back later at the higher price, you will incur a loss. Short selling is for the experienced investor.

Investor.gov, *Stock Purchases and Sales: Long and Short*, available at https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/stock-purchases-and-sales-long-and (last visited Feb. 4, 2024). The SEC also defines "buying long": "Purchasing or owning shares of stock, with the expectation that the stock will rise in value." The SEC unambiguously defines the term "long" to mean that one owns a stock.

Despite this clear definition in published guidance from the SEC, the government has made clear both in its briefing and in its purported expert disclosures that it intends to argue that the term "long" refers to the length of time one would hold stock. The superseding indictment alleges that Mr. Hennessey's posts that he was "long" were false, even though the superseding indictment alleges that he owned the stock at the time he posted that he was "long." ECF 134 at ⁋ 61 ("On or about May 19, 2021, at approximately 10:04:00 EST and approximately thirteen minutes after **falsely** claiming that he was **"long"** SURF, HENNESSEY started selling shares of SURF." (emphasis added)).

The only way the government can support its allegation is to argue that "long" means something other than the SEC's definition. The government intends to do just that through the testimony of a FINRA employee, Peter Melley. Mr. Melley has disclosed that he intends to testify:

> Being "long" in a stock refers to a position in which the investor has purchased a stock with the expectation that it will rise in value in the future. **The most common meaning of the term long generally involves a measure of time and refers to the length of time an investment is held.** An investor "goes long" when the investor believes the stock's price will rise in the future and the investor **intends to hold the stock** to realize that expected future price appreciation. Being long a stock is the opposite of being "short" a stock, which is a position a trader takes when the trader expects the

> stock's price to decline in the future and the trader seeks to profit off
> that anticipated future price movement.

While portions of Mr. Melley's intended testimony are consistent with the SEC's definition of "long," the bold portions appear nowhere in the SEC's definition or any other SEC or other agency guidance. Rather, Mr. Melley's statements are directly at odds with the SEC's definition. The SEC clearly defines "long" as owning a stock. One can be "long" in a stock for one second or one year. The SEC has made clear that time has no bearing on the definition of the term "long" as it relates to a stock position. Mr. Melley provides absolutely no support for his contrary definition, and he should not be allowed to testify that "long" means anything other than the SEC's definition. Not only should Mr. Melley's testimony regarding the term "long" be excluded, the government should not be allowed to present to the jury through evidence or argument a definition of the term "long" that is inconsistent with the clear, unambiguous SEC guidance defining that term.

### 3. The government should be precluded from presenting evidence or arguing that Defendants profited any purported amount from the alleged fraud.

The government should be prohibited from arguing that Defendants profited any amount from the alleged fraud because none of the alleged profit numbers asserted by the government in this case are supported by evidence. Therefore, allowing the government to argue a multi-million profit figure is highly prejudicial.

Only relevant evidence is admissible at trial. *See* FED. R. EVID. 402. Evidence is considered relevant if: "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." FED. R. EVID. 401. That evidence is deemed relevant is not the end of the matter, however. Under Federal Rule of Evidence 403, even relevant evidence should be excluded if "its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]"

In the indictment, and the DOJ's and FBI's press releases, the government touted this case as a *$114 million* fraud, even though the indictment only referenced approximately *$14 million* in total trading profits—a *$100 million* delta. To date, the government has not supported, and indeed cannot support, any of the allegedly fraudulent profits it has charged in this case.

The Court required the government to provide evidence to Defendants explaining how the government calculated the $114 million allegation in the indictment and superseding indictment. *See* Mar. 14, 2023 Hearing Tr. at 13–15. Instead of substantiating its allegation, the government came up with a new number: $121 million.[5] This new number included profits: (1) obtained prior to any alleged false statement—and therefore, completely unconnected to any alleged fraud; and (2) obtained from trading "meme stocks"—which the government has now excluded from its case to avoid producing highly exculpatory evidence regarding these "meme stocks." *See* ECF 424 & ECF 502.

This purported profit number has no connection to the alleged fraud. For example, the government's alleged profit figure includes Mr. Hennessey's trading profits in BBI, which Mr. Hennessey never posted about. In fact, Mr. Hennessey sold *all* his shares before any allegedly false post about the stock. *See* Ex. A, Gov. Ex. 20B. The government's own exhibit shows that Mr. Hennessey sold his last shares of BBI on April 18, 2022 at 3:23 p.m., but the first allegedly false post (by a co-defendant) was not until the following day, April 19, 2022, at 9:20 a.m. *See id.* The government nonetheless includes Mr. Hennessey's $3,009 profit from trading BBI in its purported profit calculations.

---

[5] To date, the government has not identified the stocks or alleged profits that made up the $114 million number it twice presented to the grand jury and included in both the original and superseding indictments.

Further, the government has conceded that it cannot prove that trading profits, even when obtained *after* an allegedly false post, were *caused* by the alleged fraud. The government has conceded that it cannot prove that *any* portion of Defendants' trading proceeds resulted from the alleged fraud. While the indictment alleged that Defendants engaged in a "pump and dump" scheme whereby they would post positive things about a stock on social media to *artificially* inflate the price of a stock so that they could reap illicit profits from this alleged "artificial" price increase,[6] the government has now conceded, *as it must*, that it cannot prove that Defendants caused any artificial price increase. *See* ECF 424 at 8; *see also id.* at 9 (arguing that "causation in fact of the price movement" is neither probative nor relevant). Therefore, the government simply cannot argue, much less prove, that there was any illicit profit obtained from the alleged fraud scheme. The government's asserted "profit" numbers are unconnected to the alleged fraud. Therefore, the "profit" numbers are irrelevant.

Not only are the government's touted alleged profit numbers inadmissible because they are irrelevant, they are also highly prejudicial and should be precluded under Rule 403. The government essentially conceded this when it claimed that the alleged (unsupported) profit number is relevant to motive and intent. *See* Sept. 7, 2023 Hearing Tr. at 73. To allow the government to argue that Defendants were motivated *by*, or intended to commit fraud *because*, they profited millions of dollars would be improper and unduly prejudicial. The government knows that: (1) a significant portion of the purported profits occurred *before* any alleged fraud; and (2) the government cannot prove that *any* portion of any alleged profit number resulted from the alleged

---

[6] *See* ECF 134 at ¶¶ 1–2, 12–13, 16, 21, 32, 42–43, 50, 53–54, 62–63, 71–72, 81–82, 92–93, 96, 98, 100–01, 104, 107, 111, 118.

fraud. Thus, Defendants' profits are entirely irrelevant and only serve as a means by which the government can try to improperly prejudice the jury against Defendants.

In sum, the government should be precluded from presenting any evidence or argument that Defendants profited any amount from the fraud because the government has not presented any profit number connected to the alleged fraud. Any purported profit number the government has presented is unsupported by evidence, unreliable, and includes trading profits that could not have resulted from fraud. Further, even if the purported profit numbers were supported or reliable, how much Defendants purportedly profited from the alleged fraud is simply irrelevant, and allowing the government to argue or imply that Defendants made millions of dollars would be unduly prejudicial. *See* FED. R. EVID. 403.

### 4. The government should be precluded from using the inflammatory and inapplicable phrases "pump and dump" and "victim."

Federal Rule of Evidence 403 provides that a "court may exclude evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Under Rule 403, the Court should prohibit the government from using the phrases "pump and dump" and "victim" in front of the jury.

#### a. "Pump & Dump"

The government has conceded that it cannot and will not prove that Defendants caused any artificial price increase, the hallmark of a "pump and dump" scheme. The term "pump and dump," while highly inflammatory, simply does not apply here. The government should not be allowed to short-circuit its burden of proof by using inflammatory terms such as "pump and dump" and calling

other traders "victims," when the evidence in this case does not support those terms, and the government's own admissions demonstrate that those terms do not apply in this case.

Despite its concession that it will not prove that Defendants caused an artificial price increase, the government nonetheless intends to elicit testimony from FINRA-employee Peter Melley about the meaning of the term "pump and dump." The government disclosed that Mr. Melley will testify regarding the definitions and descriptions of the term "pump and dump," as well as "features of a 'pump and dump scheme,'" including "pre-loading," "front loading," and "coordinated trading." This testimony is irrelevant and highly prejudicial.

The phrase "pump and dump" is pejorative—it suggests that something nefarious, illegitimate, and unlawful occurred. The SEC defines a "pump and dump" as a "scheme" committed by "fraudsters." Investor.gov, *Pump and Dump Schemes*, available at https://www.investor.gov/introduction-investing/investing-basics/glossary/pump-and-dump-schemes (last visited Feb. 7, 2024). Reliance on such a phrase does not evidence that a so-called "pump and dump" actually occurred—i.e., that someone artificially inflated a stock and then sold shares at the inflated price. On the contrary, it simply prejudices the jury against Mr. Hennessey and Defendants without any probative value. *See* FED. R. EVID. 403. Indeed, the SEC itself admits that potential jurors have likely been negatively exposed to the phrase via pop culture. *See* Investor.gov, *Pump and Dump Schemes* (noting that "pump and dump" schemes have been featured in at least two major Hollywood movies—Boiler Room[7] and The Wolf of Wall Street[8]).

---

[7] *See* Boiler Room (2000), available at https://www.imdb.com/title/tt0181984/ (last visited Feb. 7, 2024) (describing the film as exposing "a truly sinister side of an already immoral business").

[8] *See* The Wolf of Wall Street (2013), available at https://www.imdb.com/title/tt0993846/?ref_=fn_al_tt_1 (last visited Feb. 7, 2024) (describing the film as portraying a "securities fraud case that involved widespread corruption . . . including mob infiltration").

A phrase that has gained traction at the popular level through films about "sinister," "immoral" acts and "corruption" has no place in this trial, particularly when the government can describe the alleged crime here in a neutral manner.

Multiple courts have prohibited parties from presenting similarly pejorative phrases to juries due to the fact that the at-issue phrases were unduly prejudicial. *See, e.g.*,

- *Shady Hills Energy Ctr., LLC v. Seminole Elec. Coop., Inc.*, No. 8:20-CV-81, 2023 WL 1768348, at *1 (M.D. Fla. Feb. 3, 2023) (prohibiting the phrase "shell company");

- *Green v. Logan's Roadhouse, Inc.*, No. 2:13-CV-238, 2015 WL 268831, at *1 (S.D. Miss. Jan. 21, 2015) (same as to "hate crime");

- *United States v. Barreiro*, No. 13-CR-00636, 2015 WL 7734139, at *1 (N.D. Cal. Dec. 1, 2015) (same as to "persecuted" and "unfairly singled out");

- *City of Farmington Hills Employees Ret. Sys. v. Wells Fargo Bank, N.A.*, No. CV 10-4372, 2014 WL 12610207, at *5 (D. Minn. Apr. 3, 2014) (same as to "Ponzi Scheme," "Enron," or "Petters"); &

- *Townsend v. Benya*, 287 F. Supp. 2d 868, 876 (N.D. Ill. 2003) (same as to "code of silence" in a case concerning police officers).

Like these courts, the Court should prohibit the government from using a well-known phrase that carries nothing more than a negative connotation without any probative value.

### b. "Victim"

Similarly, the Court should prohibit the government from using the term "victim" in front of the jury because any reference to "victims" would severely prejudice Mr. Hennessey and violate his Fifth Amendment right to Due Process.

It is a fundamental tenet of American jurisprudence that Mr. Hennessey must be presumed innocent unless the government establishes his guilt beyond a reasonable doubt. *See Taylor v. Kentucky*, 436 U.S. 478, 485–86 (1978) ("[T]he Due process Clause of the Fourteenth Amendment must be held to safeguard against dilution of the principle that guilt is to be established by probative

evidence and beyond a reasonable doubt." (cleaned up)). Any reference to so-called "victims" at trial will violate this constitutional guarantee as a "victim" is, by definition, a person who has been "harmed by a crime[.]" *Victim*, BLACK'S LAW DICTIONARY (11th ed. 2019); *see also* 18 U.S.C. § 3771(e)(2)(A) (defining a "crime victim" as "a person directly and proximately harmed as a result of the commission of a Federal offense").

Any reference to an individual as a "victim" is tantamount to stating that a crime was committed, a conclusion that the government has not proved, and cannot prove. Further, the term "victim" unfairly prejudices the jury against Mr. Hennessey as it suggests that some arbiter has already finally concluded that Mr. Hennessey committed a crime, when no such conclusion has been reached. To the contrary, Mr. Hennessey is entitled to the presumption of innocence, and the government should not be permitted to trample upon that right by unilaterally declaring that Mr. Hennessey has defrauded "victims." *See United States v. August*, 590 F. Supp. 3d 972, 976 (W.D. Tex. 2022) ("[R]eference to an individual as a 'victim' is unfairly prejudicial as it encourages the jury to find guilt from improper reasoning, i.e., due to the implication that a crime has already been committed by defendant. The term "victim" "is likely to improperly color the jury's decision-making by creating an assumption that the government has already proved a core element of its case.").

Furthermore, nothing is gained by the government referring to individuals as "victims." In fact, use of the term "victim" only serves to prejudice the jury, it serves no probative value whatsoever. Accordingly, the Court should prohibit the government from using the term "victim" to avoid misleading the jury and unfairly prejudicing Mr. Hennessey.

5.     **The government should be precluded from presenting evidence or argument regarding stocks not at issue in the superseding indictment, or, at the very least, stocks outside of the 54 trading episodes the government stated it would present at trial.**

The government should be precluded from offering evidence beyond the stocks charged in the 19 substantive securities fraud counts in the superseding indictment. *See* ECF 134. The government's "concession" to reduce its trial evidence to 54 of the 397 "trading episodes" it created is no concession at all. Rather, it is an improper, constructive amendment of the superseding indictment that the Court should reject. The law is clear on this front: "The Fifth Amendment provides for criminal prosecution only on the basis of a grand jury indictment. Only the grand jury can amend an indictment to broaden it." *United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993) (citing *Stirone v. United States*, 361 U.S. 212, 215–16 (1960)). Explicit, implicit, or "[c]onstructive amendment requires reversal of the conviction." *Id.* (citing *United States v. Baytank*, 934 F.2d 599, 606 (5th Cir. 1991)). The Court should reject the government's improper attempt to expand its trial presentation beyond the four corners of the superseding indictment.[9]

If the Court declines to limit the government to the superseding indictment, it should limit the government to the 54 trading episodes the government has repeatedly stated would be the universe of trading episodes presented at trial. *See* ECF 424 & 502. On September 15, 2023, in the government's response to Defendants' motions to exclude evidence regarding episodes not charged in the superseding indictment, the government stated that it would only present evidence at trial related to 54 trading episodes, which it listed. ECF 424, Ex. 1. The government forcefully reiterated this on January 26, 2024 in its response to Mr. Constantinescu's *Brady* motion:

---

[9] As set forth in Mr. Constantinescu's Rule 404(b) motion, which Mr. Hennessey joins, the trading episodes beyond the 19 counts are not admissible under Rule 404(b).

**MR. HENNESSEY'S OMNIBUS MOTION IN LIMINE – PAGE 13**

On September 15, 2023, the United States made clear that the discrete set of stock tickers and trading periods comprising the 54 Trial Episodes would be the full universe of trading relevant for trial.

ECF 502 at 5. But the government has now marked for trial multiple exhibits that relate to trading episodes other than the 54 episodes. Not only would introduction of these exhibits constitute unfair surprise given the government's prior statements that it would limit its trial evidence to the 54 episodes, allowing the government to introduce this evidence would substantially prolong the trial.

Similarly, the Court should order the government to remove any references to trading episode numbers in the government's exhibits. The government's exhibits currently reference trading episode numbers ranging from 1 to 397. Reference to trading episodes not presented to the jury would indicate to the jury that there are more than 54 trading episodes at issue—over 300 more, for that matter. Such an implication is highly prejudicial and completely irrelevant when the government has stated that it will limit its presentation to 54 episodes. *See* ECF 424 at 1–2. Accordingly, the government's proof should be limited to the 19 counts in the superseding indictment, and at the very least, the government should be precluded from referencing the existence of any purported trading episodes outside of the 54 episodes the government stated it would present at trial.

### 6. The government should be prohibited from presenting evidence or arguing that any statement was false unless that statement was included on the list of "allegedly false" statements that the government provided on June 15, 2023.

The superseding indictment alleges that Defendants engaged in a purported $114 million securities fraud, but for most of the stocks the government claims are at issue, the superseding indictment fails to identify the allegedly false statements that are essential facts constituting the charged offense of securities fraud. *Compare* ECF 134 *and* Fed. R. Crim. P. 7. During the hearing on April 12, 2023, the Court ordered the government to produce the list of all allegedly false

statements no later than June 5, 2023, the date the government's evidence production was due. ECF 252 at 58–59. After the government failed to meet this deadline, Defendants filed a motion to compel the government to produce the list. ECF 290. The Court ordered the government to produce the allegedly false statements by June 15, 2023, the date the government's expert disclosures were due. ECF 302. On June 15, 2023, the government produced its list of the allegedly false statements.

The government should be prohibited from presenting evidence at trial or arguing that any statements not on this list are false. The Court provided the government with a clear deadline to provide Defendants with its allegations concerning the allegedly false statements, and any amendment to those allegations would deprive Defendants of fair notice and result in a trial by surprise. *See* FED. R. CRIM. P. 16.

      **7.**     **The government should be precluded from presenting evidence or arguing at trial that any individual is an alleged co-conspirator unless the government has already disclosed to Defendants that it considers an individual a co-conspirator.**

The government has only identified the individuals named and referenced in the superseding indictment as alleged co-conspirators. The government should not be allowed to attempt to introduce the statement of any other individual pursuant to the "co-conspirator hearsay exception." In addition, for any unindicted individuals, the government should be precluded from introducing evidence pursuant to the co-conspirator exception unless and until the Court conducts a hearing outside the presence of the jury to determine the proper admissibility of the evidence. *See United States v. James*, 590 F.2d 575, 582 (5th Cir. 1979) (en banc).[10]

---

[10] "Under Rule 801(d)(2)(e), the proponent of admittance must prove by a preponderance of the evidence (1) the existence of the conspiracy (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." *United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999).

8.     **The government should be precluded from presenting to the jury Government's Exhibit 1, a photo-montage that is irrelevant and unduly prejudicial.**

The government has made it clear that it seeks to sully Defendants in the jury's eyes by presenting irrelevant and inflammatory social media posts at trial. The government apparently seeks to confuse the jury by lumping Defendants together in a government-created "montage" of posts and photos. While Mr. Hennessey never made any such posts, and co-Defendants' posts are not admissible against Mr. Hennessey, the government nonetheless sandwiches Mr. Hennessey among these inflammatory posts in an apparent attempt to make it seem that Mr. Hennessey was associated with the inflammatory posts.

The government's montage exhibit does nothing to elucidate any relevant fact in this case for the jury. Rather, the only apparent purpose is to confuse and inflame. *See* Ex. B, Government Exhibit 1A ("GX1A").

Specifically, the government seeks to introduce various posts by Defendants that, while many seem intended as jokes, contain inflammatory language that could be construed as offensive or referring to criminal conduct. These posts include:

- A purported photograph of Mr. Matlock with his head down and the middle fingers of both hands extended;

- A photo of several Defendants, including Mr. Hennessey, in which other individuals are making offensive hand gestures and captioned by Mr. Cooperman "PENNY GODS @PJ_Matlock @MrZackMorris @Hugh_Henne @DipDeity @davidlovesit";

- A photo of several Defendants, including Mr. Hennessey, and another individual captioned by Mr. Cooperman: "GANG ACTIVITY @DipDeity @notoriousalerts @Hugh_Henne @PJ_Matlock @davidlovesit";

- A photo of Mr. Cooperman, Mr. Deal, Mr. Knight, and Mr. Hennessey captioned by Mr. Cooperman "GOBLIN ACTIVITY @notoriousalerts @DipDeity @Hugh_Henne";

- A photo of Mr. Knight, Mr. Hennessey, and Mr. Matlock, which Mr. Knight captioned "Pumpers !!!!!";

- A photo of Mr. Constantinescu and Mr. Hennessey that Mr. Constantinescu captioned "2 of America's most wanted @Hugh_Henne";

- A cartoon of a semi-truck with images of several Defendants, but not Mr. Hennessey, sitting on or hanging off the truck with the caption: "THE GANG HAS ARRIVED TO BLESS THE MARKET @notoriousalerts @PJ_Matlock @MrZackMorris @Hugh_Henne @DipDeity #ATLAS #GOBLINGANG";

- Various photos of other Defendants, not Mr. Hennessey, in front of luxury vehicles; and

- Various photos of some Defendants (and other individuals) in front of a private jet.

In addition, many of the images and captions could be construed as taunting law enforcement, which is both highly prejudicial and has no probative value. *See United States v. Gordon*, No. 1:19-CR-00007, 2019 WL 5270198, at *3 (D. Me. Oct. 17, 2019) ("The prejudicial impact seems apparent because of Mr. Gordon's language and his taunting of the federal agent and prosecutor. In general, the Court views the email string as having minimal probative value and having significant prejudicial impact."). The government seeks to introduce photos that could be construed as taunting the SEC but have no probative value:

- Mr. Constantinescu standing on a beach next to Mexican law enforcement, fully outfitted in tactical gear, with the caption: "The sec finally got me";

- Mr. Constantinescu and Mr. Hrvatin posing near a pool with the caption: "Sec's most wanted"; and

- Mr. Cooperman sitting in what appears to be a dog kennel with the caption: "When the sec finally arrests this MF @ohheytommy."

Ex. B, Gov. Ex. 1, at 2, 7, and 12.

In addition to Government Exhibit 1, the government seeks to introduce other photos and posts that should also be precluded because they have no probative value and are unduly prejudicial.

Rather than carrying any probative value, these images create a substantial likelihood that the jury will find the images offensive, dislike some or all of Defendants because of the images, and view the remainder of the case through that prejudicial lens.

The government also, inexplicably, includes photos with individuals' faces and names blacked out. This is highly prejudicial and leaves the jury wondering why the individual's identity is obscured. The government has provided no basis to redact these individuals' faces, and these exhibits should either be excluded entirely or the redactions removed.

**9.     The government should be precluded from presenting highly prejudicial videos and audio recording of conversations that Mr. Hennessey was not part of and were not made in furtherance of the alleged conspiracy.**

The government seeks to introduce at trial **Government Exhibits 6C-6E, 7D-7S,** and **49C-49H**, which are excerpts of audio and video recordings that do not include Mr. Hennessey. Apparently, Hutchinson Bernot surreptitiously recorded these conversations and then months later produced them to the SEC as part of his bid to become an SEC whistleblower in hopes of reaping a portion of any money the government obtains in this case.

Mr. Hennessey was not part of these recordings, and the recordings should not be admitted against him. The government cannot establish that the statements in the recordings are part of the alleged conspiracy in the superseding indictment. Rather, the individuals on the recordings (the large majority of whom are unidentified) appear to be trying to determine, through a combination of gossip and guesswork, who will post about what stocks when. The individuals discuss purchasing the stock immediately after a social media post and also selling stock after a post. If

anything, the individuals' conduct and statements are directly at odds with the charged conspiracy, not in furtherance of it.

Put differently, the recordings merely consist of the musings of a random group of unidentified individuals, along with Mr. Knight, who has pleaded guilty, and in a few instances, Mr. Cooperman, trying to predict social media posts while engaging in unrelated conversations and banter. Such idle chatter constitutes inadmissible hearsay that should not be admitted against Mr. Hennessey. *See United States v. Cornett*, 195 F.3d 776, 782 (5th Cir. 1999) (holding that "'mere idle chatter', even if prejudicial and made among co-conspirators, is not admissible under Rule 801(d)(2)(e)" (quoting *United States v. Means*, 695 F.2d 811, 818 (5th Cir. 1983)). Furthermore, each of the recordings contain numerous hearsay statements made by unidentified individuals that could not possibly have been made in furtherance of the alleged conspiracy as they have not been identified as members of said conspiracy. *See United States v. Asibor*, 109 F.3d 1023, 1032 (5th Cir. 1997). Each of the recordings should be deemed inadmissible on these grounds alone.

Several of these exhibits refer to trading episodes outside the 54 trial episodes and should be excluded on that ground as well.

Moreover, any probative value the statements may have is far outweighed by the risk of confusion and unfair prejudice. *See* FED. R. EVID. 403. The participants use coarse and offensive language. Further, there are several unidentified individuals who are not Defendants on the call, but the jury may well be confused into thinking that the voices on the call are Defendants. *See Asibor*, 109 F.3d at 1032. Accordingly, the probative value, if any, is extremely minimal, especially because Mr. Hennessey was not part of any conversation the government seeks to admit.

**MR. HENNESSEY'S OMNIBUS MOTION IN LIMINE – PAGE 19**

Government Exhibits 6C-6E were purportedly recorded on March 2, 2021 and some of the recordings mention the stock VISL, which is the subject of Count 6. Only Mr. Knight, who has pleaded guilty, is charged in Count 6. None of the other defendants are charged in Count 6, and none of the other defendants appear on the recordings that are Government Exhibits 6C-6E. This recording is both irrelevant and prejudicial. Mr. Hennessey was not part of the conversation or recording. Nor was Mr. Hennessey charged in Count 6. The recordings are of Mr. Knight and some other unidentified individual speculating about if Mr. Hennessey will post about a stock. These are certainly not statements made in furtherance of the alleged conspiracy.

- **Govt. Ex. 6C.** The recording starts mid-conversation with Mr. Knight saying "I have $100,000 worth." And then after a pause, Mr. Knight says "Hugh's [Mr. Hennessy's] about to go dummy on the floor I think."

- **Govt. Ex. 6D.** Mr. Knight asks if he should "retweet Michael Hunt VISL yawn wake me up at 10." Michael Hunt is another Twitter user, not a Defendant or alleged co-conspirator. Mr. Knight states: "I think my tweet worked." An unidentified individual asks: "Is Hugh [Mr. Hennessey] about to go off on this or what? Where's he at?" Mr. Knight responds, to laughter, "Mother f*cker you're up 5%, shut your b*tch-ass up!" Mr. Knight again sates: "I think my tweet definitely helped it out right there." The individuals on the recording then talk about how they hope the stock price goes up.

- **Govt. Ex. 6E.** Mr. Knight says he's willing to lose $750 and notes "if Hugh will go in on this DD…." An unidentified individual says, "I'll hold the last bit…. Until he does something stupid."

**MR. HENNESSEY'S OMNIBUS MOTION IN LIMINE – PAGE 20**

These recordings are irrelevant, inadmissible, and unduly prejudicial and they should not be presented to the jury.

**Government Exhibits 7D-7S** were purportedly recorded on two different days: February 24, 2021 and March 1, 2021. Government Exhibits 7D-7L were purportedly recorded during the alleged time period of Count 7—February 24-25, 2021—which charges Mr. Rybarczyk and Mr. Matlock with securities fraud in connection with the stock GTT. *See* ECF 424-1. Government Exhibits 7M-7S were purportedly recorded on March 1, 2021, which is outside the alleged time period of Count 7 and not included on the list of the 54 trial episodes the governments stated it would present at trial. These exhibits should therefore be excluded. *See id.*

- **Govt. Ex. 7D** (Feb. 24, 2021) is irrelevant and inadmissible against Mr. Hennessey. The recording is of Mr. Cooperman discussing with other individuals (not Defendants) that Mr. Constantinescu apparently made $2.2 million so far that day trading "SPY," an exchange traded fund that tracks the performance of the S&P 500 Index. This gossip and idle chatter does not relate to any stock at issue in this case, and there is no reason for the government to offer the recording other than to imply that Mr. Constantinescu's profits were somehow illicit. No such allegation has ever been made, and this exhibit is inadmissible.

- **Govt. Ex. 7E** (Feb. 24, 2021) is irrelevant and inadmissible against Mr. Hennessey. The recording is of Mr. Cooperman discussing with other individuals (not Defendants) that it's time to go to the "Rollie store," and discussing how Mr. Constantinescu's "secret swings" are successful and never stay "secret." Again, these conversations are idle chatter and gossip, have nothing to do with any of the charged stocks in this case, and are inadmissible.

- **Govt. Ex. 7F** (Feb. 24, 2021) is irrelevant and inadmissible against Mr. Hennessey. The recording is of Mr. Cooperman talking about how "they" always "slap" [purchase] a stock before "they" "alert it." The recording does not include any reference to who "they" are, and Mr. Cooperman, a co-defendant in this case, is not available for cross-examination. *See Asibor*, 109 F.3d at 1033 (noting that the district court only admitted tape recordings of the defendants and other individuals after producing "extensive evidence" to support that the individuals referenced in the tape—such as "they" here—were members of the alleged conspiracy). The statement is not made in furtherance of the purported conspiracy Mr. Hennessey is alleged to be a part of, and therefore, is inadmissible against Mr. Hennessey.

- **Govt. Ex. 7G** (Feb. 24, 2021) is inadmissible because it concerns stocks, such as "TGC," not included on the government's list of the 54 trading episodes for trial. In the recording, Mr. Cooperman recounts a conversation with Mr. Deel in which Mr. Deel asks why an unidentified individual referred to as "he" makes you hold stocks so long. Mr. Cooperman goes on to say "he" sends it around to all of his "guys in tiers." An unidentified individual then jokes about asking to "upgrade to the new tier plan." The recording does not include a reference to who "he" is, and Mr. Cooperman, a co-defendant in this case, is not available for cross-examination. Further, the government has not alleged, and there is no evidence, that the charges against Mr. Hennessey involve any kind of "tiers." Thus, these statements are not made in furtherance of the alleged conspiracy, are nothing more than idle chatter and gossip, and are accordingly inadmissible against Mr. Hennessey.

- **Govt. Ex. 7H** (Feb. 24, 2021) is inadmissible as to Mr. Hennessey. On the recording, Mr. Cooperman states that Mr. Rybarczyk just texted him "GTT bottom chart" and another individual (not a Defendant) states that Mr. Rybarczyk posted "*GTE*" "on the floor." Mr. Hennessey was not part of this conversation and is not even alleged to have *ever* traded or posted about GTT. The recording clearly states that these individuals (including Mr. Cooperman) are attempting to buy, and sell for a profit, stock *after* Mr. Rybarczyk posted the stock "on the floor." This is not consistent with the allegations in the superseding indictment, where Defendants are alleged to purchase stock *before* any post and then sell the stock *after* a false post. Thus, the statements on the recording were not made in furtherance of the conspiracy Mr. Hennessey is alleged to be a part of, and these statements are not admissible as to Mr. Hennessey.

- **Govt. Ex. 7I** (Feb. 24, 2021) is inadmissible at to Mr. Hennessey. This recording again involves Mr. Cooperman and other unidentified individuals discussing GTT—a stock Mr. Hennessey is not alleged to have traded or posted about. Their statements are not in furtherance of the purported conspiracy Mr. Hennessey is alleged to have been a part of, and are inadmissible against Mr. Hennessey.

- **Govt. Ex. 7J** (Feb. 24, 2021) is inadmissible as to Mr. Hennessey. It involves Mr. Cooperman and other individuals (not Defendants) discussing and joking about other individuals (again, not Defendants) who trade and post together. An unidentified individual opines that all "that group" wants is more people to "spread the pump." Mr. Cooperman jokingly states that he would "expose" those who trade together if they left him out. Far from advancing the alleged conspiracy, this is

simply gossip about unidentified individuals, inadmissible idle chatter and banter among the group. They are certainly not statements made in furtherance of the conspiracy Mr. Hennessey is alleged to be part of. Further, the language used— "spread the pump" —is both ambiguous and highly inflammatory. The undue prejudice outweighs any potential probative value.

- **Govt. Ex. 7K** (Feb. 24, 2021) involves a stock, SYPR, outside the 54 trial episodes. Mr. Hennessey is not alleged to have traded SYPR. But in the recording, one of the unidentified participants (not a Defendant) asks if Mr. Cooperman got the trade idea from Mr. Hennessey. This is unduly prejudicial given that Mr. Hennessey is not even alleged to have traded this stock (and Mr. Cooperman confirms that he did not get the idea from Mr. Hennessey), and the stock is not on the government's list of 54 episodes for trial.

- **Govt. Ex. 7L** (Feb. 24, 2021) also involves SYPR and NAKD, both outside the 54 trial episodes, and should be precluded for the same reasons Govt. Ex. 7K should be precluded.

**Government Exhibits 7M-7S**, purportedly recorded on March 1, 2021, refer to trading in an episode outside of the 54 trial episodes and should be excluded. In the government's June 2023 list of 397 "trading episodes" the government included Episode 141, which involves the stock GTT during the time period March 1-3, 2021. The government did not include Episode 141 in the 54 trial episodes. *See* ECF 424-1. These exhibits are also irrelevant as to Mr. Hennessey, who was not on the recording and is not alleged to have *ever* traded or posted about GTT—the stock discussed on the recordings. Further, the recordings do not include statements in furtherance of the alleged conspiracy. For example, Mr. Knight states: "We should have had a market buy just ready

right as we saw the f*cking tweet." Gov. Ex. 7M. Mr. Knight discussed buying stock *after* a tweet, the exact opposite of the alleged conspiracy in which the defendants are alleged to have purchased stock *before* posting about it. Thus, in addition to being outside of the 54 trial episodes, the statements in this exhibit are not in furtherance of the conspiracy Mr. Hennessey is alleged to be a part of. The statements are also unduly prejudicial and have no probative value.

**Government Exhibits 49C-49H** were purportedly recorded on February 10, 2021, and many of the recordings mention the stock KXIN, which is not a count in the superseding indictment but is on the government's list of 54 trial episodes as Episode 191 for the time period February 10-11, 2021. *See* ECF 424-1. These recordings feature Mr. Knight, who has pleaded guilty, and do not include Mr. Hennessey or any other Defendant. These exhibits are irrelevant and contain inadmissible hearsay.

The statements on the recordings are not co-conspirator statements made in furtherance of the alleged conspiracy. Similar to the conversations in Gov. Ex. 7D-7S, the individuals seem to be attempting to predict—through gossip and guesswork—when other individuals are going to post about a stock and then either buy before or immediately after the post and sell the stock for a profit if the price increases after the post. Their statements are idle chatter and gossip. It is clear from the recordings that the individuals on the recordings are not part of the alleged conspiracy. They talk about how they do not know if or when someone might post about a stock. Instead, they are trying to predict that. Their statements simply could not be part of, much less in furtherance of, the alleged conspiracy. The risk of confusion and undue prejudice presented by these recordings far outweigh any probative value they may have.

- **Govt. Ex. 49C.** Mr. Knight tells other individuals (not Defendants), "Seriously, guys add it . . . this is big dog . . . KXIN . . . we don't play around with percents

anymore. We're pumping stocks. We're getting a f*ck-ton of percent. Quit your job, now." Unidentified individuals are laughing while Mr. Knight is saying this.

- **Gov. Ex. 49D.** Mr. Knight states, "Dude, when this tweet comes. This is . . . we're . . . ." and an unidentified individual states, "We fi'n' to bust that." Mr. Knight states, "I'm putting sell limits of like 4.95."

- **Gov. Ex. 49E.** This recording appears to start mid-conversation with an unidentified individual stating, "That it's a good squeeze play." Mr. Knight states, "I really need, I need a Tweety McTweeterson." An unidentified individual states, "It's coming Dan. It's coming." Mr. Knight responds, "I know." Another unidentified individual states, "Remember we were nervous this morning." Mr. Knight states, "Hugh just, Hugh just text me and said 'Tell this sh*t let's go.'" Mr. Hennessey is not part of the conversation or on the recording, and Mr. Knight's statement about what Mr. Hennessey purportedly texted could not be in furtherance of the alleged conspiracy. If anything, it is mere chatter and would have no impact whatsoever on the success of the alleged conspiracy.

- **Gov. Ex. 49F.** Mr. Knight says, "Okay, he said 'bout to do it, 'bout to do it, 'bout to do it . . ." Mr. Knight does not identify who "he" is. An unidentified individual says, "What if he just tweets, KXIN offering, and he's like f*ck you, Dan." Others on the recording laugh at this, and Mr. Knight responds, "I would lose a lot of friends," followed by more laughter.

- **Gov. Ex. 49G.** Mr. Knight and unidentified individuals discuss that some unnamed individual tweeted and posted on the floor. They then talk about the price movement of an unnamed stock. And Mr. Knight states, "You want to doubt the

king?" This is completely irrelevant as there is no reference to the identity of the individual or the stock discussed.

- **Gov. Ex. 49H** is inadmissible. This recording starts with Mr. Knight saying, "That's so f*cking retarded. Like, our lives are so easy." An unidentified individual then states "This is . . . it's become a lot easier with this new aspect." And an unidentified individual states, "This is my favorite indicator ever." An unidentified individual asks, "Did you pick up TRCH?" to which Mr. Knight responds, "Of course I picked up TRCH . . . I'm up like 80 f*cking percent on it."

The recordings the governments seeks to introduce are inadmissible against Mr. Hennessey. Mr. Hennessey was not part of the conversations or on the recordings. And the statements are not in furtherance of the alleged conspiracy. The government should be precluded from presenting these statements to the jury because any probative value against any other defendant is heavily outweighed by the risk of confusion and undue prejudice, and a limiting instruction is insufficient to cure such confusion and prejudice. None of the recordings involve Mr. Hennessey, but it is highly unlikely that the jury will be able to keep straight which Defendants are on the recordings and which are not, especially when so many of the parties on the recordings are unidentified.

### 10.    The government should be precluded from objecting to the authenticity of any documents contained in the government's own production.

The government's exhibits consist of cherry-picked portions of communications (i.e., tweets, posts, and direct messages) and select portions of trading records that the government has compiled into its own, self-created exhibits.

If the government is allowed to introduce these government-created exhibits, Mr. Hennessey expects to cross examine the government witnesses on the accuracy of the government

exhibits as well as other aspects of the witnesses' testimony using the very records the government produced. The government should not be allowed to object to the authenticity of materials it produced to Defendants in an effort to avoid impeachment of its witnesses.

Mr. Hennessey has no duty to alert the government to the specific, significant flaws in its exhibits and prospective witnesses' testimonies by disclosing before trial which documents he intends to use to impeach the government's witnesses. Nor can Mr. Hennessey anticipate what each of those flaws might be before trial. Therefore, Mr. Hennessey requests that the Court prohibit the government from objecting on authenticity grounds to materials the government itself produced.

## III.    CONCLUSION

For the reasons stated, Mr. Hennessey respectfully requests that the Court grant the relief requested.

Respectfully submitted,

**JACKSON WALKER LLP**

*/s/* Laura M. Kidd Cordova
Laura M. Kidd Cordova
State Bar No. 24128031
lcordova@jw.com
Michael J. Murtha
State Bar No. 24116801
mmurtha@jw.com

1401 McKinney St, Suite 1900
Houston, Texas 77010
(713) 752-4449
(713) 752-4221 (Facsimile)

**ATTORNEYS FOR DEFENDANT
MITCHELL HENNESSEY**

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on February 9, 2024, a true and correct copy of the foregoing was served electronically on all persons via the Court's CM/ECF system.

          <u>*/s/* Laura M. Kidd Cordova     </u>
          Laura M. Kidd Cordova