# Exhibit 1



U.S. Department of Justice

Criminal Division

---

*Fraud Section*

June 15, 2023

**<u>Via Email</u>**

      **Re:** *United States v. Constantinescu, et al.*, 22-cr-612 (S.D. Tex.)

Dear Counsel:

    Under the Court's Scheduling Order (ECF No. 254) regarding the exchange of expert disclosures, the United States provides notice that it anticipates calling Peter Melley, Esq. as a witness who may provide expert testimony in the trial of the above-referenced matter. Although many of the topics and testimony described below do not constitute expert testimony, the United States includes them in this disclosure in an abundance of caution.

    Mr. Melley is Director of the Criminal Prosecution Assistance Group ("CPAG") at the Financial Industry Regulatory Authority ("FINRA"), where he has worked for approximately 25 years assisting criminal investigations and prosecutions involving securities-related crimes. Prior to joining CPAG in 1998, Mr. Melley worked for approximately two years as an Examiner in the Enforcement Department at the National Association of Securities Dealers ("NASD"), which was FINRA's predecessor. In that role, he conducted investigation into the trading and sales practices of FINRA member firms to determine if they followed FINRA rules, SEC regulations, and U.S. securities laws. As set forth in his curriculum vitae (attached as Exhibit A), Mr. Melley has also worked as an investigator for the Maryland State Prosecutor's Office and Proudfoot Reports, Inc.

    We expect that Mr. Melley will testify, in sum and substance, as follows:

- The United States Securities and Exchange Commission ("SEC") is an independent agency of the United States government responsible for regulating publicly trading companies and enforcing federal securities laws, which are designed to provide the investing public with full disclosure of all material facts regarding matters involving the offer, purchase, and sale of securities, among other things. The purpose of these laws is to protect the investing public by maintaining fair, honest, and transparent securities markets and prevent securities fraud and manipulative practices that tend to distort prices of securities.

- FINRA is the self-regulatory organization for the securities industry, created under the auspices of the SEC. FINRA's main mission is to protect investors and ensure the integrity of the marketplace. FINRA conducts surveillance across different securities and product platforms, including the New York Stock Exchange ("NYSE") and NASDAQ stock markets. FINRA also regulates the activities of its members, which include member

  brokerage firms and registered employees of those firms, and promulgates rules accordingly. FINRA often makes referrals to the SEC and DOJ.

- CPAG is a unit of FINRA that assists in criminal investigations and prosecutions involving securities fraud. That assistance may include analyzing various stock and trading records, summarizing that and other information in charts, and, if necessary, testifying to that analysis. CPAG testimony may also include information on general market and trading knowledge, terms, and topics on market integrity and fraudulent or manipulative schemes that disrupt that integrity.

- A "security" is a financial instrument that can be traded. "Stock" or "shares" are generally securities representing equity or ownership stake in a corporate entity, and are often traded on public stock markets. Stock is usually measured in shares.

- A "publicly traded company" is a corporate entity that issues shares that are traded on a public stock market. A public company often has requirements to file certain reports with the SEC in order to issue stock, as well as for stock to continue to trade on stock markets.

- The "securities markets" or "stock markets" refer to those markets where individuals and entities can publicly trade various types of securities like stock. NYSE and NASDAQ are particular stock markets. Public companies often trade on various securities markets that have their own listing requirements, like the NYSE and NASDAQ. The reports demonstrating the companies meet the exchanges' listing requirements then need to be filed with the SEC.

- An "issuer" is a company that issues stock. An issuer hoping to trade or continue trading on public exchanges in the United States must generally file reports with the SEC. Companies trading on NYSE and NASDAQ are generally "issuers." The "at-issue stocks"[1] in this litigation are "issuers" within the meaning of the relevant securities laws.

- "Volume" is the number of shares that are purchased and sold among various market participants for a particular stock in a particular time frame. Volume is an important metric for investors because it shows the interest in a particular stock. If there is a lot of volume or a significant change in volume in a particular stock, it indicates to other investors there may be significant or increasing interest in a stock and it may be worthy of investment. Trading volume may impact the price of a stock given that higher volume may demonstrate and/or create increased demand for a stock, precipitating a rise in the stock's price. A "thinly traded" or "illiquid" stock is a stock often without much volume, *i.e.*, there often are not many available buyers and sellers in the stock; this refers to the ease with which one can buy or sell a security and may have more significant impacts on volatility and price.

---

[1] The "at-issue stocks" are the securities forming the basis for each substantive securities fraud count in the Superseding Indictment (ECF No. 134), as well as all additional securities identified in Attachment A of the United States' March 31, 2023 disclosure, which Mr. Melley has reviewed. If you have any misunderstanding about this, please let us know so we may rectify it.

- A company's "shares outstanding" are the total number of shares issued by the company and actively held by stockholders, including shares held by both shareholders and company insiders, which may include shares that are restricted from trading. "Floating shares" or the "float" of a stock refer to the number of shares outstanding that are freely available to trade in the public market, subtracting any shares outstanding that may be restricted from trading. A "low float" stock is one without many shares available for trading—generally an illiquid or thinly traded stock. Low float stocks may be more volatile and have more significant price movements than stocks with higher floats.

- "Price" is the amount an individual stock costs or is trading for at the time of the quote. The "closing price" is the price of the stock at the close of the regular trading day, which begins at 9:30 a.m. EST and ends at 4:00 p.m. EST. The closing price is an important metric for investors. Comparison of the closing on a particular day with prior days' closing prices (*i.e.*, is the stock price rising or falling) may influence investors' decisions on whether to invest in a stock. Although the day's closing price is fixed at 4:00 p.m. EST, certain stocks may trade "after hours" or "AH." After-hours trading is trading that occurs after 4:00 p.m. EST and ends around 8 p.m. It is facilitated by brokers, rather than the stock exchanges. Premarket trading is similar to after-hours trading, but available before the market opens, generally from about 7 a.m. EST to 9:25 a.m. Both pre-market and after hours trading generally has fewer market participates, which can result in lower trading volume and may result in greater volatility given the lesser liquidity.

- A "penny stock" is a stock that trades at a low price per share, generally defined as less than $5/share. Penny stocks are generally thinly traded and may have very little liquidity or trading volume. For those reasons, penny stocks often have more volatility than stocks with higher prices per share.

- "Blue sheet data" is information that brokerage and/or clearing firms provide to FINRA and the SEC concerning securities trading. The data includes customer-specific information for transactions, including the customer name, address, account number, identity of the shares bought or sold, the number of shares bought or sold, the price, and the amount of money paid or received. Brokerage and clearing firms are required to maintain this information for a period of at least six years, and provide it to FINRA or the SEC upon request.

- A "brokerage" is a licensed firm that provides investment services to customers. A "brokerage account" is an account a brokerage maintains for a customer that holds cash, securities, and other financial products, and which the customer may use to trade securities. A particular customer's "brokerage records" are the records maintained by the brokerage of the trading activity of that individual customer at that brokerage.

- A "pump and dump" is a stock manipulation scheme that attempts to boost the price of a stock or security through false, misleading, or greatly exaggerated statements. Pump-and-dump schemes have occurred repeatedly over the decades, taking place historically through telemarketing campaigns touting stocks with calls from "boiler room" phone bullpens, through to the internet age, by disseminating false and misleading information online.

Common aspects of a pump and dump stock manipulation scheme include the "pumping" of a stock to increase price and volume through false or misleading public statements, *e.g.*, internet promotion campaigns, and the "dumping" of shares at prices that are artificially inflated by means of public promotion, or via artificially inflated interest in the stock, *i.e.* volume, generated by means of public promotion and internet activity. The increased trading volume generated by the "pump" may facilitate the "dump" in multiple ways, including by increasing the volume of buyers of the stock so that the price rises and/or there is sufficient liquidity for the scheme participants to sell their stock at the elevated prices or at all. Often, pump-and-dumps are executed in low-float or illiquid stocks, so the liquidity generated by the "pump" enticing investors to purchase the stock is important to allow the participants in the scheme to sell their shares into that liquidity. Pump and dump schemes negatively impact the integrity of the markets.

- "Pre-loading" or "front loading" is often a feature of pump-and-dump schemes. It refers to the practice of participants to the scheme purchasing shares of the stock that is the object of the scheme prior to beginning the "pump," so that participants in the scheme establish their position before the public statements to generate interest in the stock begin. It is also used in such schemes so that participants in the scheme are able to establish their position in the stock at a lower price, so those individuals have more to gain when the "pump" starts and less risk than others who buy into the "pump" at the higher expected prices.

- "Coordinated trading" is also often a feature of a pump-and-dump scheme and may be related to pre-loading. Individuals in a pump-and-dump scheme may coordinate in secret to buy or sell shares of a stock. At times, such individuals do so in an attempt to "lock up the float" or own a large number of shares among the members of the scheme. In this way, the individuals hope to be able to better control the price of the stock by restricting the supply of stock for sale, while at the same time generating demand for the stock through public promotion. This may cause the price of the stock to rise. This may also provide the bidding liquidity needed to sell shares of a stock without lowering the price.

- A "price target" for a stock is an individual or entity's prediction for the future price of a stock. Often, an individual or entity will publicize their price targets for stocks. Price targets may be used in fraudulent pump and dump schemes when they are stated publicly without sound basis in fact or in bad faith not in order to communicate a genuinely held opinion or prediction to the market, but in order to generate trading interest in a stock so that the participants in the scheme may maximize the profit on the sale of their shares.

- "Day trading" is a style of stock trading that generally involves making many trades in a single trading day hoping to secure profits from the intra-day price movement of a stock.

- A "swing" or "swing trading" is a different trading strategy that generally seeks to profit from price movement in a stock over a longer time frame than a day trade.

- "Scalping" is a term with various meanings. It is sometimes used as a term to describe a day trading style that specializes in profiting off small price changes in a stock, by buying a stock and then quickly selling that stock for a quick profit. It also is used to describe a

fraudulent trading strategy. Scalping describes a fraudulent trading strategy when a market participant publicly recommends a stock so as to cause the price to spike and then sells the stock at the inflated price to generate profits. Scalping that is fraudulent or manipulative negatively impacts the integrity of the markets.

- A "retail" trader or investor is a common member of the investing public. Retail investors with less than $25,000 in their account are not permitted to day trade—*i.e.*, buy and sell the same stock in the same trading day—more than three times per trading week. If such a retail investor exceeds this three day-trade limit, the investor will not be permitted to sell a stock the investor bought the same day the investor bought it, *i.e.* day trade. This restriction may be particularly harmful to retail investors who are caught up in pump and dump schemes, as those investors will be unable to sell the purchased stock until the following trading day, often after the "dump" and cratering of the stock price. Thus, such investors may be left with a substantial loss from pump and dump schemes.

- Being "long" in a stock refers to a position in which the investor has purchased a stock with the expectation that it will rise in value in the future. The most common meaning of the term long generally involves a measure of time and refers to the length of time an investment is held. An investor "goes long" when the investor believes the stock's price will rise in the future and the investor intends to hold the stock to realize that expected future price appreciation. Being long a stock is the opposite of being "short" a stock, which is a position a trader takes when the trader expects the stock's price to decline in the future and the trader seeks to profit off that anticipated future price movement.

- Mr. Melley also reviewed certain of Defendants' social media and trading records and compared those records with the volume and price information obtained for certain of the at-issue stocks. On certain trading days where Defendants posted publicly about the at-issue stocks, those stocks have increased trading volume compared to other days the stocks traded when Defendants were not posting about the stocks.

- A "market" order is an instruction by an investor to a broker to buy or sell stock shares (or another asset) at the current best available price in the market. A "limit" order is an instruction by an investor to a broker to buy or sell stock shares (or another asset) only at a certain price specified by the investor. A limit order allows an investor to set a maximum acceptable purchase price or minimum acceptable sales price while placing an order, as the order will be processed only if the asset hits that price. A "stop loss order" is an instruction by an investor to a broker to buy or sell a specific stock once the stock reaches a certain price, like a limit order. A stop-loss order is designed to limit an investor's loss on a security position. For example, an investor setting a stop-loss order at a price 10% below the price at which the investor bought the stock will attempt to limit the investor's potential loss to 10%. If the price of the stock falls 10% or more, the stop-loss order will cause the shares to be sold at the prevailing market price. A "stop-limit order" is a type of stop-loss order, except that, instead of selling the asset at the prevailing market price once the stop price is hit, the asset will only be sold at the limit price or better once the stop price is hit. Traders often use stop-limit orders to lock in profits or limit downside losses.

A list of the cases in which Mr. Melley has testified at trial during the past 4 years is attached hereto as Exhibit B. He has not been compensated by the Department of Justice as part of this case, and collects his regular salary as an employee of FINRA for participation in this case.

In addition, the United States anticipates that Mr. Melley will provide summary testimony regarding trading in the "at-issue stocks," including their publicly reported trading prices and volumes, their blue sheet data, Defendants' relevant trading and brokerage records, Defendants' relevant social media activity, and certain of the United States disclosures to the defense in this case, all of which have been produced in discovery. Mr. Melley's summary testimony will make use of certain summary charts and graphics that have not yet been prepared but will be provided in a timely fashion by the Court's August 11 deadline for exhibits and witness lists. (ECF No. 254).

Please let us know if you have any questions about this disclosure or would like to discuss it. The United States reserves the right to supplement and/or amend Mr. Melley's anticipated testimony and to call additional experts in its case-in-chief or rebuttal case, based on information made known to the United States and/or Mr. Melley before or during trial, including in response to Defendants' experts or case.

Very truly yours,

GLENN S. LEON
Chief, Fraud Section

By: *John J. Liolos*
Scott Armstrong, Assistant Chief
John J. Liolos, Trial Attorney


ALAMDAR S. HAMDANI
United States Attorney
Southern District of Texas

By: *Thomas H. Carter*
Thomas H. Carter, AUSA


*Peter J. Melley*
Peter Melley, Esq.
Director
Criminal Prosecution Assistance Group

Financial Industry Regulatory Authority

# Exhibit A

# PETER J. MELLEY
1735 K St., NW, Washington, DC  20006
Tel: (202) 728-8480
peter.melley@finra.org

## EXPERIENCE

**FINRA (f/k/a NASD, Inc.) Office of General Counsel**         May 1998 to present
**Washington, DC**
**Director, Criminal Prosecution Assistance Group**

- Manage staff of four attorneys in unit assisting criminal investigations and prosecutions involving securities fraud.
- Assist investigations and in the preparation of criminal indictments pertaining to securities fraud, money laundering, tax evasion, and other white-collar crimes for the Offices of the United States Attorney, Federal Bureau of Investigation, Internal Revenue Service, U.S. Postal Inspection Service, and local district attorney's offices throughout the nation.
- Testify as a summary fact witness in Federal District Courts and State Courts. I have testified on approximately forty occasions. Create trial exhibits presenting analyses of NYSE, Nasdaq Stock Market and over-the-counter securities trading data, SEC and FINRA filings, stockbroker's commission runs, brokerage account statements, and transfer agent records.
- Conduct numerous training programs for various law enforcement agencies on the securities industry, brokerage firm's books and records, FINRA and SEC reporting requirements, and investigative techniques regarding the prosecution of various frauds.

**NASD, Inc. Enforcement Department**
**Washington, DC**
**Examiner**                                                      September 1996 to May 1998

- Conducted numerous investigations involving trading and sales practices violations by NASD member firms.
- Responsibilities included conducting informal and formal interviews, preparing customer declarations, drafting investigative plans and memoranda, and providing settlement support.
- Attended all applicable department and corporate training classes.  Acted as a mentor to inexperienced department staff.

**Md. State Prosecutor's Office**                                January 1995 to August 1996
**Towson, MD**
**Investigator**

- Assisted prosecutors and senior investigators in investigations and prosecutions of violations of state election laws and related offenses.  Responsibilities included conducting interviews, legal research, creating timelines of events, and preparing memoranda for prosecutors

**Proudfoot Reports, Inc.**                                      September 1992 to August 1993
**Glen Cove, NY**
**Investigator**

- Conducted criminal background investigations for employee applicants with various companies located throughout the nation.  Responsibilities included researching numerous state and local criminal court databases, contacting previous employers, and preparing memoranda of findings.

## EDUCATION

**University of Baltimore School of Law** — **Juris Doctor**
Baltimore, MD — May 1996

**Loyola College** — **Bachelor of Arts, History**
Baltimore, MD — May 1992

## BAR MEMBERSHIP

Maryland

# Exhibit B

# PETER MELLEY
# DIRECTOR - FINRA CPAG
# TRIAL TESTIMONY HISTORY

| TRIAL NAME | DISTRICT | DATE OF TESTIMONY |
|---|---|---|
| U.S. v. Todd Michael Ficeto | CDCA | 6/19/2019 |
| People of the State of NY v. Adam Cohen | DANY | 2/8/2001 |
| U.S. v. Robert H. Bray | DMA | 1/27/2016 |
| U.S. v. Charlie Jihan Chen | DMA | 3/28/2019 |
| U.S. v. Edward W. Withrow, III | DMA | 12/14/2017, 12/15/2017 |
| U.S. v. Sandip Shah | DMA | 5/13/2015, 5/14/2015 |
| U.S. v. Jehu Hand | DMA | 5/2/2018, 5/18/2018 |
| U.S. v. Richard Weed | DMA | 5/9/2016, 5/10/2016 |
| U.S. v. Schultz Chan and Songjiang Wang | DMA | 6/28/2018, 6/29/2018 |
| U.S. v. Christopher Rad | DNJ | 11/20/2012 |
| U.S. v. James Norman Turek | EDKY | 6/13/2012, 6/14/2012 |
| U.S. v. Dennis Gaito | EDNY | 11/13/2000 |
| U.S. v. Ragusa, et al. | EDNY | 11/29/2000 |
| U.S. v. Philip A. Kenner | EDNY | 6/2/2015 |
| U.S. v. Louis F. Petrossi | EDNY | 4/20/2017 |
| U.S. v. John Surgent | EDNY | 2/21/2005 |
| U.S. v Joel Nazareno, et al. | EDNY | 4/26/2001 |
| U.S. v. Dolney | EDNY | 9/2005 |
| U.S. v. Vladlen Vindman | EDNY | 9/21/2004 |
| U.S. v. Mark Wayne Ramsey | EDPA | 9/23/2021 |
| U.S. v. Phillip W. Offill, Jr. | EDVA | 1/21/2010 |
| U.S. v. David Alcorn and Aghee William Smith II | EDVA | 2/4/2022 |
| U.S. v. Christopher Benyo, et al. | EDVA | 01/2007 |
| U.S. v. Scott Wiegand | EDVA | 12//2005 |
| U.S. v. Daryl Bank | EDVA | 3/31/2021, 4/1/2021 |
| State of FL v. Ralph McNamara | FL Circuit Court | 10/11/2007 |
| U.S. v. Paul S. Kruse | MDFL | 2/5/2013 |
| U.S. v. Gary Heesch | NDIL | 7/31/2008 |
| U.S. v. James Jedynak | NDIL | 9/30/2013 |
| U.S. v. Klundt and Sargent | NDIL | 1/12/2023 |
| U.S. v. George David Gordon, et al. | NDOK | 4/7/2010, 4/8/2010 |
| U.S. v. Paul Rampoldi | SDCA | 2/27/2018, 2/28/2018 |
| U.S. v. James T. Kelly | SDFL | 11/4/2004 |
| U.S. v. Michael J. Muzio | SDFL | 2/11/2010 |
| U.S. v. Mitchell J. Stein | SDFL | 5/14/2013 |
| U.S. v. Omar Leon Plummer | SDFL | 4/11/2012, 4/12/2022 |

1

| | | |
|---|---|---|
| U.S. v. Stephen J. Drescher | SDNY | 7/24/2001 |
| U.S. v. Glen Benussi | SDNY | 2/12/2002 |
| U.S v. John Cassese | SDNY | 9/17/2003 |
| U.S. v. Martha Stewart and Peter Bacanovic | SDNY | 2/18/2004 |
| U.S. v. Frank Skelly, et al. | SDNY | 9/29/2004 |
| U.S. v. Cervino | SDNY | 3/9/2017 |
| U.S. v. Benjamin Chow | SDNY | 4/16/2018 |
| U.S. v. Tuzman | SDNY | 12/17/2017, 12/18/2017 |
| U.S. v. Donna Levy and David Levy | SDNY | 3/6/2017, 3/7/2013 |
| U.S. v. Timothy Matthews, et al. | SDNY | 4/24/2002, 4/25/2002 |
| U.S. v. Gordon Hall, et al. | SDNY | 4/8/1999, 4/12/1999 |
| U.S. v. Joseph Hirko, et al. | SDTX | 5/24/2005 |