UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. 4:22-cr-612 |
| | § | |
| CONSTANTINESCU, *et al.* | § | The Honorable Andrew S. Hanen |
| | § | |
| Defendants. | § | |

**United States' Response to Defendant Hennessey's Motions *in Limine* ECF No. 541**

The United States, by and through undersigned counsel, responds to Defendant Hennessey's Omnibus Motion *in Limine* (ECF No. 541).[1] The Motion raises ten points, which the United States addresses in turn. The Court should deny the Motion.

**1. The Court articulated the relevant duties in this case when denying Defendants' motions to dismiss (Order, ECF No. 385).**

The United States agrees that all parties "should be precluded from arguing or implying that [Defendants] had [or did not have] a fiduciary or fiduciary-like duty to social media users," beyond the duty the Court recognized in its Order dismissing Defendants' motions to dismiss. (ECF No. 541 at 2; *see also* Order, ECF No. 385.) There, the Court found:

> Once the Defendants opted to publicly speak, they had a duty to be honest and not to defraud. This is not the Government or the Court imposing an unknown duty on the Defendants after the fact. The duty not to defraud is imposed by 18 U.S.C. §§ 1348–1349 and the duty to be honest was self-imposed on the Defendants by the Defendants when they chose to engage in discourse pertaining to various stock transactions.

(Order at 3–4.) Those are the only duties relevant to this case. Thus, all parties should be precluded

---

[1] Defendant Hennessey is joined by his remaining co-Defendants "to the extent they are similarly situated to Mr. Hennessey." (Mot. at 1.)

from mentioning any other duties—or suggesting no other duties applied to Defendants—in front of the jury. (*See* ECF No. 538, US MILs section II.21.) Evidence and argument of the duties the Court described are, of course, relevant and admissible at trial.

## 2. Witnesses may define trading terms like "long" as they understand them to be used.

Defendant Hennessey argues the United States should be precluded from presenting evidence or argument different from "the SEC's definition of 'long' as that term relates to a stock position." (Mot. at 4–6.) But in another motion Defendant Hennessey joined, Defendants *themselves* argued that definitions of trading terms "are hotly contested issues that cannot be boiled down to one, unchallenged version." (ECF No. 533 at 3.) Defendant cannot have it both ways.

The United States only presents relevant evidence; it does not control the content of that evidence. Evidence of definitions for a stock trading term like "long" may come from multiple different sources in this case, including the testimony of various witnesses, lay and expert. The understandings of traders in the market, or investigators of market misconduct, may be consistent with, broader, or different than an official definition promulgated by a body like the SEC. The witness' understandings are relevant to this case and will be helpful to the jury.

Defendant addresses his argument most directly at Peter Melley's expected testimony. As previously described, Mr. Melley is an attorney who has over 25-years' experience investigating market misconduct as a veteran of FINRA's CPAG unit. (*See* ECF No. 571.) Mr. Melley's testimony is informed by those many years of highly relevant experience.

Defendants take issue with the fact that Mr. Melley's definition of "long" uses different words than the SEC's stated definition. For example, Defendant asserts that the SEC's definition does not contain the following component of Mr. Melley's definition: "[t]he most common meaning of the term long generally involves a measure of time and refers to the length of time an

2

investment is held. An investor 'goes long' when the investor believes the stock's price will rise in the future and the investor intends to hold the stock." (Mot. at 5.) But the SEC's definition itself *includes the concept* that "long" indicates a stock held over time: "Investors maintain 'long' security positions in the expectation that the stock will rise in value *in the future*." (*See* Mot. at 4–5 (emphasis added).) Any distinction between the definitions is essentially semantic. And it is a distinction without a difference.

Further there is no requirement in law that a witness establish that a single wording of a definition for a term is the only possible definition for the testimony to be relevant and admissible. *See United States v. York*, 572 F.3d 415, 424 (7th Cir. 2009) ("Experts need not establish that certain words have fixed meanings only in the [relevant industry] or in the particular conspiracy before they can interpret those words."). Evidence and testimony as to how these terms are used, and their intended meaning, by those who use them to discuss and investigate stock trading will be helpful to the jury despite any semantic distinctions. Defendant's arguments to the contrary go to the weight of such testimony, not its admissibility

Defendant's argument actually reads as an attempt to make a fair notice argument, inserting the notion that Defendant Hennessey believed (without any as-yet articulated foundation) only in the SEC's precise definition, and that holding him accountable for any definition with additional or different words would be unfair to him. If that is the truth, Defendant Hennessey is free to take the stand and say so. But the Court should not adopt an artificial limitation unsupported by law or logic in order to impermissibly inject Defendant Hennessey's testimony while sheltering it from proper cross-examination. The Court already rejected Defendants' notice arguments and should reject this argument, too. (Order, ECF No. 385; US MILs II.21.)

### 3. The Court should admit evidence of Defendants' profits in the Trial Episodes because the evidence is probative of motive and other issues of consequence.

As discussed in the United States' Motions *in limine*, Defendants' profits in the Trial Episodes are relevant to motive and admissible as such. (ECF No. 538, US MILs section II.2); *see also United States v. Moss*, 34 F.4th 1176, 1189 (11th Cir. 2022) ("[P]rofit is relevant to motive, which is always relevant in a criminal case."); *United States v. Jones*, 587 F.2d 802, 806 (5th Cir. 1979) (evidence of siphoning off profits relevant to show motive in conducting the fraud).

 The profits are summed in the United States' summary exhibits that Defendants have had drafts of since August 13, 2023, and the revised trial set since January 29, 2024. The profit numbers, on the first page of each summary exhibit, are simply summed from the trading that follows within the exhibit. It is a matter of arithmetic that cannot be legitimately in dispute.

Of course, the United States is alleging in each one of those instances, Defendants executed their fraudulent scheme, posting about and trading in the at-issue stocks. The United States will prove that with those summary exhibits, testimony, and other competent evidence. Thus, profit during that alleged execution of the scheme is relevant to demonstrate Defendants' motive to participating in the scheme over and over again, as well as to show that they did so intending to deprive others of money or property. *See* 18 U.S.C. § 1348.

As to Defendants profiting in executions of the scheme without themselves posting about those particular stocks, Defendants were in a conspiracy and a scheme in which not every Defendant posted on every occasion they traded in a stock. The United States will offer trial evidence that shows how it was common practice for one or more Defendants to seek to pump the price of a certain stock while others stayed silent and traded for a profit in the background. (*See, e.g.*, Ex. 1 (GX 67) at 2 (Defendants Constantinescu, Matlock, Deel, Cooperman and Hennessey discussing how "we don't all have to mention the same play . . . [and] [w]e can just buy dips in the

background"). Further, the United States anticipates proving that Defendants routinely bought and sold the security within a Trial Episode once the security was selected by one or more Defendants, even before posting about that security, because the price of the security would increase around the time the Defendants purchased the stock themselves and sent it to others to do the same. (*See, e.g.*, Ex. 2 (GX 68) (Defendants Deel and Cooperman discussing how they "build the chart our selfs [sic]" which is the "old ultra method").) So, the fact that every Defendant did not post on every occasion where they traded or that they scalped as Defendants were loading the stock does not mean those Defendants were not attempting to profit from the scheme.

On the causation point, Defendants, at best, carelessly read the United States' briefing and statements on the topic.[2] The United States has never said that Defendants' fraud was not a cause of the observable market activity following their postings. The United States has simply said that it never alleged Defendants were the *sole* cause of any such activity. The United States hasn't done so, because it is not an element of the crime and not an issue it needs to prove at trial. Defendants hope to make this entire trial about an issue that is not an element of the charged crimes. The Court should not let the trial so devolve.

The United States' trial evidence will prove that Defendants statements were material—an actual element of the charged crimes—in that they could (and did) influence the trading decisions of Defendants' social media followers. Further, the United States expects the Court and jury will hear from many of those followers that Defendants' statements *in fact caused them* to make their trading decisions in the stocks.

At base, the United States will present substantial evidence for each element of the charged crimes (which does not include causation of market movement or damages), sufficient to support

---

[2] The United States addresses this argument more thoroughly in its opposition to ECF No. 539 and incorporates that response here. (*See* ECF No. 577.)

a reasonable jury's conclusion that Defendants committed those charged crimes. Thus, Defendants' profits in the Trial Episodes are relevant evidence of motive and their intent to deprive others of money or property. *See, e.g.*, *Moss*, 34 F.4th at 1189. The only prejudice is that it tends to show guilt, which is not the unfair prejudice at which Rule 403 is aimed. *United States v. McRae*, 593 F.2d 700, 707 (5th Cir. 1979) ("Relevant evidence is inherently prejudicial; but it is only Unfair prejudice, Substantially outweighing probative value, which permits exclusion of relevant matter under Rule 403.").

**4. Defendants used the terms "pump-and-dump" themselves repeatedly while executing their scheme to deprive victims of money and property.**

The Superseding Indictment alleges that Defendants "*sought* to 'pump' the price of that security by posting false and misleading information . . . ." (ECF No. 134, ¶ 13.) That is exactly what the United States' trial evidence will show. Indeed, far from the terms "pump" and "dump" "simply not apply[ing]" here (Mot. at 9–10), it is Defendants themselves that have put the terms at issue with their own words and conduct highly probative of their fraudulent scheme and intent. The following exhibits provide a non-exhaustive sample of how pervasive the theme is among Defendants' own words:

- Def. Constantinescu: "Ultra [going to] **pump** xrtx" (Ex. 3 (GX 36C))[3];
- Def. Constantinescu: "Ultra can't make money without **pumping**" (Ex. 4 (GX 59));
- Def. Constantinescu: "I'm a **PUMPER** not a **DUMPER**" (Ex. 5 (GX 151));
- Def. Constantinescu: "I never **dump** on my followers . . . ." (Ex. 6 (GX 174));
- Def. Cooperman: "I loves EZFL . . . but now being **pumped** to[o] hard" (Ex. 7 (GX 17D));
- Def. Cooperman: "I BUY A STOCK .. then I LET YALL KNOW what I

---

[3] Emphasis added throughout this list of exhibit quotations.

bought. That doesn't mean I'm **dumping** shares or contracts on ANYONE I'm not here to scalp 2cents on people . I want us all to win together!" (Ex. 8 (GX 239));

- Def. Deel: "[T]hat guy accusing me of some stuff again?? Funny how I take a 40k loss if I'm allegedly '**dumping** on my followers' I must be doing it wrong then. I'll lose money before I screw my followers over." (Ex. 9 (GX 204));

- Def. Constantinescu: "F it **pump** for us"; Def. Hennessey: "We need an ultra **dump**" (Ex. 10 (GX 24E));

- Def. Hrvatin: "I **pump** stocks for a living" (Ex. 11 (GX 278.D));

- Def. Matlock: "if [Ultra] didn't have **pumps** I don't think he'd make it" (Ex. 12 (GX 117));

- Def. Matlock: "If you talk about a ticker, it's a **pump**. You want it to go your way. Why wouldn't you, you bought it for a reason." (Ex. 13 (GX 146));

- Def. Matlock: "I'll never get sick of **pumping**…. Money into my followers bank accounts. LETS ALL GET RICH!" (Ex. 14 (GX 181)); and

- Def. Rybarczyk: "They say **pUmP** And **DUmP** . . . The ones saying this are insecure and…. a" (Ex. 15 (GX 188)).

The evidence speaks for itself. Defendants, in their own words, injected these terms into their scheme, and their own words are highly probative of their fraudulent intent. Thus, the Court should deny Defendants' efforts to preclude the phrase "pump-and-dump" from this trial.

As to the term "victims," which Defendant seeks to exclude, the United States alleges that Defendants victimized others with their charged crimes. The United States must be allowed to state it will (and then argue it has) proved those allegations. Indeed, even in the single case Defendant cites in his effort to prevent the United States from invoking the term victim, that defendant "concede[d] the Government is free to state in its opening that it will prove that the [individuals at issue] are victims and argue in its closing that is has proved they were." *United States v. August*, 590 F. Supp. 3d 972, 974 (W.D. Tex. 2022) (quotations omitted); (Mot. at 12).

Defendants, who in their own words called their followers "idiots" and "sheep," argue that referring to individuals as "victims" is unduly prejudicial. (*See* ECF No. 529 (GX 7P)); Ex. 16 (GX 94A) at 2.) It is the United States' allegation that these are, in fact, victims of Defendants' fraudulent scheme. The United States should not be precluded from so arguing. *See, e.g.*, *August*, 590 F. Supp. 3d at 974.

5. **The Court should admit exhibits probative of issues of consequence that contain passing references to other stocks that are not the subject of the exhibits.**

Several of the United States' exhibits contain passing references to other stocks beyond the Trial Episodes. That is no reason to preclude the exhibits. The United States offers the exhibits not for the references to the other stocks or any trading in those stocks, but for other relevant purposes unrelated to those mentions or that stock trading.[4]

The "why rob the same bank twice" exhibit provides the perfect example. At the start of the exhibit, Defendant Constantinescu says, "I sold expr around 4 but I regret it . . . it has more juice . . . But I don't buy back." (*See* Ex. 17 (GX 75).) After some back and forth, Defendant Hrvatin responds, "why rob the same bank twice[?]" (*Id.*) The fact that Defendant Constantinescu makes specific reference to EXPR or to his underlying trading in the stock has no relevance to the purpose for the exhibit's admission. Rather, the exhibit is probative of how Defendant Hrvatin thinks about stock trading with Defendants, *i.e.*, as "robbing a bank." The exhibit's mention of EXPR or Defendant's underlying trading have nothing to do with the purpose for which the exhibit is offered. Indeed, the United States would even be amenable to redacting the reference to EXPR. The ticker itself is meaningless to the proffered use of the exhibit; it is Defendant Hrvatin's immediate response that is telling of his intent. The Court should admit it and similar exhibits.

---

[4] The United States has already briefed this issue in response to another motion *in limine* (ECF No. 539) and incorporates that briefing here (ECF No. 577).

Defendant argues the Court should exclude these exhibits because the stock tickers mentioned in passing are not among those identified in the Trial Episodes, which consists of all the stock *trading* the United States will put at issue at trial. This argument is a classic sleight of hand the Court should reject.

With the Trial Episodes, the United States narrowed its case to the presentation of Defendants' *trading* in those stocks and time periods, as demonstrated in the summary charts of Ms. Garibotti. (*See* ECF No. 424 at 10 ("The *trading* at issue is only that alleged to be fraudulent, *i.e.*, the *trading* in the stocks in the time periods of the 54 at-issue trial episodes." (emphasis added)); ECF No. 502 at 2 ("information about *trading* in stock tickers and/or time periods that is irrelevant to the Trial Episodes—the only stock *trading* at issue for trial." (emphasis added).) The United States never represented that it would exclude other exhibits that do not present stock *trading* but, nonetheless, contain content probative of other issues in the case, such as fraudulent intent and consciousness of guilt. Any underlying stocks or trading referenced in passing are not at issue, and the United States will not put them at issue.

As noted, to the extent the Court would like, the United States can redact references to stock tickers outside those mentioned in the Trial Episodes and stipulate to a generic "stock ticker" reference in place of the specific ticker references. The specific references have no relevance to the probative points the exhibits are offered for and do not provide a basis to preclude the exhibits, given their independent probative value and the ability to cure any potential confusion. The exhibits should go to the jury.

**6. The United States has identified the false statements it will present at trial.**

United States has no intention of asserting statements about stock trading are false if they are not in the summary exhibits Defendants have had drafts of since August 13, 2023, then again

9

on January 29, 2024. Defendants cannot legitimately claim they have not had fair notice in this case, having possessed drafts of the United States' trial evidence for the better part of a year by the time of trial. Indeed, the United States has attempted to focus the jury, Court, and Defendants on the false statements at issue by coding them in yellow on United States' summary charts, which Defendants are trying to exclude. They can't have it both ways, arguing to confine the universe of false statements but then hoping to obscure which statements are actually within that set. The Court should focus this trial on the false statements the United States has clearly identified are at issue.

### 7. Co-Conspirator statements are admissible against Defendants under Rule 801(d)(2)(E).

Defendant seeks to prevent the United States from introducing co-conspirator statements based on the incorrect premise that the United States "has only identified the individuals named and referenced in the superseding indictment as alleged co-conspirators." (Mot. at 15.) That is wrong. For example, Defendant Sabo is not named in the Superseding Indictment, but pleaded guilty to the charged conspiracy and the United States expects will testify at trial. His prior statements may be admitted under Rule 801(d)(2)(E). Further, other Defendants themselves have recognized for over a year that there are multiple unindicted co-conspirators in this case. (*See* ECF No. 160 at 7 ("This begs the question whether many of the so-called victims are, instead, unindicted co-conspirators.").)

Evidence of co-conspirator statements in furtherance of the conspiracy is properly admitted under Rule 801(d)(2)(E) as the United States has already explained at length. (*See, e.g.*, ECF No. 529.) There is no requirement the United States identify a declarant by name for a statement to be admissible under Rule 801(d)(2)(E). *United States v. Ayala*, 601 F.3d 256, 268 (4th Cir. 2010) ("Regarding the first requirement [of Rule 801(d)(2)(E)], it is not necessary for the offering party to identify the declarant by name. Instead, the offering party need only show that the unknown

10

declarant was more likely than not a conspirator." (quotations and citations omitted)). The United States, of course, will not attempt to admit a statement under Rule 801(d)(2)(E) without offering the requisite proof or following any required procedure. But the Court should not artificially limit the United States' ability to admit statements under the Rule.[5]

### 8. The Court should admit GX 1 as a Rule 1006 summary of voluminous evidence helpful to and convenient for the jury.

The United States has already responded to Defendants' separate effort to bar evidence of their own social media posts in furtherance of the scheme and conspiracy. The United States incorporates that briefing here and omits full recitation. (Response to 573.) Evidence of Defendants (1) promoting the scheme by projecting their wealth in order to grow their followers; (2) promoting themselves together online in furtherance of the scheme and conspiracy; and (3) making admissions, are all highly probative of issues of consequence. The Court should admit the evidence. (*Id.*)

### 9. The Court should admit audio-video recordings that include numerous statements of co-conspirators in furtherance of the conspiracy.

Defendants challenge (again) audio-video recordings of the charged scheme and conspiracy in action. Defendants seek to preclude clips from three separate conversations, two of which Defendants have tried to exclude elsewhere. The United States has briefed these issues multiple times, and refers the Court to that briefing, which it incorporates here and recites only briefly. (ECF Nos. 529, 581, 586.)

The clips in GX 6C through 6E involve a conversation in which Defendant Knight made

---

[5] Of course, without reaching the requirements of Rule 801(d)(2)(E), statements of others are admissible "for the limited purpose of putting the responses of the [Defendants] in context and making them intelligible to the jury . . . ." *United States v. Uribe*, 132 F.3d 1455, 1997 WL 802936 at *4 (5th Cir. 1997) (quotations omitted).

the relevant statements and performed the fraudulent execution of the scheme. The United States expects Defendant Knight to testify at trial. Thus, these exhibits should be admitted, at the very least, subject to being connected up with that testimony and other evidence at trial.

Exhibits GX 7D through 7S are segments from the "robbing idiots of their money" video, which the United States has briefed at length. (ECF Nos. 529, 581, 586.) The Court should admit the exhibits. (*See id.*)

The exhibits in 49C through 49H concern stock trading in KXIN on or about February 10, 2021, which is a Trial Episode. As Defendants note, the recordings feature Defendant "Knight, who has pleaded guilty, and do not include Mr. Hennessey or any other Defendant." (Mot. at 25.) But for a statement to be in furtherance of a conspiracy, the law only requires the statement be made *by* a co-conspirator, not *to* a co-conspirator. *See, e.g.*, *United States v. Edmond*, 52 F.3d 1080, 1111 (D.C. Cir. 1995) ("Rule 801(d)(2)(E) does not require that the statement be made to a co-conspirator."); *United States v. Zavala-Serra*, 853 F.2d 1512, 1516 (9th Cir. 1988) ("It is well established that statements made by a co-conspirator need not be made to a member of the conspiracy to be admissible under [R]ule 801(d)(2)(E)."); *United States v. James*, 510 F.2d 546, 549–50 (5th Cir. 1975) (admitting against defendant statement of another co-conspirator to undercover government agent and noting that although the "in furtherance of the conspiracy" requirement "has a talismanic ring to it, we must not apply the standard too strictly, lest we defeat the purpose of the exception").[6]

Thus, Defendant Knight's statements are in furtherance of the conspiracy when he says things like: "Seriously, guys add it . . . this is big dog . . . KXIN . . . we don't play around with

---

[6] Of course, statements of others are admissible "for the limited purpose of putting the responses of the [Defendants] in context and making them intelligible to the jury . . . ." *United States v. Uribe*, 132 F.3d 1455, 1997 WL 802936 at *4 (5th Cir. 1997) (quotations omitted).

percents anymore. We're pumping stocks. We're getting a f*ck-ton of percent. Quit your job now." (Mot. at 25–26 (GX 49C).) The United States expects Defendant Knight's testimony at trial—along with the other trial evidence—will support admission of the exhibits and, thus, the Court should admit them.

### 10. The Court should not prematurely curtail the United States' ability to object to authenticity, particularly considering Defendants' own universal authenticity objections.

Defendants lodge blanket authenticity objections to *every single exhibit* the United States will offer, while at the same time asking the Court to preclude the United States from being able to object to the authenticity of a *single exhibit* Defendants may offer from the vast swath of documents the United States has produced in this matter. Defendants cite no law in support of this extraordinary position. Perhaps because there is none.

Simply because the United States produced something among its many files in this case does not mean it is automatically authenticated. Obviously, evidence in this case was compiled from various and varied sources. Some is supported by Rule 902(11) certifications. Other evidence is not. The United States will not unreasonably object on authenticity grounds and has no intention of mirroring Defendants' tact of lodging reflexive authenticity objections to every single exhibit. But there is no foundation in the law for the Court to order blanket preclusion of the United States' ability to challenge authenticity should a good faith basis to do so arise. The Court should reject Defendants' gamesmanship and deny the Motion.

### Conclusion

The Court should grant the United States' motions *in limine* to ensure the jury is presented with an efficient trial focused on the issues legitimately before it.

Dated: February 27, 2024					Respectfully submitted,


							GLENN S. LEON
							Chief, Fraud Section
							Criminal Division, Department of Justice

					By:	*/s/ John J. Liolos*
							Scott Armstrong, Assistant Chief
							John J. Liolos, Trial Attorney
							Fraud Section, Criminal Division
							United States Department of Justice
							1400 New York Ave. NW
							Washington, DC 20005
							Tel.: (202) 768-2246


							ALAMDAR S. HAMDANI
							United States Attorney
							Southern District of Texas

					By:	*/s/ Thomas Carter*
							Thomas H. Carter
							Assistant United States Attorney
							State Bar No.: TX24048387
							1000 Louisiana Street, 25th Floor
							Houston, Texas 77002
							Tel.: (713) 567-9470

## Certificate of Service

I hereby certify that on February 27, 2024, I will cause the foregoing motions to be electronically filed with the Clerk of the Court using the CM/ECF system, which will provide copies to counsel for all parties.

*/s/ John J. Liolos*
John J. Liolos, Trial Attorney
U.S. Department of Justice
Criminal Division, Fraud Section